**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

John A. Mansour,

        *Plaintiff,*

v.

Morgan Stanley; Morgan Stanley & Co. LLC;
Morgan Stanley Smith Barney LLC; Merrill
Lynch, Pierce, Fenner & Smith Incorporated;
Deutsche Bank Securities Inc.; Charles
Schwab & Co., Inc.; and John Does 1–20,

        *Defendants.*

Civil Action No. 4:24-cv-459

Jury Trial Demanded

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................. 1

PARTIES ............................................................................................................... 2

I.     PLAINTIFF ................................................................................................ 2

II.    DEFENDANTS ........................................................................................... 2

JURISDICTION AND VENUE ............................................................................ 3

FACTS .................................................................................................................. 5

I.     MONEY LAUNDERING AND THE FINANCIAL INSTITUTION DEFENDANTS ..... 5

    A.    Money Laundering and the Capture of High-Net-Worth Individuals .................... 5

    B.    Morgan Stanley's Recurring Pattern and Practice of Money Laundering ........... 11

    C.    Deutsche Bank and Its History of Money Laundering and Criminal Conduct..... 19

    D.    Merrill Lynch—Internal Systems and Controls Engineered for Money Laundering .................................................................................... 26

II.    THE INTERMEDIA MERGER AND THE NEW CONSTELLATION OF FIDUCIARIES ..................................................................................... 34

    A.    Plaintiff and His Brothers Sell Their Telecommunications Company ................ 34

    B.    KPMG and the BLIPS Tax Shelter ....................................................... 37

    C.    Jimmy Mansour and Terri Lacy .......................................................... 40

III.    MORGAN STANLEY EXFILTRATES $20.5 MILLION OF PLAINTIFF'S INTERMEDIA STOCK ............................................................................ 42

    A.    Morgan Stanley's Supposed Hedging and Sale Strategy ...................................... 42

    B.    Morgan Stanley Secrets Away Millions of Dollars of Intermedia Stock ............. 46

    C.    Morgan Stanley's Hedging Strategy Was a Smokescreen that Further Covered Up the Taking of Plaintiff's Intermedia Stock ....................................... 55

IV.    NETPLIANCE, AND MORGAN STANLEY'S MONEY LAUNDERING ................. 58

    A.    Netpliance ...................................................................................... 58

    B.    Lacy Creates an Approximately $5-Million Tax Margin of Error Ahead of Hundreds of Millions of Dollars of Trades through Mansour's Morgan Stanley Accounts ......................................................................................... 59

    C.    Morgan Stanley Washes Hundreds of Millions of Dollars a Month Through Plaintiff's Managed Account ............................................................... 72

    D.    Morgan Stanley Engages in Highly Coordinated Money Laundering through Netpliance/TippingPoint Trades in Plaintiff's Managed Account ....................... 75

    E.    Lacy Finally Causes the FLP to Take a Passthrough Tax Loss ............................ 83

F.     Morgan Stanley's Trades Bear Every Hallmark of Money Laundering, Sophisticated Concealment, and Hidden Money .................................. 84

V.    THE BLIPS STRATEGY FAILS, MASKING THE PROCEEDS OF THE SHARES ASSOCIATED WITH "MISSING" STOCK CERTIFICATE NO. 3 AND MORGAN STANLEY'S ILLICIT TRADES ...................................................................... 86

VI.   A BRIEF STINT AT DEUTSCHE BANK AND THE $6 MILLION FRAUDULENT LOAN ...................................................................................................... 89

    A.     The Transfer to Deutsche Bank .............................................................. 89

    B.     The Deutsche Bank Loans ...................................................................... 91

    C.     The Fraudulent $6 Million Loan ........................................................... 94

VII.  MERRILL LYNCH COVERS UP ITS FAILURE TO OBTAIN THE MISSING $6 MILLION FROM DEUTSCHE BANK ...................................................... 101

    A.     Plaintiff Opens Accounts at Merrill Lynch ......................................... 101

    B.     Merrill Lynch Loses the Horizon, Lateef, and Aletheia Investments and Covers It Up with Plaintiff's Own Money ........................................... 102

    C.     Plaintiff Discovers that Merrill Lynch Never Invested in Horizon, Aletheia, or Lateef on His Behalf .......................................................................... 105

VIII. MERRILL LYNCH MASKS COORDINATED MONEY LAUNDERING WITH BILLIONS OF DOLLARS OF TRADES THROUGH PLAINTIFF'S MERRILL LYNCH AND SCHWAB ACCOUNTS .......................................................... 110

    A.     Merrill Lynch Engaged in Large-Scale, Coordinated Trading in Managed Merrill Lynch Accounts with Plaintiff's Charles Schwab Account ................... 110

    B.     Merrill Lynch's Trade Volume Was Also Part of an Unlawful Scheme to Fund Its Own Proprietary Trades with Client Reserves .............................. 114

    C.     Merrill Lynch's Account Statements and Omissions Were Fraudulent as to the Trades Disclosed from February through December 2009 ................. 119

    D.     Schwab Failed to Disclose or Stop the Coordinated Trades, Unauthorized Access, and Unusual Trade Volume in Plaintiff's Account ................. 120

IX.   MERRILL LYNCH MISAPPROPRIATED FUNDS AND LIED ABOUT IT IN INFLATED ACCOUNT STATEMENTS SENT TO PLAINTIFF ................. 121

X.    MERRILL LYNCH AND THE SHADOW ACCOUNTS ............................. 127

XI.   PLAINTIFF'S INVESTIGATION .................................................................. 133

REALLEGATION AND INCORPORATION BY REFERENCE ........................... 135

CLAIMS FOR RELIEF ....................................................................................... 135

I.     CLAIMS AGAINST DEFENDANT MORGAN STANLEY ....................... 135

II.    CLAIMS AGAINST DEFENDANT DEUTSCHE BANK ........................... 186

III.   CLAIMS AGAINST DEFENDANT SCHWAB .......................................... 195

IV.     CLAIMS AGAINST DEFENDANT MERRILL LYNCH ............................................. 197

PRAYER FOR RELIEF....................................................................................................... 204

JURY DEMAND ................................................................................................................. 205

**INTRODUCTION**

1. This lawsuit arises from a coordinated, multi-year scheme in which a group of recidivist investment banks, unscrupulous family members, and a lawyer exploited the multimillion dollar assets of a high-net-worth, but retired entrepreneur to facilitate money laundering, conversion, and outright theft.

2. In 1998, Plaintiff John Mansour sold his second successful telecommunications startup, National Telecommunications of Florida ("NTF"), for $151 million. Plaintiff had co-founded NTF with his brothers, and as part of its acquisition by publicly-traded Intermedia Communications, Inc., Plaintiff received cash and restricted stock valued at nearly $50 million.

3. At the advice of his brother Jimmy Mansour, Plaintiff hired a sophisticated trusts and estates lawyer and placed his assets under the management of expert bankers at Morgan Stanley. Over the next two decades, Plaintiff would continue to follow the advice of Jimmy and of the lawyer, and move his money and stock to Deutsche Bank and Merrill Lynch, sequentially.

4. At every step of Plaintiff's investment journey, bad luck seemed to follow him—despite asking for conservative investment strategies and hedges, his net assets declined precipitously in the millennium tech downturn, then stagnated or shrunk for the next 15 years, despite multiple bull markets and a collection of expensive wealth managers and lawyers apparently actively managing Plaintiff's accounts.

5. When COVID hit in 2020 and—despite Plaintiff's instruction to his bankers at Merrill Lynch to put all his assets in conservative bonds and cash—Plaintiff's assets again began to precipitously decline, and Plaintiff engaged experts to investigate what, exactly, was going on with his financial accounts. Through an investigation begun in earnest in 2021 and expanded to include forensic accountants, attorneys, and an investment banking expert between 2022 and 2024, Plaintiff discovered hard evidence of a scheme so farfetched no reasonable investor would ever

have believed it—let alone discovered it—without smoking-gun evidence and lengthy analysis by experts in accounting, law, and investment banking: In the twenty years after Plaintiff put his money under the management of his brothers, their lawyer, and their chosen bankers, Plaintiff's assets were used to facilitate money laundering and other unauthorized transactions in the ***billions of dollars***.

6. The details of the scheme, which trailed Plaintiff's brother Jimmy Mansour and their shared attorney across multiple banks, including Morgan Stanley, Deutsche Bank, Merrill Lynch, and Charles Schwab, required forensic accountants and an investment banking expert to understand, and are explained in this Complaint.

7. Through a scheme of money laundering, conversion, and fraud spanning two decades, Plaintiff suffered tens of millions of dollars in losses, foregone gains, and outright theft by the Defendants. This action seeks appropriate damages and injunctive relief.

## PARTIES

### I. PLAINTIFF

8. Plaintiff John A. Mansour is a entrepreneur and serial founder who resides with his family in Austin, Texas. After founding and selling a series of companies focused on telecommunications from the 1980s and into the early days of the Internet, Mansour retired—expecting to enjoy his success and spend time with his family.

### II. DEFENDANTS

9. Defendant Morgan Stanley is a corporation incorporated in Delaware and headquartered at 1585 Broadway, New York, New York 10036. Plaintiff's former banker Jim Moriarity, who participated in much of the wrongful conduct described herein, works in Morgan Stanley's Private Wealth Management Group. *See* https://advisor.morganstanley.com/moriarity-dehond-mulka-scherer. Morgan Stanley also engaged in the wrongful conduct described herein

through certain subsidiaries, including the following: Defendant Morgan Stanley & Co. LLC ("MS&Co.") is a limited liability company incorporated in Delaware and headquartered at 1585 Broadway, New York, New York 10036. Defendant Morgan Stanley Smith Barney LLC ("MSSB") is a limited liability company incorporated in Delaware and headquartered at 1585 Broadway, New York, New York 10036. Hereinafter, Morgan Stanley, MS&Co., and MSSB are referred to collectively as "Morgan Stanley."

10. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a corporation incorporated in Delaware and headquartered at One Bryant Park, New York, New York 10036.

11. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a corporation incorporated in Delaware and headquartered at One Columbus Circle, New York, New York 10019.

12. Defendant Charles Schwab & Co., Inc. ("Schwab") is a corporation incorporated in California and headquartered at 3000 Schwab Way, Westlake, Texas 76262, within this judicial district.

13. John Doe Defendants 1–20 are persons and entities who directly or indirectly participated in the wrongful conduct described herein and whose identities are currently unknown to Plaintiff. Plaintiff will request leave to amend this Complaint upon learning the identity of the John Doe Defendants during the course of appropriate discovery.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, and 18 U.S.C. § 1964(c), because Plaintiff asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* This Court also has subject matter jurisdiction over the claims asserted in this

Complaint pursuant to 28 U.S.C. § 1367(a), as the Complaint asserts claims that are related to the federal claims asserted by Plaintiff, over which this Court has original jurisdiction under 28 U.S.C. § 1331.

15.     Venue is proper in this District pursuant to 18 U.S.C. § 1965 (RICO), 28 U.S.C. §§ 1391(b)(1) and (2), 1391(c)(2), and 1391(d).

16.     First, venue is proper under 18 U.S.C. § 1965(a), which states that "[a]ny civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs." Defendant Schwab is found within this District, and Defendants participated in a RICO conspiracy that involved parties within this District—namely, Schwab. In addition, venue is proper under § 1965(b), which states: "In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice requires parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof." The ends of justice require that Defendants answer for their wrongful conduct under RICO in this judicial district, and Defendants may be served within this District pursuant to the nation-wide service of process provision in 18 U.S.C. § 1965(b).

17.     Second, venue is proper under 28 U.S.C. § 1391(b)(1), because for purposes of this action, Defendant Schwab resides in the Eastern District of Texas. In addition, each Defendant has offices in the state of Texas.

18.     Third, venue is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims in this Complaint occurred within the Eastern District of Texas, including conduct by Defendant Schwab.

**FACTS**

**I.     MONEY LAUNDERING AND THE FINANCIAL INSTITUTION DEFENDANTS**

**A.     Money Laundering and the Capture of High-Net-Worth Individuals**

19.     Money laundering is conduct that allows money from illegitimate or unlawful sources to appear to come from legitimate or lawful sources. As the United States Department of the Treasury explains on its website:

> Money laundering generally refers to financial transactions in which criminals, including terrorist organizations, attempt to disguise the proceeds, sources or nature of their illicit activities. Money laundering facilitates a broad range of serious underlying criminal offenses and ultimately threatens the integrity of the financial system.

20.     Money laundering is not conduct exclusively within the domain of drug traffickers and terrorists. Any party seeking to mask the source of funds can use money laundering tactics to avoid detection. Indeed, money laundering is sometimes employed to avoid financial limits on political contributions or to evade taxes.

21.     As the IRS explains in Part 9, Ch. 5, § 5 of the Internal Revenue Manual (the "IRM"):

> Money laundering is the process of disguising criminal proceeds and may include the movement of clean money through the United States with the intent to commit a crime in the future (e.g., terrorism). Common methods include disguising the source of the proceeds; changing the form of the proceeds; or moving the proceeds to a place where the proceeds are less likely to attract attention. The object of money laundering is ultimately to get the proceeds back to the individual who generated them. Money laundering is a necessary consequence of almost all profit generating crimes and can occur almost anywhere in the world. Money laundering is a threat to the United States tax system in that taxable illegal source proceeds go undetected along with some taxable legal source proceeds from tax evasion schemes. Both schemes use nominees, currency, multiple bank accounts, wire transfers, and international "tax havens" to avoid detection. This

5

untaxed underground economy ultimately erodes public confidence in the tax system.

22.     Money laundering conduct follows a common pattern. Money from illegitimate sources is first "placed" by, for example, depositing the money in accounts held or managed by a financial institution. Then, the money is layered, meaning the launderer engages in numerous transactions, sometimes involving front companies and entities, that mix the money to be laundered with other legitimate funds. Finally, the money is integrated with legitimate funds, such as through wire transfers, the purchase of a high-ticket item, or phony loan repayments. The more complex the integration, the more difficult it is to disaggregate the money laundering conduct from legitimate transactions.

23.     As *Anti-Money Laundering in a Nutshell, Awareness and Compliance for Financial Personnel and Business Managers*, by Kevin Sullivan, explains:

**Putting It All Together for a Payday**

Here are examples of methods used in the three-step process of placement, layering, and integration.

**Placement**

1. The cash is deposited directly into a bank account or incorporated into the proceeds of a legitimate business.

2. The cash is exported out of the country.

3. The cash is used to purchase high-ticket items, goods, property, or business assets.

**Layering**

1. The money is wire transferred out of the country using shell companies.

2. The money is deposited into foreign banking systems.

3. A previously purchased high-ticket item or property is sold off.

**Integration**

1. Phony loan repayments or doctored invoices are used as concealment for dirty money.

2. A complex web of wire transfers makes it difficult to trace the original source of income.

3. The proceeds from sold goods or property appear to be legitimate.

24.     Money laundering at scale is difficult. One reason for this is that money laundering schemes often require large sums of money to be effective, with high transaction volumes and dollar amounts better concealing the source of illicit funds. Moreover, the larger the transaction volume and value of seemingly legitimate transactions, the more money can be laundered.

25.     As a further tool against detection and identification, the money launderer will often use a "nominee"—an individual or entity registered as the holder of shares on behalf of the actual beneficial owner—for subject transactions. The more distant the nominee from the illicit source, the less likely the money launderer is to be detected and identified as associated with the transaction.

26.     Money launderers sometimes use "money mules" to engage in transactions that place, layer, and integrate illicit funds. Money mules are sometimes privy to or complicit with the money-laundering scheme, but unwitting money mules are more advantageous, as they do not pose the risk of defection, including cooperation with law enforcement.

27.     As Schwab's website states on a webpage titled "From Victim to Criminal: Think Twice Before Assisting Money Movement":

**What is a Money Mule?**

A money mule is a person who, at someone else's direction, transfers or moves illegally acquired money. Criminals recruit money mules to help launder proceeds directly from criminal activity, such as scams, frauds, and human or drug trafficking. Money mules may get to keep a portion of the funds for their service, which can involve moving funds in various ways including through bank accounts, cashier's checks, virtual currency, gift cards, prepaid debit cards, or

money service providers. By using a money mule in this way, criminals add layers of distance between themselves and their crimes.

**Types of Money Mules**

There are three types of money mules. **Unwitting** or **Unknowing** money mules are individuals who may be unaware they are part of a larger scheme. These individuals are frequently solicited during an online romance scam or through a job offer and are motivated by trust in the actual existence of their romantic partner or job position. **Witting** money mules are individuals who ignore obvious red flags or act willfully blind to their activity. These individuals may have been warned that they could be involved with fraudulent activity and they are generally motivated by financial gain or an unwillingness to acknowledge their role. Finally, **Complicit** money mules are individuals who are aware of their role and actively participate. They are motivated by financial gain or loyalty to a known criminal group.

28. High-net-worth individuals are prime targets for money launderers. To begin with, such individuals have access to large amounts of money and assets that can be used as part of a money laundering scheme; their funds are often managed by large financial-services companies and wealth managers, which often deliberately operate lax anti-money laundering systems; and high-net-worth individuals routinely engage in securities, commodities, and foreign exchange transactions less commonly employed by individuals of ordinary wealth. In addition, high-net-worth individuals often maintain complex entity structures, including as part of tax-mitigation plans. All of this operates as a significant and valuable smokescreen for money launderers.

29. High-net-worth individuals rely on professionals that can be corrupted or incentivized to be complicit in money-laundering schemes. Indeed, the multitrillion-dollar investment advisory business is one of the highest risks to anti-money-laundering regulations throughout the United States.

30. Investment advisors, particularly those with discretion to invest funds, are notoriously unregulated. The U.S. Treasury Department's Financial Crimes Enforcement Network

("FinCEN") has on multiple occasions tried and failed to impose money-laundering regulations on investment advisors. Indeed, FinCEN only recently proposed rules that addressed lax anti-money laundering detection and enforcement among largely unregulated investment advisors.

31.     As *The Wall Street Journal* reported in a February 13, 2024 article titled "U.S. Proposes Requiring Investment Advisers to Put in Place Anti-Money-Laundering Controls":

> U.S. investment advisors will soon need to start detecting and reporting suspected money laundering to the government under a newly proposed rule as the U.S. again attempts to rein in potential illicit finance flowing through the private funds sector.
>
> The new requirements, proposed Tuesday by the U.S. Treasury Department's Financial Crimes Enforcement Network, would apply to investment advisers who register with the U.S. Securities and Exchange Commission and those who are exempted from registration but still required to report to the SEC.

32.     Even the proposed rules, however, would cover a fraction of the investment advisers that manage funds for high-net-worth individuals, as most are exempt from registration with the SEC:

> Investment advisers are generally required to register with the SEC if they oversee at least $110 million in client assets. Exempt reporting advisers generally advise only private funds and oversee less than $150 million in the U.S. or advise only venture-capital funds.
>
> About 17,000 state-registered advisers aren't covered by the proposed rules, a senior FinCEN official said in a briefing call Monday.
>
> Under the proposed rules, investment advisers would need to implement an anti-money-laundering and counterterrorism financing compliance program, file suspicious activity reports with FinCEN and keep records such as those related to fund transfers, similar to obligations in place for banks and broker-dealers. The proposed rule would allow information sharing between FinCEN, law enforcement agencies and certain financial institutions.

33.     FinCEN has repeatedly failed to impose anti-money laundering regulations on investment advisers in the midst of an unprecedented industry expansion—and proliferation of bad actors:

> FinCEN has twice in the past tried to put in place anti-money-laundering rules on the investment adviser sector by proposing rulemakings, including as recently as in 2015. But neither proposed rule was completed.
>
> The investment sector has grown larger in the intervening years, nearly doubling in assets under management since 2015. The uneven application of anti-money-laundering controls across the sector has enabled both legitimate and illicit investors to "shop around" for advisers who don't ask about the source of their wealth, FinCEN said.
>
> There has also been a surge in the use of investment advisers by bad actors, such as sanctioned individuals, corrupt officials, tax evaders and other criminals, looking to access the U.S. financial markets, according to FinCEN.
>
> "The issue and the need for transparency is greater than it has ever been," the senior FinCEN official said.
>
> Through a risk assessment, also published on Tuesday, FinCEN said it has seen U.S. competitors using investment advisers to invest in early-stage companies to gain access to sensitive information and technologies with national security implications. For instance, the FinCEN official said the agency has seen U.S. investment advisers with significant ties to Russian oligarchs investing in companies developing artificial intelligence and autonomous vehicles as well as in government military and intelligence contractors.

34.     As explained below, not only are financial institutions, including broker-dealers, investment advisers, and banks, lax, complicit, and largely unregulated when it comes to money laundering, but each of the financial institutions in this case have a long history (including during the periods when Plaintiff held accounts at each bank) of directly engaging in money laundering on behalf of wealthy and powerful clients—even at the expense of their overall reputations and innocent client bases.

**B.    Morgan Stanley's Recurring Pattern and Practice of Money Laundering**

35.    Morgan Stanley is one of the largest financial institutions in the world. It is also one of the most recidivist violators of anti-money laundering and Foreign Corrupt Practices Act laws and regulations—not simply because of lax controls, but because of the bank's affirmative money laundering conduct.

36.    For example, on April 25, 2012, a Morgan Stanley managing director pleaded guilty in the Eastern District of New York for conspiring to circumvent Morgan Stanley's internal controls (purportedly) designed to sound the alarm concerning suspicious transactions. As an April 25, 2012 press release by the U.S. Department of Justice titled "Former Morgan Stanley Managing Director Pleads Guilty for Role in Evading Internal Controls Required by FCPA" recounts:

> According to court documents, Peterson [the Morgan Stanley MD] conspired with others to circumvent Morgan Stanley's internal controls in order to transfer a multi-million dollar ownership interest in a Shanghai building to himself and a Chinese public official with whom he had a personal friendship. The corruption scheme began when Peterson encouraged Morgan Stanley to sell an interest in a Shanghai real-estate deal to Shanghai Yongye Enterprise (Group) Co. Ltd., a state-owned and state-controlled entity through which Shanghai's Luwan District managed its own property and facilitated outside investment in the district. Peterson falsely represented to others within Morgan Stanley that Yongye was purchasing the real-estate interest, when in fact Peterson knew the interest would be conveyed to a shell company controlled by him, a Chinese public official associated with Yongye and a Canadian attorney. After Peterson and his co-conspirators falsely represented to Morgan Stanley that Yongye owned the shell company, Morgan Stanley sold the real-estate interest in 2006 to the shell company at a discount to the interest's actual 2006 market value. As a result, the conspirators realized an immediate paper profit of more than $2.5 million. Even after the sale, Peterson and his co-conspirators continued to claim falsely that Yongye owned the shell company, which in reality they owned. In the years since Peterson and his co-conspirators gained control of the real-estate interest, they have periodically accepted equity distributions and the real-estate interest has appreciated in value.

37.     Morgan Stanley was also fined for failing to provide anti-money laundering safeguards for several years in the 2010s. As *Reuters* reported in a December 26, 2018 article titled "Morgan Stanley unit to pay $10 million fine for anti-money laundering violations":

> Wall Street's industry funded watchdog fined the U.S. brokerage unit of Morgan Stanley $10 million on Wednesday for compliance failures in the firm's anti-money laundering program, the regulator said.

> The Financial Industry Regulatory Authority (FINRA) said the lapses spanned more than five years, from January 2011 until April 2016.

38.     Morgan Stanley's automated systems responsible for detecting money laundering were in practice an ineffective travesty, failing to effectively flag high-risk conduct, frequent securities transactions involving illiquid, low-value stocks:

> A Morgan Stanley automated surveillance system did not receive important data from other Morgan Stanley systems, FINRA said. The lapse impaired the firm's overall tracking of tens of billions of dollars of wire and foreign currency transfers, FINRA said.

> Those transactions included transfers to and from countries known for money laundering risk, FINRA said.

> In 2015, a consultant that Morgan Stanley hired to test its surveillance identified several "high risk" issues, according to the settlement agreement. Morgan Stanley did not fix one of those problems until at least February 2017.

> Morgan Stanley's other violations include failing to "reasonably monitor" customers' deposits of 2.7 billion shares of penny stock between 2011-2013, FINRA said.

> Low-priced securities, such as penny stocks, are often subject to efforts by fraudsters to falsely inflate trading volume and share prices, a securities law violation that is frequently a precursor to money-laundering, according to anti-money laundering compliance professionals.

39.     A FINRA settlement letter with Morgan Stanley (called a "Letter of Acceptance, Waiver, and Consent"), signed by D. Scott Tucker, Morgan Stanley Managing Director, on

December 12, 2018, summarized the alarming lapses in controls at Morgan Stanley, including with respect to wire transfers involving foreign currencies:

> Beginning in 2011, Morgan Stanley failed to develop and implement an anti-money laundering ("AML") program that was reasonably designed to achieve and monitor the Firm's compliance with the requirements of the Bank Secrecy Act ("BSA") and its implementing regulations. Specifically, the Firm failed to establish and implement policies and procedures that were reasonably expected to detect and cause the reporting of potentially suspicious activity in the following three respects:

> - First, from January 2011 until at least April 2016, several of the systems that the firm used to send and receive wire transfer information suffered from significant flaws. Specifically, those systems failed to transmit certain wire information to the Firm's automated AML surveillance system ("Transaction Monitoring System" or "TMS"), undermining that system's surveillance of tens of billions of dollars of wire and foreign currency transfers, including transfers to and from countries known for having high money laundering risk.

> - Second, from January 2011 to December 2013, the Firm failed to devote sufficient resources to review alerts generated by the Firm's automated AML system, and as a result, the Firm's AML analysts often closed alerts without sufficiently conducting and/or documenting their investigations of the potentially suspicious wire transfers that generated the alerts.

> - Third, from January 2011 to December 2013, the Firm's AML Department failed to reasonably monitor customers' deposits and trades of low-priced securities ("penny stocks") for potential AML issues, including insider trading and market manipulations, despite the fact that the Firm's customers deposited approximately 2.7 billion shares of penny stock, which resulted in subsequent sales totaling approximately $164 million, in that time period.

> By virtue of the foregoing, Morgan Stanley violated FINRA Rules 3310(a) and 2010.

40.    As explained in the FINRA settlement letter, Morgan Stanley had disconnected internal monitoring systems from portions of its business that facilitated money laundering, and in

many cases simply ignored its own supposed internal controls entirely—including internal controls requiring risk-based reviews of foreign financial institutions' correspondence accounts.

> In addition, from January 2011 to December 2013, Morgan Stanley failed to establish and maintain a supervisory system reasonably designed to achieve compliance with Section 5 of the Securities Act of 1933 ("Section 5") and applicable rules and regulations. Specifically, the Firm divided responsibility for vetting its customers' deposits and sales of penny stocks among its branch management and its Compliance and Executive Financial Services ("EFS") departments without reasonable coordination among them. Instead, the Firm primarily relied on its customers' representations that the penny stock they sought to deposit was not restricted from sale, and the representations of issuers' counsel that the customers' sales complied with an exemption from the registration requirements. As a result, the Firm failed to reasonably evaluate the customers' penny stock transactions for red flags indicative of potential Section 5 violations. Based on the foregoing, Morgan Stanley violated NASD Rule 3010(a) and FINRA Rule 2010.

> Finally, in 2012 and 2013, Morgan Stanley had in place but failed to implement its policies, procedures, and internal controls reasonably designed to achieve compliance with the BSA and its implementing regulations by failing to conduct risk-based reviews of the correspondent accounts of certain financial institutions ("FFIs"), as required by the BSA and its implementing regulations and the Firm's policies and procedures. As a result, Morgan Stanley violated FINRA Rules 3310(b) and 2010.

41.     Notably, Morgan Stanley had failed to even connect certain parts of its automated systems to data sources, ensuring that certain types of transactions would never sound any alarms that would warrant review. As the FINRA Letter of Acceptance, Waiver, and Consent with Morgan Stanley explained:

> Morgan Stanley uses a number of automated systems to process and to monitor wire and foreign currency transfers sent to and received by its customers. However, from January 2011 until at least April 2016, some of the systems for processing wires were impacted by significant design limitations and programming flaws, which affected the transmission of certain transaction-related information to the Firm's automated Transaction Monitoring System. As a consequence, Morgan Stanley failed to surveil hundreds of thousands of wire and foreign currency transfers—which

transmitted tens of billions of dollars—including money transfers to and from jurisdictions that the Firm deemed to have high money laundering risk.

42.     Although the agreement ending FINRA's investigation covered the period beginning in January 2011, there is no evidence that Morgan Stanley had any more effective monitoring prior to that date. The picture that emerges is that Morgan Stanley had inexplicably exempted high-risk transactions from its automated system and blamed the matter on supposed "design limitations."

43.     Indeed, FINRA's statement of the facts, which Morgan Stanley accepted, makes clear that Morgan Stanley's conduct was *detected* in the 2010s. The discovered flaws appear to have been of a sort that likely existed for many years prior to detection. For example, the FINRA Letter of Acceptance, Waiver, and Consent states:

> Similarly, a Firm system for processing outgoing wires, known as the Outgoing Wire Transfer System ("OWTR"), also failed to send certain wire data to TMS as intended. As a result, from January 2014 to August 2015, Morgan Stanley sent out more than $25.5 billion (including $1.2 billion to high-risk jurisdictions) through approximately 91,000 outgoing wires that were not surveilled through TMS for the jurisdiction of the recipient account.
>
> The Firm discovered some of the above-described system deficiencies while responding to FINRA staff's inquiries, and discovered others independently and brought them to FINRA staff's attention. In some instances, Morgan Stanley knew, or should have known, that certain wire and foreign currency transfer activity were not being monitored by TMS as intended, but failed to take timely remedial action. For example, the Firm knew in 2012 that an issue with OWTR caused correspondent banks to reject some outgoing wires to foreign banks, but the Firm did not consider whether the issue affected TMS until late 2014, when the Firm began a review to respond to FINRA staff's inquiries.
>
> Perhaps most significantly, starting in 2013, the Firm retained a consultant to test the integrity of the data that its systems sent to TMS. In or around August 2015, the consultant identified multiple "high-risk" issues to the Firm, that is, issues that could negatively impact the effectiveness of TMS. One such issue was that foreign

currency transactions on the FX Ion platform did not transmit data to TMS, resulting in the Firm's complete failure to surveil transactions from that platform through TMS. In late 2016, the consultant was again utilized, this time to assist with testing potential data transmission issues identified by the Firm. The consultant identified additional data transmission problems that undermined TMS' surveillance of transactions that occurred via Global Currency and FX Ion. This issue was not remediated until at least February 2017.

44.     Morgan Stanley's conduct fit a consistent pattern among the financial institutions at issue in this case—its internal systems were essentially unplugged from certain high-risk parts of the business, including high-volume securities transactions, bank wires, and foreign exchange transactions. This was a clear recipe to allow Morgan Stanley personnel and affiliated investment advisers to launder money from high-net-worth accounts without setting off any alarms.

45.     These unplugged and hollow automated systems allowed egregious conduct by Morgan Stanley's employees. For example, between 1999 and 2012, a Morgan Stanley banker was found guilty of laundering money to buy weapons, including missile systems. As *Bloomberg* reported in an October 15, 2019 article titled "Ex-Morgan Stanley Banker Jailed Over Greek Money-Laundering":

> A former Morgan Stanley banker in Switzerland was convicted of money laundering related to a kickback of about 50 million Swiss francs ($50.1 million) from arms sales negotiated by ex-Greek defense minister Akis Tsohatzopoulos.
>
> The banker, who can only be identified as PB, was sentenced to 15 months in prison after being found guilty of qualified money-laundering, but was acquitted on a separate charge of embezzlement, the Swiss Federal Criminal Court said late Monday. . . .
>
> Tsohatzopoulos was found guilty by a Greek court in 2013 of siphoning off millions of euros from contracts to buy missile systems and submarines for the Greek armed forces. . . . PB was convicted for laundering the millions of Swiss francs between 1999 and 2012, the court said.

46.     On May 24, 2023, the IRS announced that a Morgan Stanley investment adviser had even operated a Ponzi scheme—through Morgan Stanley:

> According to court documents and information presented in court, Good was employed as a registered representative and investment advisor for Morgan Stanley Smith Barney, LLC in Wilmington. From 2012 to February 2022, Good executed a scheme to obtain money through an investment fraud commonly known as a Ponzi scheme. Specifically, Good solicited investments from business clients and others for purported real estate projects and tax-free municipal bonds, touting these opportunities as low-risk investments that would pay returns of between 6% and 10% over three- or six-month terms.

> To effectuate these investments, Good caused some clients to obtain a liquid asset line of credit (LAL) secured by their Morgan Stanley investment or retirement accounts. Good directed clients to transfer the LAL funds to their personal bank accounts and then wire the funds directly to Good's own personal bank account. Other victims paid Good by paper check and wire transfers using funds derived from sources other than Morgan Stanley accounts.

47.     Notably, the Morgan Stanley banker utilized a common tool that evaded any scrutiny—the use of low-risk accounts to collateralize loans for high-risk and unlawful transactions.

48.     In Texas, Morgan Stanley overtly engaged in money laundering through one of its bankers, Doug McKelvey, who pleaded guilty in the Eastern District of Texas to money laundering offenses. As AdvisorHub reported on June 7, 2023:

> A former Morgan Stanley broker in Southlake, Texas, pleaded guilty on Tuesday to stealing at least $1.5 million from his mother and mother-in-law, according to the U.S. Attorney's Office, Eastern District of Texas.

> Doug M. McKelvey, 58, admitted to charges of money laundering and faced up to 10 years in prison, the U.S. Attorney's office said.

> From June 2013 to February 2022, McKelvey misappropriated the funds through 300 fraudulent wire transfers, according to the Securities and Exchange Commission, which on Tuesday filed civil charges against the former broker. McKelvey used the money to pay

for vacations, cruises, restaurants and other personal expenses, the SEC said.

McKelvey in some cases transferred funds to a trust account that he controlled and falsely attested that he had received a verbal request from the customer, according to the civil complaint.

In other instances, the SEC said McKelvey listed the account information for a customer as the payment instruction for his and his wife's credit card at a second bank—identified by prosecutors as Citibank. Morgan Stanley's compliance system did not require authorization from the account holder for ACH transfers initiated by third parties such as the second bank, the SEC said.

McKelvey sold stocks or used securities-backed liens of credit to generate cash in client accounts and also sent his mother-in-law a fabricated account statement to hide his scheme, the SEC and prosecutors said.

49. Morgan Stanley's money laundering in Texas fit a common pattern: (a) Morgan Stanley's automated systems exempted particular types of transfers; (b) a Morgan Stanley banker created false statements and transfer requests to execute and hide transactions; (c) and, notably, Morgan Stanley allowed lines of credit that were collateralized by securities in different accounts to be used by one of its bankers to generate the cash needed for money laundering.

50. By late 2023, it had also become clear that Morgan Stanley's Wealth Management division in particular was a hotbed for money laundering and overtly illegal conduct by Morgan Stanley bankers. As *The Wall Street Journal* reported on April 11, 2024 in an article titled "Morgan Stanley's Wealth Arm Probed by Multiple Federal Regulators":

Multiple federal regulators are probing Morgan Stanley over how it vets clients who are at risk of laundering money through the bank's sprawling wealth-management division. . . .

The main issues regulators are looking at boil down to whether Morgan Stanley has been sufficiently investigating the identities of prospective clients and where their wealth comes from, as well as how it monitors its clients' financial activity. Some of the probes are focused on the bank's international clients. . . .

The SEC last year sent Morgan Stanley a list of current and former clients with questions about how they were vetted. It also questioned why Morgan Stanley's financial-adviser unit, which works directly with affluent individuals, did business with some clients who were cut off by E*Trade, the Morgan Stanley-owned digital trading platform, because of red flags.

The SEC's list includes a billionaire with ties to Russia who has been sanctioned by the U.K. and an individual who claimed she was based in the U.S. but whose activity on E*Trade indicated she was located on a Caribbean island and had more money in her account than would be typical for someone with her stated occupation.

The Treasury's Financial Crimes Enforcement Network, known as FinCEN, also sent the bank a list of client names, at least some overlapping with the SEC's. Morgan Stanley also received an administrative subpoena from Treasury's Office of Foreign Assets Control requesting information on the firm's sanctions policies and procedures, according to a bank document viewed by the Journal.

51. Morgan Stanley is not merely complicit in money laundering. Its internal systems and controls are designed not to surveil precisely the sort of transactions that are most likely to be connected with money laundering. It is not a mere coincidence that its bankers go undetected for years while overtly engaging in money laundering through accounts and assets in Morgan Stanley's hands. Put simply, Morgan Stanley is a recidivist money launderer, and its conduct fits a recurring pattern—exemptions from automated systems, loans collateralized by securities, the use of trust accounts, false statements and authorizations, and unmonitored wire transfers.

52. As explained later in this Complaint, this is precisely the pattern of conduct and concealment that allowed a vast money-laundering conspiracy to capture and exploit Plaintiff's accounts and assets for years without detection.

**C.     Deutsche Bank and Its History of Money Laundering and Criminal Conduct**

53. Deutsche Bank's money laundering activities were perhaps the most brazen among the global financial institutions that cater to high-net-worth individuals. Deutsche Bank's money laundering focused on generating a massive volume of securities transactions while maintaining

hollow anti-money laundering systems. Deutsche Bank's particular flavor of money laundering, however, exploited its sophisticated structured lending products—the same sort of products that wreaked havoc in the global financial system in 2008.

54.     Deutsche Bank's money laundering facilitates a broad range of conduct, including tax dodging, bribery, and sanctions evasion. For example, Deutsche Bank entered into a deferred prosecution agreement and criminal information with the United States DOJ for conduct perpetrated in or about and between 2008 and 2016. Specifically, Deutsche Bank had contracted with "business development consultants," or "BDCs," to obtain and retain global business. The bank provided these BDCs with bribes and used its lax internal controls to conceal the source and destination of those bribes.

55.     As the criminal information against Deutsche Bank states:

> Beginning in or about at least 2009 through in or about at least 2016, the defendant DEUTSCHE BANK AG, acting through its employees and agents, knowingly and willfully conspired and agreed with others to maintain false books, records, and accounts that did not accurately and fairly reflect the transactions and dispositions of DEUTSCHE BANK AG's assets, by, among other things, (1) falsely concealing bribes paid to a client's decisionmaker in Saudi Arabia to retain that client's business by recording the payments as "referral fees" paid to a BDC; and (2) falsely concealing millions of dollars of payments made to an intermediary acting as a proxy for a foreign official in Abu Dhabi by recording the payments as "consultancy" payments to BDC.

56.     A central feature of Deutsche Bank's business was its lax controls, which enabled it to conceal outright bribery in connection with its business. Indeed, Deutsche Bank's business is uniquely suited for global bribery schemes, as it is able to generate cash through debt instruments and conceal movements of that cash by exempting what it unilaterally deems to be "low risk" money transfers from internal anti-money-laundering systems.

57.     The most infamous money laundering scheme at Deutsche Bank involved "mirror trading," which involved buying and selling securities in coordination across multiple accounts in order to mask the movement of money. Deutsche Bank ensured that mirror trades kept accounts relatively flat and the size of each trade innocuous.

58.     As *The New Yorker* recounts in an August 22, 2016 exposé titled "Deutsche Bank's $10-Billion Scandal":

> Almost every weekday between the fall of 2011 and early 2015, a Russian broker named Igor Volkov called the equities desk of Deutsche Bank's Moscow headquarters. Volkov would speak to a sales trader—often, a young woman named Dina Maksutova—and ask her to place two trades simultaneously. In one, he would use Russian rubles to buy a blue-chip Russian stock, such as Lukoil, for a Russian company that he represented. Usually, the order was for about ten million dollars' worth of the stock. In the second trade, Volkov—acting on behalf of a different company, which typically was registered in an offshore territory, such as the British Virgin islands—would sell the same Russian stock, in the same quantity, in London, in exchange for dollars, pounds, or euros. Both the Russian company and the offshore company had the same owner. Deutsche Bank was helping the client to buy and sell to himself.

59.     Deutsche Bank's many transactions did not appear significant, and individual transactions alone in any single account were insufficient to reveal the substance of what was going on. Deutsche Bank's money laundering scheme masterfully layered and integrated funds across numerous accounts and through many seemingly unrelated trades. As *The New Yorker* explained about the mirror trades:

> At first glance, the trades appeared banal, even pointless. Deutsche Bank earned a small commission for executing the buy and sell orders, but in financial terms the clients finished roughly where they began. To inspect the trades individually, however, was like standing too close to an Impressionist painting—you saw the brushstrokes and missed the lilies. These transactions had nothing to do with pursuing profit. They were a way to expatriate money. Because the Russian company and the offshore company both belonged to the same owner, these ordinary-seeming trades had an alchemical purpose: to turn rubles that were stuck in Russia into dollars stashed

outside Russia. On the Moscow markets, this sleight of hand had a nickname: *konvert*, which means "envelope" and echoes the English verb "convert." In the English-language media, the scheme has become known as "mirror trading."

60. Deutsche Bank has had a culture of criminal conduct. The company has paid billions in fines and has misled regulators throughout the world. As *The New Yorker* recounted in 2016:

> Scandals have proliferated at Deutsche Bank. Since 2008, it has paid more than nine billion dollars in fines and settlements for such improprieties as conspiring to manipulate the price of gold and silver, defrauding mortgage companies, and violating U.S. sanctions by trading in Iran, Syria, Libya, Myanmar, and Sudan. Last year, Deutsche Bank was ordered to pay regulators in the U.S. and the U.K. two and a half billion dollars, and to dismiss seven employees, for its role in manipulating the London Interbank Offered Rate, or LIBOR, which is the interest rate banks charge one another. The Financial Conduct Authority, in Britain, chastised Deutsche Bank not only for its manipulation of LIBOR but also for its subsequent lack of candor. "Deutsche Bank's failings were compounded by them repeatedly misleading us," Georgina Philippou, of the F.C.A. declared. "The bank took far too long to produce vital documents and it moved far too slowly to fix relevant systems."

61. Notably, Deutsche Bank's bankers openly engaged in the mirror trades, and none of the monitoring systems at the bank sounded the alarm:

> Four employees at Deutsche Bank in Moscow recall that nobody tried to hide the scheme. Wiswell, Buznik, and Maksutova all met with Volkov, and his orders were discussed openly on the desk. Colleagues also remember that Hayes asked both Buznik and Wiswell about the mirror trades. Few conversations relating to the trades, however, were likely retained by Deutsche Bank's internal monitoring systems. Within the office, conversations about the trades typically occurred face to face, and videoconferences with colleagues in London were not recorded.

> Several Deutsche Bank employees in London knew about the mirror trades, even though the orders were taken in Moscow. The London office executed half the transactions. The trades were also documented by a computer system, called DB Cat, which catalogued every trade made by the bank. Hayes and Koep, the

supervisors in London, could call up trading receipts on their computers.

62.     Money laundering conduct, when it occurred at Deutsche Bank, infected entire

teams, and Deutsche Bank's anti-money laundering systems were nowhere to be found. This was

likely because a key tactic employed by Deutsche Bank was keeping the trades small in size, but

high in volume:

> Crucially, the footprint of individual mirror trades was small. One Deutsche Bank employee recalls that, in 2014, the Moscow equities desk traded seventy to ninety million dollars' worth of stock daily. Mirror trades never exceeded twenty million dollars a day, and were normally in the region of ten million dollars. (Deutsche Bank claims that some of the suspicious trades were "one-way," meaning that another bank picked up the mirror order—a more laborious but less traceable transaction.)

63.     A key feature of Deutsche Bank's money laundering was the use of fake or

unauthorized loans. As *The New Yorker* reported:

> The Deutsche Bank mirror-trades operation appears to be linked to an even bigger attempt to expatriate money: the so-called Moldovan scheme. Starting in 2010, fake loans and debt agreements involving U.K. companies helped funnel about twenty billion dollars out of Russia to a Latvian bank, by way of Moldova.

64.     Deutsche Bank's money laundering playbook is engineered to avoid detection. In

the case of the mirror-trade scheme, the conduct went undetected for years:

> Reports of Deutsche Bank's internal investigation into mirror trades do not inspire confidence. Mirror trades occurred for at least two years before anyone raised any concerns, and when red flags appeared it was months before anyone acted on them. According to Bloomberg News, the internal report notes that, in early 2014, a series of inquiries about the propriety of mirror trades had been logged by multiple parties, including Hellenic Bank, in Cyprus, the Russian Central Bank, and back-office staff members at Deutsche Bank itself. When Hellenic Bank executives contacted Deutsche Bank and asked about the unusual trades, they did not hear back from the compliance department. Instead, their inquiry was fielded by the equities desk that was performing the mirror trades. Deutsche

Bank in Moscow reassured Hellenic Bank that everything was in order.

65.     Deutsche Bank was fined $630 million for its money laundering of $10 billion of Russian money alone. The UK's Financial Conduct Authority imposed its largest fine ever— £163 million for Deutsche Bank's money laundering.

66.     In the mid-2010s, Deutsche Bank continued to engineer its anti-money laundering systems to ignore high-risk transactions by its bankers. As *The New York Times* reported in a July 19, 2023 article titled "The Fed Slaps Deutsche Bank with a $186 Million Fine":

> The Federal Reserve imposed a $186 million fine on Deutsche Bank on Wednesday, saying it moved too slowly to fix problems with the bank's money-laundering controls that the bank regulator flagged in 2015 and 2017.
>
> "Deutsche Bank made insufficient remedial progress" in complying with those orders, which it had consented to, the Fed said in a statement.

67.     The Fed's fine came after Deutsche Bank had previously been fined for over a decade, including during the run-up to the 2008 financial crisis:

> Deutsche has a troubled history with regulators and prosecutors. Over the past decade a number of sanctions have been imposed on the bank and it has paid big fines over its failure to crack down on money laundering and over allegations of enabling tax violations, price fixing and foreign bribery. In 2017, the bank reached a $7.2 billion civil settlement with federal prosecutors over its sale of toxic mortgage products in the run-up to the 2008 financial crisis. The bank also paid a $150 million fine to a New York bank regulator in 2020, partly over its banking relationship with the disgraced financier Jeffrey Epstein.

68.     Deutsche Bank had repeatedly flouted regulators. For more than a decade, its money-laundering controls missed some of the largest scandals in the history of finance. These were not one-off problems—they were what drew bad actors to the bank and to the ranks of its banking teams. Indeed, Deutsche Bank was fined more than $7 billion for its role in the mortgage-

backed securities crisis of 2008, and in 2007, it was caught manipulating the London Interbank

Offered Rate (LIBOR), among other global interest benchmarks.

69.     On November 29, 2018, Reuters reported that police in Germany had raided six

Deutsche Bank offices in and around Frankfurt as part of a money-laundering investigation. As

Reuters reported in the article, which was titled "Deutsche Bank offices raided in money

laundering probe":

> Investigators are looking into the activities of two unnamed
> Deutsche Bank employees alleged to have helped clients set up
> offshore firms to launder money, the prosecutor's office said. It
> focuses on the years 2013 through to 2018, a spokeswoman for the
> prosecutor's office said.
>
> Around 170 police officers, prosecutors and tax inspectors searched
> the offices where written and electronic business documents were
> seized. . . .
>
> The prosecutors said they are looking at whether Deutsche Bank
> may have assisted clients to set up offshore companies in tax havens
> so that funds transferred to accounts at Deutsche Bank could skirt
> anti-money laundering safeguards.

70.     On June 10, 2019, the *Financial Times* reported in an article titled "Deutsche Bank

finds serious failings in payments screening" that Deutsche Bank had once again implemented

hollow anti-money laundering protections:

> Deutsche Bank has discovered serious failings in its anti-money
> laundering and sanctions controls that allowed cheques and high-
> value electronic payments to be processed without proper screening.
>
> The weakness lasted years, internal auditors found, in the latest
> compliance problem for the embattled German lender.
>
> One of six "core deficiencies" was a "filtering gap" that affects
> cheques written by corporate clients to foreign recipients, according
> to people familiar with the review. More than six months after
> uncovering the holes in its London office, the bank is still working
> to close them.

71.     On September 9, 2020, the U.S. Department of Treasury entered into a settlement with Deutsche Bank for its violation of sanctions laws in connection with international funds transfers. The Office of Foreign Assets Control ("OFAC") found several aggravating factors according to the Treasury Department's Enforcement Release:

- At a minimum, DBTCA [Deutsche Bank Trust Company Americas], including several senior managers within the bank's anti-financial crime division, as well as a representative from its counsel's office, failed to exercise a minimal degree of caution or care in connection with the conduct that led to the apparent violation;

- Multiple DBTCA personnel, including several senior managers within the bank's anti-financial crime division, as well as representative from its counsel's office, had actual knowledge of the conduct that led to the apparent violation . . . .

72.     The enforcement release noted that Deutsche Bank's conduct "involved almost identical conduct" to previous violations it settled in 2013. In other words, Deutsche Bank repeatedly engaged in the same conduct designed to frustrate anti-money laundering regulations.

73.     On July 13, 2023, Deutsche Bank entered into a consent order with the Federal Reserve Board of Governors. Deutsche Bank had laundered more than $267 billion to foreign actors through U.S. dollar payments from 2007 through 2015. The Federal Reserve found that Deutsche Bank "lacked adequate BSA/AML internal controls" during its relationship with foreign actors, and as a result missed "high levels of suspicious activity reports" concerning the unlawful transactions. OFAC found that Deutsche Bank had engaged in unsafe and unsound banking practices.

**D.     Merrill Lynch—Internal Systems and Controls Engineered for Money Laundering**

74.     Merrill Lynch also has a long history of lax anti-money laundering standards. Merrill Lynch's means of facilitating money laundering, however, was surprisingly simple: Merrill

simply exempted broad swaths of transactions from its internal monitoring systems and did little to ensure that client authorizations were authentic. This allowed Merrill's own bankers to engage in outright money laundering, including in its U.S.-based offices.

75. For example, on March 8, 2013, the United States DOJ announced in a press release that a Merrill Lynch banker, James Lanier, was sentenced to 106 months in federal prison for money laundering—including by initiating fraudulent wire transfers and creating false client authorizations. The press release states:

> Between 2008 and 2010, Lanier used his position as a financial advisor for Merrill Lynch in Tallahassee to funnel approximately $887,931 in client funds to his own personal bank accounts. Lanier was able to induce Merrill Lynch Client Associates to wire transfer client funds to bank accounts Lanier controlled by using forged client authorization letters and falsely claiming that his clients had verbally approved the transfers. To facilitate the scheme, Lanier purposely sought assistance from Merrill Lynch employees who were unfamiliar with Lanier's clients. Lanier used the embezzled client funds to make loan payments, and to purchase vehicles, an interest in a cellular telecommunications business, and a condominium in Albany, Georgia.
>
> Last November, Lanier pled guilty to 13 counts of wire fraud, three counts of mail fraud, four counts of money laundering and two counts of aggravated identity theft in connection with the embezzlement.

76. Merrill Lynch's banker had executed the surefire playbook for evading the hollow controls at Merrill Lynch—false client authorizations, unauthorized bank wires, and exploiting the lack of institutional information sharing about clients.

77. In May 2014, Merrill Lynch was probed by the SEC for money laundering. As Reuters reported on May 22, 2014 in an article titled "Exclusive: SEC Probes Schwab, Merrill, for anti-money laundering violations – sources":

> U.S. regulators are investigating Charles Schwab Corp and Bank of America Corp's Merrill Lynch brokerage over whether they are

doing enough to learn about their clients' identities, sources said, the latest sign a crackdown on money laundering is expanding.

The U.S. Securities and Exchange Commission is looking into whether the brokerages missed red flags that could indicate attempts to move money illicitly or to feed proceeds from drug trafficking and other crimes into other financial system by failing to know their customers well enough, the sources said.

78. Merrill Lynch's Texas employees had allowed and facilitated money laundering—this time for drug cartels. Moreover, as will become significant later in the Complaint, Charles Schwab accounts were exploited in similar fashion and during the same period:

In both cases, some of the accounts, whose ownership the brokerages did not adequately investigate, were eventually linked to drug cartels, they said.

One of Charles Schwab's clients, a rancher in Texas, was found to be transferring money to a holding company that was revealed to be a shell company, according to one of the sources.

The source said most of the suspect account holders in the Schwab case were located near the Mexican border and some were linked to drug money in Mexico. Some accounts contained hundreds of thousands of dollars while others held millions, the source said.

79. Merrill Lynch's conduct became more brazen. In June 2016, Merrill Lynch was fined $415 million for leveraging client accounts as collateral for its own risky investments—though trades with no economic substance. This occurred from 2009 through 2012.

80. As the SEC stated in a June 23, 2016 press release titled "Merrill Lynch to Pay $415 Million for Misusing Customer Cash and Putting Customer Securities at Risk":

An SEC investigation found that Merrill Lynch violated the SEC's Customer Protection Rule by misusing customer cash that rightfully should have been deposited in a reserve account. Merrill Lynch engaged in complex options trades that lacked economic substance and artificially reduced the required deposit of customer cash in the reserve account. The maneuver freed up billions of dollars per week from 2009 to 2012.

According to the SEC's order instituting a settled administrative proceeding. Merrill Lynch further violated the Customer Protection Rule by failing to adhere to requirements that fully-paid for customer securities be held in lien-free accounts and shielded from claims by third parties should a firm collapse. From 2009 to 2015, Merrill Lynch held up to $58 billion per day of customer securities in a clearing account that was subject to a general lien by its clearing bank and held additional customer securities in accounts worldwide that similarly were subject to liens. Had Merrill Lynch collapsed at any point, customers would have been exposed to significant risk and uncertainty of getting back their own securities.

81.     Notably, Merrill Lynch had executed trades in client accounts that lacked economic substance, which then allowed it to use clearing reserves to collateralize its own trades. Merrill Lynch did this to the tune of $58 billion per day for at least four years without detection.

82.     As explained below, the same sort of trades without economic substance were executed in Plaintiff's accounts during this period.

83.     On the same day as its press release, June 23, 2016, the SEC issued cease-and-desist orders against Merrill Lynch and the bank's Head of Regulatory Reporting and Acting Chief Financial Officer, William Tirrell. As the Tirrell order describes, the scheme relied on Merrill Lynch employees directly adjusting amounts in reserves:

ML underfunded its reserve account by billions of dollars through the use of trades, known internally as Leveraged Conversion Trades ("Trades"), that improperly used ML customer assets to finance its own activities.

Tirrell was MLPF&S's Head of Regulatory Reporting, which is the department responsible for, among other things, ensuring ML protects its customers by complying with Rule 15c3-3. Tirrell was also MLPF&S's designated Financial and Operational Principal ("FinOP"), assuming specific and primary responsibilities for the firm's compliance with the Rule. In these capacities, Tirrell and his subordinates calculated the customer reserve requirement each week. Tirrell knowingly reduced the amount ML reserved by billions of dollars as a result of the Trades despite knowing that regulators had significant unanswered questions about the changes being made to the Trades, changes that Tirrell both approved of and failed to address with those regulators. In addition, he failed to

accurately disclose the purpose of the Trades to regulators and repeatedly ignored requests from regulators for information that, if provides, would have put an abrupt end to the Trades. In doing so, Tirrell was reckless and negligent.

84. Merrill Lynch—with the knowledge of a C-suite executive—was systematically creating trades without economic substance, and the very same people charged with monitoring for this sort of conduct were in on it, directly adjusting numbers to hide that Merrill Lynch was brazenly trading for its own account by using collateral from its client accounts.

85. During the same period, Merrill Lynch had ensured that the many trades it made with client funds that lacked economic substance would not trigger suspicious activity reports to regulators ("SARs"). Merrill Lynch was ultimately caught by FINRA many years later and settled the conduct in July 2023.

86. As the FINRA Letter of Acceptance, Waiver, and Consent (No. 2020066667001), signed on July 11, 2023, by FINRA Senior Counsel Jeffrey Baldwin summarized:

> From January 2009 to November 2019, Merrill Lynch incorrectly applied the $25,000 monetary threshold applicable to banks rather than the $5,000 threshold applicable to broker-dealers to determine when to file a category of Suspicious Activity Reports (SARs). By applying the incorrect threshold, Merrill Lynch failed to file approximately 1,500 SARs from January 2009 to November 2019. Merrill Lynch failed to establish and implement policies and procedures reasonably designed to detect and cause the reporting of suspicious transactions in violation of NASD Rule 3011(a), and FINRA Rules 3310(a) and 2010.

87. The factual details of the conduct are striking—Merrill had designed its internal anti-money-laundering systems to ignore precisely the sort of sham trades it was running through client accounts:

**Merrill Lynch Applied the Incorrect SAR Filing Threshold for More than a Decade**

Broker-dealers and national banks are both required to file SARs in connection with, among other suspicious activity, suspected

30

criminal activity that meets or exceeds certain dollar thresholds. A broker-dealer, such as Merrill Lynch, is required to report suspected criminal activity that meets the $5,000 threshold described above. By contrast, a national bank is required to report suspected criminal activity in the following circumstances: (i) insider abuse involving any amount; (ii) violations aggregating $5,000 or more where a suspect can be identified; and (iii) violations aggregating $25,000 or more regardless of potential suspects. 12 C.F.R. § 21.11(c). Therefore, for suspected criminal activity that does not involve insider abuse and for which there is no substantial basis to identify a suspect responsible for the suspicious activity, national banks are subject to a $25,000 threshold while broker-dealers are subject to a $5,000 threshold.

From January 2009 until November 2019, Merrill Lynch incorrectly applied the $25,000 threshold applicable to national banks rather than the $5,000 threshold applicable to broker-dealers when determining whether to file a SAR on potential fraud activity where there was no identifiable suspect (and the case did not involve insider abuse, potential money laundering, or BSA violations). It therefore, for over 10 years, failed to file a SAR for potential fraud activity above $5,000 but below $25,000.

88.     On December 21, 2017, Merrill Lynch again settled with FINRA for engineering its systems to allow money laundering. As the FINRA Letter of Acceptance, Waiver, and Consent (No. 2012035224301) explained:

As described below, at various relevant times, Merrill Lynch's implementation of certain systems and procedures that comprise its anti-money laundering (AML) program related to retail brokerage accounts suffered from numerous deficiencies.

Merrill Lynch used an automated monitoring system called Mantas as a central part of its AML program to monitor for potentially suspicious activity in Merrill Lynch brokerage accounts. In approximately October 2010, the Firm connected Mantas to a BAC enterprise-wide, proprietary system called "Event Processor" or "EP." Thereafter, Mantas generated events related to potentially suspicious activities and fed these events into Event Processor, and Event Processor grouped Mantas events with other events generated by other monitoring systems into "Event Groups." Each Event Group was scored based on the AML risk posed by the events or customer types identified; if the total score for an Event Group reached a credit risk-based threshold, the Firm opened an investigation of the potentially suspicious activity.

For a four-month period (September 19, 2011 until January 31, 2012), Merrill Lynch did not investigate suspicious activity detected only by Mantas. By 2011, the Firm believed that system was producing too many "false positives" and determined to change how the system generated and scored Mantas events and investigated potentially suspicious activity. In September 2011, the Firm decided to not investigate Event Groups generated only from Mantas events while it implemented the changes. The firm did not start reviewing such Event Groups until February 2012.

Merrill Lynch also decided not to review (a) hundreds of Mantas alerts that had been generated by the automated surveillance system since May 2011 but not reviewed prior to September 2011 and (b) certain alerts in Merrill Lynch accounts that occurred from September 2011 to January 2012. As a result of these decisions, Merrill failed to investigate 1,015 instances of potentially suspicious activity at that time.

89.     Merrill Lynch put its thumb on the scale regarding the risk-based scoring of transactions, which prevented suspicious transactions from triggering internal review and reporting to regulators:

In addition, how the Firm scored certain events in its automated surveillance system minimized potentially suspicious activity or prevented such activity from being reviewed. For example, based on flawed analysis, Merrill Lynch determined to score multiple occurrences of potentially suspicious money movements involving high risk counterparties and entities once. Until 2015, it did not link related accounts for some of Merrill Lynch's highest risk customers and did not consistently identify or monitor customers in certain high risk jurisdictions or senior foreign political figures who were opening or conducting transactions through Merrill Lynch accounts.

90.     Notably, before 2015, Merrill Lynch had engineered its systems to exclude millions of accounts from automated monitoring:

Finally, prior to May 2015, Merrill Lynch excluded millions of accounts from its automated monitoring system and therefore failed adequately to monitor the accounts for potentially suspicious activity. ***These accounts included retirement accounts, certain securities-based loan accounts and the accounts pledged to them, and certain managed accounts whose investments were not controlled by the beneficial owner***.

(emphasis added). As explained below, these were precisely the sort of accounts through which Merrill Lynch generated billions of dollars of trades that lacked any economic substance.

91.     Notably, the sort of accounts exempted from anti-money-laundering systems included accounts funded by loans collateralized by securities accounts and managed accounts. As the FINRA settlement explained:

> These accounts in fact experienced significant money movements. During 2013, more than $22 billion was moved into and out of retirement accounts in approximately 2.5 million transactions. Approximately $6 billion was moved into and out of personal advisory accounts or accounts managed by third parties in 2013 in more than 400,000 transactions, and more than $35 billion moved into and out of securities-based loan accounts and the accounts pledged to them in more than four million transactions. As of February 2015, there were approximately 4.2 million retirement accounts, 228,000 personal advisory accounts and accounts managed by third parties, and 421,000 securities-based loan accounts and accounts pledged to them held at Merrill Lynch.

92.     Merrill Lynch simply pretended that these accounts were "low risk"—all while it exploited the exempted categories of accounts to launder money and trade for its own account.

93.     Once again, Merrill Lynch's Texas offices were at the center of the money laundering. As the FINRA settlement explains:

> The McAllen, Texas branch had almost 3,000 active accounts during the period September 2011 through July 2012. Approximately 500 of those accounts had wire movement activity during that time period, and some had no securities transactions. There were more than 1,600 incoming and outgoing wire transfers in these accounts, including transfers to or from such high-risk jurisdictions as Russia, Zambia, Mexico, and China. There were cash withdrawals totaling more than $1 million, and almost 1,200 journal-entry fund transfers into customer accounts totaling $80 million. Certain of the money movements in the McAllen branch were potentially suspicious.
>
> A Mexican citizen, ER, who had alleged ties to Mexican drug cartels and numerous Mexican politicians, maintained nine accounts at the Texas branch, including one in the name of a New Zealand-based trust with a mailing address in Switzerland. Because the Firm did not link these accounts in Mantas, it failed to detect and investigate

potentially suspicious activity that occurred in more than one of these accounts, including wire transfers and money movements to and from third party accounts. During the period September 2011 until July 2012, the trust account received a wire transfer of more than $262,000 from another trust with an address in Switzerland, and wired out almost $50,000 to third parties. Two of the accounts owned by ER received a total of more than $10 million from third-party entities and wired out a total of more than $12 million to third party entities. Further, ER journaled over $7 million among his accounts. ER's accounts triggered numerous events that the Firm did not investigate because it did not link the accounts in Mantas and because many of the events occurred during the period September 2011 to January 2012, when the Firm did not investigate Mantas-only Event Groups.

94.    For years, Merrill Lynch had disabled its automated systems from detecting the precise sort of money-laundering mechanisms in which the bank's employees were engaged. Merrill Lynch bankers could use loans collateralized by securities, unauthorized wire transfers, and high-volume transactions to launder and misappropriate money, and Merrill Lynch's internal systems were gerrymandered around such transactions.

## II.    THE INTERMEDIA MERGER AND THE NEW CONSTELLATION OF FIDUCIARIES

### A.    Plaintiff and His Brothers Sell Their Telecommunications Company

95.    Plaintiff cofounded National Telecommunications of Austin in 1984 with his brothers James ("Jimmy") and Joseph ("Joe") Mansour. In 1991, the Mansour brothers sold National Telecommunications of Austin to Long Distance Discount Services, Inc. ("LDDS"), which later became WorldCom, for approximately $36 million in cash and stock.

96.    Plaintiff and Jimmy then founded another long-distance company, National Telecommunications of Florida ("NTF"), in the late 1990s. In its first stock issuance, NTF issued approximately 250 shares of stock, with 100 shares issued to Plaintiff, 100 to his brother Jimmy, and 50 shares remaining.

97.     NTF continued to issue significant stock to Plaintiff, to Jimmy Mansour, and to Mark Mansour, as well as to trusts established in favor of Plaintiff's other siblings. Plaintiff and his brother Jimmy remained the largest NTF shareholders.

98.     On April 30, 1998, Plaintiff and his brothers sold NTF to publicly traded Intermedia Communications, Inc., for $151 million. As part of that acquisition, NTF filed for merger clearance under the Hart-Scott-Rodino Act. Unbeknownst to Plaintiff, he was listed as the sole NTF applicant in merger filings, including with the Federal Trade Commission ("FTC").

99.     A month prior to closing, on March 30, 1998, the NTF-Intermedia transaction was granted early termination of the premerger waiting period by the FTC. Plaintiff was the only person listed in connection with application 19982102, which corresponded to the Intermedia acquisition of NTF. *See* Granting of Request for Early Termination of the Waiting Period under the Premerger Notification Rules, 63 Fed. Reg. 19495, 19495 (Apr. 20, 1998).

100.    The closing documents for the NTF-Intermedia transaction listed all NTF share issuances since the company's founding. For their respective NTF shares, Plaintiff and Jimmy Mansour each received approximately $18 million in cash and 427,000 shares of Intermedia stock, then trading at approximately $74 per share—a total of approximately $49.5 million each.

101.    The closing documents listed 50 shares of initially-issued NTF stock—roughly 20% of the company's equity at its founding—as part of NTF Stock Certificate Number 3, described as "Never Issued." Without anyone telling Plaintiff, and on the eve of closing, a faxed affidavit was added to the closing documents, signed by another of Plaintiff's brothers, Joseph ("Joe") Mansour. This affidavit claimed that the NTF stock certificate listed in the Intermedia merger documents as "never issued," Stock Certificate No. 3, which signified the original issuance of 50 shares of the company in 1990, had been lost:



102.    The last-minute fax had in fact been signed months prior to the April 30, 1998

closing of the transaction—on February 10, 1998. Despite statements in the set of closing

documents presented to Jimmy for his signature stating that NTF Stock Certificate No. 3 had

"never issued," Joe Mansour's affidavit stated that 50 shares had in fact been issued as part of

"stock certificate number three of National Telecommunications of Florida, Inc.," but averred that

Joe Mansour never possessed the certificate, disposed of it if he had it, and disclaimed any interest

in the stock of NTF or the shares issued as part of the certificate.

103.    At closing of the Intermedia transaction, the 50 shares of NTF issued as part of Stock Certificate No. 3 would have been worth approximately half the consideration paid to Plaintiff and his brother James Mansour—about $24.75 million. The affidavit, slipped in at closing, ensured that the stock was not attributed to Plaintiff's brother Joe Mansour.

**B.    KPMG and the BLIPS Tax Shelter**

104.    The sale of NTF to Intermedia yielded Plaintiff and his brothers a significant amount of wealth in a single year. The tax consequences of the sale were significant. At the time, the long-term capital gains rate was 20%, meaning that Plaintiff would likely owe approximately $9.9 million if he sold all of his Intermedia shares at the merger closing price.

105.    At the time of the Intermedia transaction, Plaintiff's brother Jimmy Mansour was well connected, with sophisticated tax and estate-planning professionals in his orbit. Jimmy introduced Plaintiff to Big Four accounting firm KPMG, which pitched Plaintiff and his siblings a supposedly novel tax shelter called the "Bond Linked Issue Premium Structure," referred to as "BLIPS."

106.    For BLIPS, KPMG worked with a commodities hedge fund, Presidio Advisors, to provide high-net-worth clients with a series of entities that would engage in complex maneuvers to generate a tax loss on the books of the person purchasing the tax shelter.

107.    As described by KPMG for a hypothetical transaction, the BLIPS investment vehicle would first require the formation by the taxpayer of a single member limited liability company ("LLC"). The LLC would then obtain non-recourse financing of approximately $20 million and simultaneously receive a $10-million loan premium at an above-market interest rate.

108.    The borrowed money would then be co-invested with two Presidio entities for a 90% interest in the investment vehicle.



**Day 10 --
Capital Contributions**

*Investor's LLC contributes the $30 million of loan proceeds, subject to the loan, along with the original $700,000 to Fund in return for a 90% interest.*

*Two Presidio LLCs, Presidio Growth & Presidio Resources, contribute $77,778 to Fund in return for a 10% interest.*

KPMG

109.     The taxpayer's 90% interest in the $30-million asset would purportedly have a $28-million tax basis under the tax laws at the time. Presidio then invested the fund's assets and distributed foreign-currency-based securities equal to the LLC's capital account in the overall fund. When the taxpayer sought an exit, the LLC's interest in the fund could be sold back to Presidio, resulting in a gain or loss above the supposed tax basis. While the investment existed, however, transaction costs associated with the fund would result in pass-through losses.

110.     As KPMG described in a presentation, the tax shelter could create an offsetting loss to a transaction that would otherwise recognize significant taxable gain:

## Expected Tax Impact of Investment Program

| | Outright Sale | Sale with the Strategy |
|---|---|---|
| Gross Sale Proceeds of Property | $10,000,000 | $10,000,000 |
| Less: Cost Basis of Property Sold | $0 | $0 |
| Net Capital Gain/Ordinary Income | $10,000,000 | $10,000,000 |
| Transaction Cost/Invested Capital | $0 | ($700,000) |
| Tax Savings (Cost) | ($2,500,000) | $175,000 |
| Net Proceeds from Sale of Property | $7,500,000 | $9,475,000 |
| Dollar Increase by Using the Strategy | | $1,975,000 |

*Assumptions:*
*The effective capital gains tax rate is 25 percent (Federal and State).
*The investment strategy was unsuccessful.
*The transaction costs/invested capital are deductible.

KPMG

111.    KPMG warned that the IRS might disallow the transaction, resulting in significant expense, interest, penalties, and back taxes.

112.    Although Jimmy urged Plaintiff and his other siblings to undertake the BLIPS tax strategy, Plaintiff was not a tax expert, and the complexity of the tax structure rendered the maneuver opaque to him. Moreover, Plaintiff had already paid significant taxes on his share of the proceeds of the Intermedia merger: $265,000 on June 12, 1998; $425,000 on September 14, 1998; $472,000 on January 19, 1999; $7,500,000 on April 28, 1999; and $1,150,000 on June 21, 1999—in all, $9,812,000, approximately 20% of the total value of Plaintiff received in the Intermedia acquisition and roughly the *maximum* amount Plaintiff could possibly owe in capital gains taxes if he sold his Intermedia shares at the traded price on the date the transaction closed. (As explained below, however, Intermedia stock fell after the closing and Plaintiff did not in fact sell his shares at the peak price.)

113. The BLIPS tax shelter seemed unnecessary to Plaintiff, but on advice of his new fiduciaries at KPMG and at his brother Jimmy's urging, Plaintiff bought into BLIPS alongside his siblings. Together, Plaintiff and his siblings formed a series of companies, each company a member of a parent entity that KPMG used to execute the BLIPS transaction on Plaintiff and his siblings' respective behalf.

114. As explained below, KPMG's BLIPS strategy ultimately failed, but the strategy's fallout disguised from Plaintiff that he had paid taxes on Intermedia stock that was hidden from him (and variously reported as "never issued" or lost).

### C. Jimmy Mansour and Terri Lacy

115. The series of entities involved in BLIPS and other aspects of the Intermedia windfall required careful structuring by a sophisticated professional. Jimmy Mansour (Plaintiff's brother) introduced Plaintiff to a high-profile lawyer who managed his estate and tax planning— Terri Lacy, a partner at the law firm Andrews Kurth (now Hunton Andrews Kurth LLP ("HAK")).

116. Lacy's practice at HAK caters to high-net-worth individuals, including prominent politicians and their families. As Lacy's profile on Chambers.com's High Net Worth Guide states:

> For 40 years, Ms. Lacy has focused her legal practice on personal tax planning, with particular emphasis on structuring estate plans for high-net-wealth individuals across the United States. She produces efficient, predictable results in the ever-evolving field of wealth management. Much of her practice entails the creation and administration of highly structured, complex privately-held family entities. Ms. Lacy also has developed extensive experience in government ethics laws, and uses that expertise to represent officials in the federal administration.

117. As her profile indicates, Lacy's practice centers around forming complex tapestries of shell entities and trusts for high-net-worth individuals.

118. Lacy had managed Jimmy Mansour's estate prior to the Intermedia merger and had created trusts and other entities for Jimmy and for Plaintiff's other siblings. Indeed, as part of a

trust in favor of Plaintiff's brother Joe Mansour and his family, Lacy advised Plaintiff to grant a sweepingly broad power of attorney to Joe—supposedly a necessary part of estate planning for Joe's family and for Plaintiff's service as trustee.

119.     As would be revealed decades later, Lacy and Jimmy procured and used a power of attorney over Plaintiff in the name of his brother Joe Mansour (and Mark Mansour upon Joe's death) on January 9, 1997, and the document was recorded with Travis County, Texas.

120.     After the Intermedia merger and during the execution of the BLIPS tax strategy, Plaintiff retained Lacy as his own lawyer to manage his estate and related tax planning. Plaintiff provided Lacy with all of his financial documents and tax information, and Lacy structured several entities for Plaintiff and his family, including a family partnership, called the John Mansour Family Limited Partnership (the "FLP"), and several affiliated entities, including the John Mansour Family Trust (the "Family Trust") and the JAM/KMM Mansour Children's Trust (the "Children's Trust").

121.     Plaintiff's brother Jimmy Mansour had political ambitions and worked closely with Lacy, not simply on estate and tax structuring, but in connection with business and policy ventures. During the late nineties and for several years thereafter, Lacy could frequently be seen in Jimmy Mansour's office during business meetings—something Plaintiff observed through the glass wall separating his and Jimmy's respective offices at the time.

122.     Jimmy Mansour's political ambitions and connections with and through Lacy bore fruit. Among other political appointments and accolades, Jimmy Mansour was appointed by then-Governor Rick Perry as chairman of the Texas Cancer Prevention and Research Institute ("CPRIT")—a state grant-making entity that later became the center of a scandal resulting in multiple indictments (including one of Perry).

123.     Jimmy Mansour's rapidly growing wealth allowed him to quickly rise to political power, but overt or public expenditures, including on political causes, were in many cases neither practical nor permissible. Plaintiff, however, was differently situated. Unlike his brother Jimmy, Plaintiff decided to spend his time after the Intermedia merger with his family, raising his children. Plaintiff did not share Jimmy Mansour's political aspirations, and was therefore unlikely to garner attention from the public. Plaintiff had also delegated his finances and estate planning to the professionals in Jimmy's orbit, including Lacy and KPMG. This constellation of fiduciaries advising Plaintiff provided Jimmy Mansour and anyone he saw fit with direct access to Plaintiff's considerable wealth, array of accounts at financial institutions, and even his identity.

124.     This was the beginning of a multi-decade nightmare for Plaintiff: he had unwittingly been conscripted as a money-laundering mule, and Plaintiff's own supposed fiduciaries carefully kept him in the dark.

## III.    MORGAN STANLEY EXFILTRATES $20.5 MILLION OF PLAINTIFF'S INTERMEDIA STOCK

### A.    Morgan Stanley's Supposed Hedging and Sale Strategy

125.     Among the financial services professionals in Jimmy Mansour's orbit was Wall Street investment bank Morgan Stanley. Jimmy and Joe Mansour recommended Morgan Stanley to Plaintiff prior to the Intermedia merger, and in September 1997 Plaintiff opened a series of accounts with the bank. Plaintiff's accounts were managed primarily by two Morgan Stanley bankers, Jim Moriarity and Andrew Slimmon, currently Executive and Managing Directors at Morgan Stanley, respectively.

126.     By the time the Intermedia merger closed, Plaintiff faced a series of complex and time-sensitive financial tasks that had to be completed in the near term. The most pressing was to mitigate the risk Plaintiff faced from his extensive allotment of Intermedia stock received as part

of the NTF-Intermedia merger, which stock was restricted from sale. Specifically, Plaintiff's Intermedia stock received through the merger carried a restriction that allowed Plaintiff to sell only 1/12th of his Intermedia shares each month for a one-year period after the merger closed. This exposed Plaintiff to a substantial (indeed, potentially eight-figure) risk that the Intermedia stock price would fall while Plaintiffs' shares remained restricted from sale, resulting in significant losses without any ability to diversify away to safer investments.

127.    The risk was particularly high as the late-1990s technology bubble began to buckle as the new millennium approached. Stock market volatility had increased to record levels, as did valuations of technology companies. Plaintiff did not have the expertise to manage the staged sale of his stock, nor to appropriately diversify his investments. As a result, he relied on Morgan Stanley for both objectives.

128.    Morgan Stanley proposed what it referred to as a "hedging strategy" for Plaintiff's restricted Intermedia stock. According to Morgan Stanley, although Plaintiff could not sell his stock, he could offset the risks associated with a downward price movement through a series of other positions in securities. The net position of offsetting securities is called a "hedge." As Investopedia explains:

> What Is a Hedge?
>
> To hedge, in finance, is to take an offsetting position in an asset or investment that reduces the price risk of an existing position. A hedge is therefore a trade that is made with the purpose of reducing the risk of adverse price movements in another asset. Normally, a hedge consists of taking the opposite position in a related security or in a derivative security based on the asset to be hedged.

129.    A common method of devising a hedge involves the purchase of "derivatives." These are separate securities, structured as financial contracts, that are priced in relation to an underlying asset. They come in many forms—for example, stock options, which provide the right

to buy or sell a stock at a specific price, by or on a specific date. Because options to buy or sell stock often trade at fractions of the price of the stock itself, they can be used to offset a risky position for a reasonable premium associated with the volatility of the stock and the expiration date of the option. The cost of derivatives required to hedge a stock position is generally higher if an underlying stock is riskier or more volatile. As Investopedia explains:

> The specific hedging strategy, as well as the pricing of hedging instruments, is likely to depend upon the downside risk of the underlying security against which the investor would like to hedge. Generally, the greater the downside risk, the greater the cost of the hedge. Downside risk tends to increase with higher levels of volatility and over time; an option that expires after a longer period and is linked to a more volatile security and [sic] thus will be more expensive as a means of hedging.

130.    There are generally two kinds of stock options commonly used for hedging: a put option and a call option. A call option for a stock is straightforward. It gives the purchaser the right to buy the stock before an expiration date at a certain price. The price at which an option can be exercised—converted to stock—is called the strike price, and the date by which the option can be exercised is called the expiration date. If the option is not exercised by the expiration date, it ceases to exist.

131.    Thus, an option for IBM stock with a $100 strike price and May 15, 2026 expiration date would give the purchaser the right, but not the obligation, to purchase IBM stock for $100 at any time before the May 15, 2026 expiration date. If IBM stock is $125 on or before expiration, the option can be exercised for a $25 gain minus the premium paid for the option.

132.    A put option is an option that provides the purchaser the right, but not the obligation, to sell a stock at a given strike price before expiration. Thus, a put option on IBM stock with a strike price of $100 is worth at least $25 dollars at expiration if IBM is trading at $75.

133.    Put and call options can be either bought or sold. If an investor owns IBM stock, he or she can sell the option to purchase the investor's stock at a certain strike price and by a certain expiration date. The seller receives a credit for the option price, which when traded in an efficient market generally reflects the probability of the option having value at or before the expiration date. If the stock price is below the strike price, the person selling the call option keeps the premium and his or her stock. If the option expires above that price, it is generally exercised, meaning that the person selling the call option must sell his or her stock at the agreed-upon strike price. Put options can be sold in the same way.

134.    A seller of options need not own the underlying stock, but selling options without the collateral needed if the option is exercised is significantly riskier than selling options on stock that is owned. When a seller of an option owns the underlying stock, a sale is referred to as a "covered" option sale, and when he or she does not, the sale is referred to as a "naked" option sale.

135.    Stocks can also be sold "short," meaning an investor can borrow stock if available on the market, sell it at a certain price, then purchase the stock on the open market to close the position. An investor selling a stock short is betting that the stock price will go down and can sustain infinite theoretical losses if the stock price rises.

136.    These various securities positions can be used to offset a stock position, but each creates its own unique risks and complexity. Positions that employ several of these tools can become exponentially more complex and difficult to predict.

137.    Securities with significant volatility or inherent risk require technical expertise to hedge with derivatives or short positions, and even if carefully planned and designed, a hedge may fail due to unforeseen market fluctuations. Morgan Stanley proposed handling this task for Plaintiff

as part of his "managed" accounts at the bank, which already provided Morgan Stanley discretion as a fiduciary to invest the contents of Plaintiff's accounts on his behalf.

138.    Morgan Stanley proposed selling 1/12th of Plaintiff's Intermedia shares each month, as the restrictions on sale lifted for each set of shares. Morgan Stanley would simultaneously hedge the remaining restricted stock in a separate stock options account using derivatives. In addition, as Plaintiff sold his Intermedia stock, Morgan Stanley proposed a diversification strategy for the proceeds of the sales that met Plaintiff's risk tolerance—which was conservative.

139.    In the late 1990s, derivative trading was not readily accessible to most retail investors, and in any event, Plaintiff did not have the expertise to execute an effective hedge of his Intermedia stock. Accordingly, Plaintiff engaged Morgan Stanley to execute its proposed strategy and relied on his fiduciaries at the bank to tell him what he needed to know about his stock position, his hedge, and the diversification of his investments.

**B.      Morgan Stanley Secrets Away Millions of Dollars of Intermedia Stock**

140.    Morgan Stanley set up its supposed strategy for the sale and hedging of Plaintiff's restricted Intermedia stock in June 1998 and (purportedly) began in earnest to execute it by July of that year. Morgan Stanley began by transferring Plaintiff's restricted Intermedia stock into an options account managed by Morgan Stanley's options desk.

141.    Morgan Stanley implemented a supposed hedge of Plaintiff's restricted Intermedia stock by buying put options and selling call options against the restricted stock. The premise of these derivative purchases was that they would increase in value as the restricted stock's price dropped.

142.    From June 30, 1998, through June 30, 1999, Morgan Stanley purportedly sold all of Plaintiff's restricted Intermedia stock. A sudden downturn in the stock market as the tech boom

of the late '90s began to sag resulted in severe price drops in Intermedia stock over this period. By the time Morgan Stanley supposedly sold all of Mansour's Intermedia shares, Plaintiff's account had lost $21 million in value.

143.    Moriarity, Slimmon, and Morgan Stanley's bankers told Plaintiff that the Intermedia stock price had moved against him over the course of the year Morgan Stanley claimed to have sold off Plaintiff's Intermedia stock, and further explained that Morgan Stanley's hedging strategy had failed to mitigate most of the loss. Plaintiff's multimillion dollar losses were simply bad luck, they told him, which occurs in the securities markets. All of this was plausible to Plaintiff, as it would have been to anyone investing throughout the twilight of the millennium tech bubble.

144.    Indeed, Morgan Stanley's explanation would not have spurred any reasonable inquiry. Intermedia's stock price had dropped significantly in October 1998 alone and continued to drop during the period of the sale. As the *Tampa Bay Times* reported in an October 29, 1998 article titled "Intermedia stock tumbles on broad loss":

> Intermedia Communications Inc.'s stock tumbled 30 percent Wednesday after the company surprised Wall Street with a wider-than-expected third-quarter loss.
>
> The Tampa provider of telephone and Internet services also warned that the company would not grow as fast as it expected for the rest of this year and into 1999.
>
> The earnings surprise and revised business outlook combined to knock $7.50 off Intermedia's stock price, which closed at $17.75 in trading of 17-million shares. The stock was the second most active by volume on the Nasdaq exchange after Dell Computer Corp. and the second largest percentage decliner. Earlier in the day, the stock fell as low as $16.37.

145.    From May 31, 1998, until June 1999, the price at which Morgan Stanley quoted and traded Intermedia stock fell from approximately $74 per share to approximately $25 per share.

146.     To Plaintiff, it appeared that Morgan Stanley had executed the strategy pitched to him to the letter—the bank appeared to have sold Plaintiff's restricted Intermedia stock as the restrictions on Plaintiff's shares rolled off, all while (unsuccessfully) hedging Plaintiff's long position with options.

147.     As explained below, this was not the case. And the truth would not—and could not—be discovered until two decades later in 2024, after Plaintiff had begun a multiyear, multimillion-dollar investigation into his accounts that led him back to the beginning—when Morgan Stanley supposedly handled the sale of his Intermedia stock.

148.     The Morgan Stanley investigation, which required the expertise of highly trained professionals, including investment bankers, forensic accountants, investigators, and lawyers, revealed a carefully hidden exfiltration of approximately $20.5 million of Plaintiff's Intermedia stock. In particular, Plaintiff's lawyers obtained detailed account records from Morgan Stanley, investigators compiled and arranged the obtained data, and an experienced investment banker finally connected the dots across several accounts and the web of supposed hedging positions Morgan Stanley took on Plaintiff's behalf.

149.     Plaintiff's forensic analysis conducted prior to this lawsuit comprised an entry-by-entry review of every "journal" entry on each Morgan Stanley account record provided by the bank to Plaintiff (at the request of Plaintiff's lawyers and other representatives). A journal entry is an accounting tool used by financial institutions to record financial transactions associated with an account or business. The journal entries form a general ledger, which provides a detailed picture of every logged event, including when a transaction occurred, where funds or assets came from, and where they were transferred. As Oracle's *Netsuite.com* explains in a September 8, 2022 article titled "What Is a Journal Entry in Accounting? A Guide":

Journal entries are the fundamental building blocks that provide the answers to those and other questions. Journal entries list vital data, such as how much was credited and debited, when and from which accounts. Each journal entry corresponds to one discrete business transaction and is eventually posted to the general ledger.

The validity of all financial reports is affected by the accuracy—or inaccuracy—of the information entered at this level.

150. Journal entries must contain a minimum amount of information to be valid. As the *Netsuite.com* article explains:

Each journal entry contains the data significant to a single business transaction, including the date, the amount to be credited and debited, a brief description of the transaction and the accounts affected. Depending on the company, it may list affected subsidiaries, tax details and other information.

It is crucial to accurately enter complete journal data so that the general ledger and financial reports based on this information are also accurate and complete. With modern accounting software, recurring journal entries may be templatized and automatically executed, minimizing the potential for error.

151. By maintaining the chronological ordering of journal entries, the general ledger will implement "double-entry accounting," which allows a reader of the ledger to link movements and events across multiple accounts:

Journal entries are made in chronological order and follow the double-entry accounting system, meaning each will have both a credit and a debit column. Even when debits and credits are linked to multiple accounts, the amounts in both columns must be equal. For example, say a company spends $277.50 catering lunch for employees. The expenses account increases by that amount, while the cash account, which is an asset, decreases by $277.50 because that money is now spent.

152. Morgan Stanley's account records for Plaintiff did not maintain consistent journal entries for similar transactions. In fact, certain journal entries appeared to have been manually generated and lacking the minimal information required to determine the state of the general ledger before and after certain transactions.

153. To begin with, most journal entries in Plaintiff's Morgan Stanley account records appropriately record transactions. For example, the following journal entry appearing in Plaintiff's August 1998 account record states what security is being redeemed, for how much, to whom the funds are being transferred, and the reason for the redemption. The entry also contains the value, date, type of transaction, and quantity of securities.

```
08-27 CSH    FUNDS        161,361.650-  REDEMPTION OF MSIF MUNICIPAL MMKT      1.00           161,361.65
                                        PORTFOLIO TO JOHN A MANSOUR / RE:
                                        COVER PURCHASE
```

154. Likewise, some of the journal entries in Plaintiff's Morgan Stanley account record refer to transfers of cash from one account to another. Most of the journal entries provide detailed information, including the source and destination account number associated with the transfer. The following is another example from Plaintiff's August 1998 Morgan Stanley statement:

```
08-28 CSH    JOURNAL               JRNL FROM 06-21394 TO 0680419          25,034.02
                                   (JULY INCO ME FOR 06-78649)
```

155. The journal entry above clearly explains the source and destination of the funds, as well as a brief description of the funds.

156. However, among the transactions carefully journaled in Plaintiff's Morgan Stanley account records are opaque entries concerning Plaintiff's restricted Intermedia stock. For example, Plaintiff's March 1999 statement includes the following journal entry:

```
03-22 CSH    DELIVER          150,000-  INTERMEDIACOMMUNICATIONS INC COM
                                        STK RESTRICTED
```

157. The entry includes the journal description "DELIVER" and identifies -150,000 shares of restricted Intermedia stock, signifying that the stock exited Plaintiff's account. The entry does not populate the "Debit Amt," "Credit Amt," or "Price" columns. There is no indication of where the stock went or why it went there—no account number, name, or reason. The entry stands

in stark contrast to the majority of other entries from the 1998 and 1999 period in which Morgan Stanley sold Plaintiff's Intermedia stock.

158.    In fact, in other instances describing a transfer of Intermedia stock out of Plaintiff's account, detailed account information is provided as part of the journal entry:

```
07-28 CSH    JOURNAL              73,951- //INTERMEDIACOMMUNICATIONS INC COM
                                  STK RESTRICTED// JRL FROM 0621394
                                  TO 3385A33 SAME NAME
```

159.    The journal entry above states the amount of Intermedia stock leaving Plaintiff's account and importantly, the source, destination, and name associated with the transfer.

160.    And when a journal entry is affiliated with a legitimate sale of Mansour's stock, it includes significantly more detail, including the per-share sale price and the amount netted from the sale:

```
05-06 05-11 CSH SOLD    7,600- INTERMEDIA COMMUNICATIONS INC COM   28 5/8              217,542.74
                        RULE 144
```

161.    Plaintiff's Morgan Stanley account records from June 1998 to June 1999 include many "DELIVER" journal entries associated with Plaintiff's Intermedia stock with no information about where the stock was transferred.

162.    Moreover, these journal entries occur in Plaintiff's main securities account, not in the account where Morgan Stanley had transferred Plaintiff's restricted Intermedia stock for hedging. In other words, Morgan Stanley was "delivering" significant amounts of Intermedia stock from Plaintiff's accounts without actually selling Plaintiff's restricted Intermedia shares. Instead, Morgan Stanley had been manually journaling transfers of Intermedia stock out of Plaintiff's account to an undisclosed destination and creating a negative amount of stock in his account— referred to as a short position.

163.     On July 31, 1998, Morgan Stanley transferred 73,751 Intermedia shares with a journal entry stating "DELIVER" and no destination information—or any information about the transaction.

164.     On August 11 and 31, 1998, two journal entries marked "DELIVER" transferred 34,000 and 57,200 shares of Intermedia stock, valued at $845,750 and $1,422,850, respectively.

165.     On September 24, 1998, a journal entry indicated an "adjustment" of 122,400 Intermedia shares, which immediately left Plaintiff's account, an amount valued at $3,044,700.

166.     On October 22, 1998, two "DELIVER" entries removed 48,098 and 20,400 shares of Intermedia stock from Plaintiff's account, worth $889,813 and $377,400, respectively.

167.     On February 28, 1999, 24,488 shares were transferred out of Plaintiff's account, an additional $441,090, with a "DELIVER" journal entry.

168.     On March 22, 1999, another 150,000 of Intermedia shares were marked "DELIVER" and removed from Plaintiff's account, worth $3,909,375.

169.     On April 6 and April 22, 1999, respectively, 55,521 and 25,000 Intermedia shares were marked "DELIVER" and removed from Plaintiff's account, a transfer of $1,787,082 and $804,687.50, respectively.

170.     On May 3, 1999, 74,991 Intermedia shares were marked "DELIVER"—again, with no destination—resulting in a transfer of $2,249,730 in value out of Plaintiff's account.

171.     Finally, on June 1, 1999, an additional 70,000 Intermedia shares were journaled out of Plaintiff's accounts, transferring $1,741,250 of value.

172.     In total, the manual journal entries resulted in $20,499,677 of money transferred out of Plaintiff's Morgan Stanley accounts to an unknown destination.

173. Each journal entry omitted necessary information about the transaction—most critically, the destination account where the Intermedia shares were delivered. Morgan Stanley was not maintaining an ordinary bank account, nor was it providing a nondiscretionary brokerage account. It was managing Plaintiff's money as his fiduciary, and Morgan Stanley had a duty to speak fully and truthfully about every transaction. Instead, Morgan Stanley said virtually nothing other than that it was sending Intermedia shares out of Mansour's account.

174. The "DELIVER" transactions were sprinkled inconspicuously throughout months of journal entries and account records. Moreover, they were seeded among other technical terms in journal entries, such as "BOX," signifying a security is being placed in a figurative lockbox pending a short sale. Morgan Stanley had buried its "DELIVER" entries and neither Plaintiff—nor even a forensic accountant or banker without specific experience with broker-dealer financial statements—would have ascertained the true substance of these journal entries.

175. The picture that emerges from a recent analysis is a systematic removal of Plaintiff's Intermedia stock by the very Morgan Stanley bankers hired to represent Plaintiff's interests:

| Date | Shares | Value |
|------|--------|-------|
| 6/30/98 | 73,751 | $2,985,950 |
| 8/11/98 | 34,000 | $845,750 |
| 8/31/98 | 57,200 | $1,422,850 |
| 9/24/98 | 122,400 | $3,044,700 |
| 10/22/98 | 48,098 | $889,813 |
| 10/22/98 | 20,400 | $377,400 |
| 2/28/99 | 24,488 | $441,090 |
| 3/22/99 | 150,000 | $3,909,375 |
| 4/6/99 | 55,521 | $1,787,082 |
| 4/22/99 | 25,000 | $804,687 |
| 5/3/99 | 74,991 | $2,249,730 |
| 6/1/99 | 70,000 | $1,741,250 |
| **Total** | 755,849 | $20,499,677 |

176. In addition, Plaintiff's restricted stock remained in a separate options account—intact—as these transfers occurred, creating the illusion that Plaintiff's stock was still in his possession.

177. Although from Plaintiff's contemporaneous perspective, it appeared that Morgan Stanley had, as promised, sold the entirety of Plaintiff's Intermedia position from June 1998 to June 1999, Morgan Stanley had in fact been creating a short position of Intermedia stock—$20.5 million worth. Because Plaintiff's restricted stock could not be sold or transferred, the short position did not net with the stock Plaintiff actually held for most of the period. When the

restriction was finally lifted, Morgan Stanley netted its short position with Plaintiff's unrestricted stock—causing Plaintiff's assets to vanish into thin air.

178. In fact, Plaintiff had not lost money from fluctuations in market price. He had lost $20.5 million in value through a complex scheme perpetrated by Morgan Stanley that comprised accumulating massive Intermedia short positions on Plaintiff's behalf and ultimately exfiltrating Plaintiff's Intermedia stock from his accounts.

179. At the same time, because of the precipitous decline of Intermedia stock during the June 1998 to June 1999 period, the short positions taken by Morgan Stanley for Plaintiff, if associated with incoming value, should have made tens of millions of dollars when covered at the end of the period by Plaintiff's stock. But that did not occur because there were no sale proceeds for the stocks marked "DELIVER" and then transferred out of the account. Morgan Stanley's scheme moved Intermedia stock that was not actually in Plaintiff's main Morgan Stanley account, thereby creating an *effective* short position, but Plaintiff never saw a dime in appreciation from the millions of dollars in effective shorts Morgan Stanley was executing through this accounts.

180. Morgan Stanley hid all this from Plaintiff—and as explained below, its deception was bolstered by the bank's supposed hedge strategy, which gave Plaintiff the false impression that the $20.5-million decline in net asset value in his Morgan Stanley accounts had occurred due to declines in Intermedia's stock price and a failed but legitimate hedge.

### C. Morgan Stanley's Hedging Strategy Was a Smokescreen that Further Covered Up the Taking of Plaintiff's Intermedia Stock

181. A significant portion of Plaintiff's restricted Intermedia stock was in a separate options account, where it could serve as collateral for the purchase and sale of options that would offset the stock's downside risk.

182. Plaintiff's stock needed protection from only downside risk. In other words, Plaintiff would happily accept an increase in the price of his stock while it was restricted, but sought the mitigation of losses he would experience if the stock dropped in price.

183. There were many ways to hedge Plaintiff's restricted Intermedia stock against this downside risk. For example, Morgan Stanley could have bought put options at a strike price below the price at which Plaintiff had received his Intermedia shares—or a price below Plaintiff's risk tolerance.

184. Likewise, Morgan Stanley could have sold call options against Plaintiff's restricted Intermedia stock, creating a credit in Plaintiff's account in the amount of a premium that would protect Plaintiff from some downside movement. This approach, however, ran the risk that the stock would get called away before expiration, which could not occur while the stock in Plaintiff's account was restricted.

185. Morgan Stanley inexplicably did both—and did so at strike prices that provided virtually no meaningful downside protection. Specifically, Morgan Stanley sold call options and bought put options at strike prices distant from each other, allowing the underlying stock to fluctuate within a broad range without meaningful protection. Moreover, Morgan Stanley purchased puts at prices largely offset by the credits it received from selling calls—in effect, requiring Morgan Stanley to take put and call positions that provided Plaintiff no meaningful protection against asymmetric downside risk.

186. To an untrained eye, Morgan Stanley's hedge appeared complex and sophisticated. Indeed, it even looked like it occasionally worked, as fluctuations in the market would create intermittent and uncorrelated gains in the value of the derivatives purchased. But to the investment

banking expert that reviewed Plaintiff's Morgan Stanley transactions in 2024, the hedge appeared nonsensical and largely ineffective by design.

187.    The supposed hedging strategy was a smokescreen. It was not designed to protect Plaintiff from significant downside risk. Instead, it provided Morgan Stanley plausible deniability when $20.5 million of value had been lost: according to Morgan Stanley, the market moved against Plaintiff, and the hedge (despite the bank's efforts) had simply failed to protect him. Contemporaneously, Plaintiff accepted this explanation. Plaintiff relied on Morgan Stanley, and his banker Jim Moriarity, for expertise he did not have. More importantly, Plaintiff relied on them—his fiduciaries—for the whole truth about what they were doing with his money and assets, and what was going on in his accounts.

188.    In May 1998, just before Morgan Stanley began its supposed hedging and sale of Plaintiff's Intermedia stock, the net asset value ("NAV") across all of Mansour's accounts was $63,112,587. When Morgan Stanley's disguised raid of Plaintiff's Intermedia stock ended in June of 1999, Plaintiff's NAV had fallen to $49,229,427. A total of $13,883,160 had vanished from account balances, with the $20.5 million taken by Morgan Stanley offset by other gains across his eight accounts, including the gain realized from the unwinding of Morgan Stanley's hedge smokescreen.

189.    Morgan Stanley's transfer of $20.5 million in Intermedia stock from Plaintiff's accounts would have been plain to see if the stock had simply been sent out of Mansour's accounts without any apparent authorization. But instead, Morgan Stanley created an overlapping web of obfuscation to hid what was going on in Plaintiff's accounts. Indeed, as Mansour would later find out, several accounts associated with Morgan Stanley's supposed sales were not even disclosed to Plaintiff.

# IV. NETPLIANCE, AND MORGAN STANLEY'S MONEY LAUNDERING

## A. Netpliance

190.    Netpliance was a Texas company that developed and sold one of the first Internet appliance PCs—computers designed narrowly for connecting to the Internet and the World Wide Web. Netpliance was founded in 1999 by John McHale, the former President and CEO of early Internet service provider NetSpeed.

191.    Netpliance's primary product was the I-Opener. Netpliance's business model was to sell the I-Opener as a loss leader, at a $300-$400 price point, in order to sell monthly subscriptions for dial-up Internet access at $21 per month.



192.    The company struggled to sell more than a few million dollars' worth of I-Openers during its entire lifetime, and computer enthusiasts discovered that they could configure Netflix

hardware to function as a full computer without purchasing Netpliance's subscription-based Internet services.

193.    Plaintiff's brother Jimmy Mansour was a member of Netpliance's board of directors since February 1999, and was an insider with a significant ownership stake in the company. Plaintiff did not learn about Jimmy's insider role at the company until decades later, in 2024.

194.    On August 31, 1999, a wire transfer was initiated from Plaintiff's "separate property" Morgan Stanley account to Netpliance for $441,054. On September 23, 1999, another wire transfer was initiated from the same account, transferring $500,004 to Netpliance. Then, yet another wire was initiated to Netpliance out of the same account for an additional $150,036. None of the wires had been authorized by Plaintiff, nor had he instructed the Morgan Stanley bankers managing his accounts to transfer funds to Netpliance.

195.    As Plaintiff would later realize, he had been invested through his managed Morgan Stanley account—without his knowledge—in his brother Jimmy's company, Netpliance.

**B.      Lacy Creates an Approximately $5-Million Tax Margin of Error Ahead of Hundreds of Millions of Dollars of Trades through Mansour's Morgan Stanley Accounts**

196.    Terri Lacy, who by 2000 worked closely with Jimmy Mansour and other Netpliance executives, did—unlike Plaintiff—know about Plaintiff's supposed investment in Netpliance shares.

197.    Indeed, on January 21, 2000, Plaintiff executed a limited partnership agreement drafted by Lacy for an entity called "The John Mansour Family Limited Partnership" (referred to above as the FLP) on behalf of Plaintiff and his family. The partnership was divided among several family-related entities, with Plaintiff holding an approximately 89.54% ownership of the entity as his separate (non-marital) property.

198.     The agreement Lacy drafted contained a series of exhibits in support. Exhibit B to the agreement was a schedule of assets owned by the newly formed partnership. It asserted that Plaintiff possessed an interest in Netpliance, Inc.

**EXHIBIT  B**
**PROPERTY**

**DESCRIPTION**

J. A. Mansour, Inc.

$23,300 investment in Telcomsmart.com

K. M. Mansour, Inc.

$23,300 investment in Telcomsmart.com

John A. Mansour

214,000 shares in Netpliance, Separate Property
$226,700 investment in Telcomsmart.com

Kimberly M. Mansour

$226,700 investment in Telcomsmart.com

John A. Mansour, Trustee of the John Mansour Family Trust

$10 in cash

199.     Specifically, the exhibit stated that Plaintiff owned 214,000 shares of Netpliance stock as separate property. There were several other assets listed on the exhibit, and all of them stated the value of the asset being contributed to the partnership. The Netpliance shares, however, did not have any listed value—not even the cost basis at which Plaintiff supposedly acquired the stock.

200.     Netpliance filed a Form S-1 with the Securities and Exchange Commission on December 23, 1999, and on March 17, 2000, its shares began publicly trading on the Nasdaq under the ticker symbol NPLI. The stock debuted at an IPO price of $18 per share. It did not remain at

that price for very long. As *Wired* reported in a March 23, 2000 article titled "Netpliance Zaps Cheap PC Buzz":

> But after a moderately successful initial public offering last week, the stock has been in dramatic decline. From an opening-day high of 26 1/8 last Friday, the stock sank to a low Wednesday of 12 1/8, well below the $18 IPO offering price.

201.    The amount of Netpliance stock that Plaintiff supposedly owned did not match the value of the wires sent from Plaintiff's account—and did not accord with the disclosures on Netpliance's filing with the SEC about shares sold at the time or valuations for contemporaneous sales. Plaintiff's supposed wire transfers from his managed Morgan Stanley account occurred in August and September 1999. Netpliance's S-1 cryptically stated that just prior to the wire transfer from Plaintiff's managed Merrill Lynch account, an unidentified "founder" of the company had exercised the right to purchase 185,714 shares of Series A preferred stock for $7,800,000—a roughly $42-per-share valuation:

> In January 1999, one of our founders entered into an agreement with us under which he purchased 350,000 shares of Series A preferred stock for an aggregate purchase price of $2,000,000 and received rights to purchase additional shares of Series A preferred stock. These rights were exercised in May and July 1999 for the purchase of an aggregate of 185,714 shares of series A preferred stock for an aggregate purchase price of $7,800,000.

202.    If the August 1999 wire transfer from Plaintiff's managed Morgan Stanley account was for the purchase of Netpliance shares, the 214,000-share position would have cost $8,988,000, not $441,054, even if one applied a 20% discount (a discount discussed in a Netpliance "valuation" later ordered by Lacy to adjust from preferred stock to common stock value).

203.    The September 1999 wires from Plaintiff's account also did not match with Plaintiff's purported Netpliance holdings, given the disclosed valuations in Netpliance's S-1. In September 1999, Netpliance sold 122,933 of Series A preferred stock for $7,375,980, and in

October 1999, Netpliance sold 116,666 shares in a Series B round for $7,000,000, a valuation of approximately $60 per share for both transactions. Plaintiff's supposed $1 million in wire transfers in September 1999 could not have bought Plaintiff the 214,000 Netpliance shares that Lacy put on the FLP's books.

204.    Moreover, according to Netpliance's S-1 filing, Plaintiff's brother Jimmy Mansour had purchased 41,670 shares as part of the company's Series A, and held 306,731 shares of Netpliance stock as of its March 2000 IPO.[1] This 306,731-share position resulted in Jimmy's listing on Netpliance's IPO filing as a 2.1% owner of the company, placing Plaintiff's supposed 214,000-share investment among the largest individual holdings at Netpliance.

205.    By April 24, 2000, Netpliance stock had dropped to half of its IPO price, to approximately $9 per share. The decline accelerated, and by December 2000, Netpliance was a penny stock and the company had announced it was abandoning its flagship product line, the I-Opener.

206.    In December 2000, almost a year from the filing of its S-1 registration statement, Netpliance's CEO attempted to take the company private. As *The Wall Street Journal* reported in a December 22, 2000 article titled "Netpliance CEO Offers to Take Internet-Device Maker Private":

> A group of investors led by Netpliance Inc.'s chief executive has offered to take the Internet-appliance pioneer private in a deal that values the entire company at about $39 million. . . .
>
> The investor group, headed by Netpliance Chairman, Chief Executive and co-founder John F. McHale, collectively owns a stake of about 52% in the firm. The offer, worth 65 cents a share, is for the shares the group doesn't already own. The stock jumped 64% to 56 cents at 4 p.m. EST Friday on the Nasdaq Stock Market.

---

[1] Jimmy Mansour held his Netpliance shares through an entity he controlled called JMM PHLP, Ltd.

> Netpliance went public late last winter at $18 a share, raising $144 million at the height of Internet mania.

207.    On January 17, 2001, Netpliance announced that it faced delisting by Nasdaq because its stock was trading below $1 per share. By January 22, 2001, McHale and his investor group had withdrawn their offer to take Netpliance private.

208.    On February 3, 2001, Netpliance laid off more than half its employees. As *The New York Times* reported in a February 3, 2001 article titled "Company News; Internet Company Netpliance Is Laying Off 76":

> Netpliance in Austin, Tex., said yesterday that it would dismiss 76 workers or 54 percent of its staff, and that its president and co-founder was resigning as it continued to reorganize into a high-speed Internet services company. Netpliance, which has abandoned its i-opener Internet appliance business, said the job cuts would reduce operating expenses by about $6 million a year and would leave it with about 50 employees. The company said its president, Kent Savage, a co-founder, had resigned effective March 15, although he would remain on its board. Another co-founder, Kenneth Kalinoski, and the vice president and general manager, Valerie Walden, also recently resigned.

209.    By April 2001, Netpliance had become objectively worthless in comparison to its supposed valuations just prior to the IPO—it had abandoned its product, laid off its staff, and it traded for pennies on the Nasdaq, which had ordered the company delisted from its exchange subject to Netpliance's appeal of the decision.

210.    In April of 2001, Lacy ordered a valuation of Netpliance as of the date of the supposed conveyance of 214,000 Plaintiff-held shares to the FLP, February 4, 2000. Lacy commissioned this valuation from a company called Fowler Valuation Services. Fowler drafted a memorandum addressed to Lacy on April 4, 2001. The memorandum stated that Fowler had been assigned to value a 25% share of the FLP, which included among its other assets 214,000 shares of Netpliance stock:

> At your request, we have performed a valuation consulting assignment, a discount study, ("the Assignment") in regard to a 25% limited partnership interest ("the LP Interest") in the John Mansour Family Limited Partnership ("the Partnership") transferred by John and Kimberly Mansour to the John A. Mansour Family Trust ("Trust") on February 4, 2000 ("the Valuation Date"). The purpose of the Assignment is to assist you in determining the fair market value of the LP interest for gift tax purposes.

211.    Despite a year of public trading, a massive and sudden decline in stock price after IPO, and the impending de-listing of the company from the Nasdaq for trading below a dollar, the valuation memorandum used sales related to Netpliance's Series E offering to value the company instead of its publicly traded post-IPO price. Notably, the Lacy-ordered valuation did not limit itself to information prior to the supposed February 2000 assignment to the partnership:

> For financial and other information on Netpliance, we have reviewed the Prospectus issued in connection with the Company's IPO, excerpts from which are attached hereto as an Exhibit. Although the date of the Prospectus is subsequent to the Valuation Date, in our opinion, the information about the Company in the Prospectus would, to a substantial degree, have been available to an informed prospective buyer and seller of the LP Interest on the Valuation Date.

212.    At the time of the valuation, however, Netpliance was relatively worthless. It was trading as low as approximately 30 **cents** per share with spikes in pricing reaching at most 56 cents per share (while a 65 cent take-private tender offer had been made, at that). The stock never exceeded a dollar per share throughout all of 2001, and had been a penny stock since the end of 2000.

213.    The valuation memorandum simply took an ostrich approach to clear, market indicators that Netpliance stock was likely worth less than a dollar per share even at the time it commenced its IPO. Worse yet, the memorandum concluded that the company's common stock—then publicly trading for 30-56 cents, and trending downward—was likely worth not just $1, or

even \$2, but ***$24 dollars*** as of February 2002, just 20% less than the \$30 per share Series E preferred stock price from before its IPO.

214. Lacy apparently provided the valuation company direct access to the General Counsel and Vice President of Netpliance. Here is what the memo states:

> We have reviewed the prospectus ("Prospectus") covering the Netpliance, Inc. initial public offering, the closing date of which is reflected in the Prospectus to be March 22, 2000. We have also interviewed James Cahill, the Company's Vice President and General Counsel in regard to the Company and its offering of Series E Convertible Preferred stock which closed on February 7, 2000.

215. The memorandum then bases its valuation in part on the say-so of Cahill:

> Mr. Cahill advises, however, that notwithstanding the SEC's policy which required recognition of the beneficial conversion feature, the \$30 per share price of the Series E offering represented fair market value at the time of the offering. He stated that the \$30 price was arrived at in arm's length negotiations between the Company and the investors who purchased the Series E preferred and that these investors were sophisticated investors who were knowledgeable about the Company, its risks and potential. We believe this to be a correct assessment of the facts and that, after applying a 20% discount for the difference between the common and the preferred, \$24 per share was the fair market value of the common stock on the Valuation Date. Consequently, the 214,000 NPLI Shares had a total fair market value on the Valuation Date of \$5,136,000.

216. In other words, the valuation memorandum asserted that Netpliance was worth \$24 per share, even though it traded below 50 cents in and around the date of the valuation. And, the memorandum valued the 214,000 Netpliance shares at \$5,136,000, not the likely less-than-\$100,000 valuation readily derived from the publicly traded price of the stock. Lacy's valuation had inflated the value of 214,000 Netpliance stock shares by about \$5 million.

217. Indeed, Netpliance stock prices immediately subsequent to the supposed transfer of 214,000 Netpliance shares to the FLP in February 2000 showed a rapid decline in value, implying

that the pre-IPO value was unlikely to be correct. Yet the valuation memorandum inexplicably considered post-IPO information, but not any post-IPO quotes.

218.    Transactions immediately after the Netpliance IPO, including the rapid downward trajectory of the company's stock price, made a $24 dollar per share valuation implausible. Indeed, Netpliance's stock had become a "level 1 asset" within months after the date that 214,000 Netpliance common shares were supposedly contributed to the FLP. As Investopedia explains, a level 1 asset price is far more reliable than an estimate based on an illiquid private placement price:

> Publicly traded companies must classify all of their assets based on the ease that they can be valued, with Level 1 assets being the easiest. A big part of valuing assets comes from market depth and liquidity. For developed markets, robust market activity acts as a natural price discovery mechanism. This, in turn, is a core element to market liquidity, which is a related gauge measuring a market's ability to purchase or sell an asset without causing a significant change in the asset's price.

219.    Despite all of the above, Lacy accepted the Netpliance valuation and filed an IRS Form 709 gift tax return relying on it on August 9, 2001. Lacy signed the tax form as its preparer:

220.    The very next day after Lacy filed the tax form, on August 10, 2001, Netpliance changed its name to TippingPoint Technologies, Inc. and executed a 1-for-15 reverse stock split to avoid delisting on the Nasdaq exchange. As The Austin Business Journal reported on August 10, 2001:

> Austin's Netpliance Inc. [Nasdaq: NPLI] is executing a one-for-15 reversed stock split amid management, business model, and name changes.
>
> Netpliance is changing its name to Tipping Point Technologies Inc. to reflect a change in strategy. Previously, Netpliance sold Internet appliances and internet service.

221. As the article noted, Netpliance had not traded above $1 per share in all of 2001 and was facing delisting, with its new name and reverse stock split a proposed means to convince Nasdaq to change its mind:

> The one-for-15 reverse stock split is in response to a possible delisting of Netpliance's stock by the Nasdaq market.
>
> The stock hasn't traded above $1 a share in 2001. The company was notified in April by Nasdaq that it had failed to comply with the minimum bid price required for continued listing. The minimum is $1 a share for 30 consecutive trading days.
>
> The stock closed Aug. 10 at 40 cents a share.
>
> In June, Netpliance met with a Nasdaq panel to review the delisting notice. Webster says the stock reversal was part of the plan presented to the panel.
>
> The stock reversal will occur Aug. 20, the same day switches to a new ticker symbol—TPTI.

222. Lacy, who had direct access to Jimmy Mansour (then on Netpliance's board, unbeknownst to Plaintiff) and the Vice President and General Counsel of the company, Cahill, likely knew that Netpliance was rebranding and modifying its capital structure within days of the August 9th filing of the gift tax return. Lacy had valued stock shares that were actually worth approximately $85,600 at $5,136,000 in a filing mailed and/or electronically transmitted to the IRS. This valuation was facially implausible such that it was both objectively and subjectively false and misleading, particularly in light of the immediate decline in Netpliance share price immediately after IPO. As Plaintiff's fiduciary, Lacy had a duty to tell Plaintiff the whole truth about her tax filing on his behalf and about Netpliance—she did not.

223. Setting aside the inflated valuation, Lacy's submission of the gift tax return was in itself peculiar. The Internal Revenue Code does not ordinarily recognize capital contributions to partnerships as revenue recognition events. There are, however, exceptions, which create the risk

that the transfer of an asset to a partnership is treated as a sale at fair market value. As Section 704 of the Internal Revenue Code stated at the time Lacy filed the gift tax return:

(c) **Contributed property.--**

(1) **In general.**--Under regulations prescribed by the Secretary--

(A) income, gain, loss, and deduction with respect to property contributed to the partnership by a partner shall be shared among the partners so as to take account of the variation between the basis of the property to the partnership and its fair market value at the time of contribution, and

(B) if any property so contributed is distributed (directly or indirectly) by the partnership (other than to the contributing partner) within 5 years of being contributed--

(i) the contributing partner shall be treated as recognizing gain or loss (as the case may be) from the sale of such property in an amount equal to the gain or loss which would have been allocated to such partner under subparagraph (A) by reason of the variation described in subparagraph (A) if the property had been sold at its fair market value at the time of the distribution,

(ii) the character of such gain or loss shall be determined by reference to the character of the gain or loss which would have resulted if such property had been sold by the partnership to the distributee, and

(iii) appropriate adjustments shall be made to the adjusted basis of the contributing partner's interest in the partnership and to the adjusted basis of the property distributed to reflect any gain or loss recognized under this subparagraph.

224. Lacy's gift tax return put Plaintiff squarely within the crosshairs of Internal Revenue Code § 704(c)(1)(B), which provided that a distribution of the Netpliance interest to anyone other than Plaintiff in his separate capacity would result in the recognition of a gain at the inflated fair market value Lacy submitted to the IRS. In other words, Lacy had immediately conveyed an interest in the FLP (which held Netpliance) from Plaintiff to other members of the FLP, triggering a taxable gain of approximately 90% (Mansour's separate property share) of $5,136,000—minus the taxable basis, which Lacy never disclosed to the IRS or in the trust documents, and the valuation never as much as mentions.

225. Lacy, a highly trained expert in tax law, particularly with respect to gift taxes and partnership contributions, deliberately executed a simultaneous inflated valuation and transfer that

had a high likelihood of resulting in a retroactive gain for Plaintiff in the 2000 tax year, when the property would have been deemed sold to the FLP.

226. Not only did it make no apparent sense for Lacy to run headfirst into a statutory landmine, but it also made no apparent sense for her to significantly overvalue Netpliance shares given the risk of disallowance.

227. Lacy created a further risk of a $5.1 million (paper, taxable) gain for Plaintiff just months later. On November 2, 2000, Lacy drafted a $1 million promissory note from the FLP to Plaintiff:



228. The timing of Lacy's promissory note was inexplicable given her previous filing in August, particularly given Lacy's expertise. This is because the IRS presumes that a transfer of value within two years of a partnership contribution is indicative of a "disguised sale" of the contributed asset to the partnership. As 26 C.F.R. § 1.707-3(c) provides:

> **(c) Transfers made within two years presumed to be a sale—(1) In general.** For purposes of this section, if within a two-year period a partner transfers property to a partnership and the partnership transfers money or other consideration to the partner (without regard to the order of the transfers), the transfers are presumed to be a sale of the property to the partnership unless the facts and circumstances clearly establish that the transfers do not constitute a sale.
>
> **(2) Disclosure of transfers made within two years.** Disclosure to the Internal Revenue Service in accordance with § 1.707–8 is required if—
>
> **(i)** A partner transfers property to a partnership and the partnership transfers money or other consideration to the partner with a two-year period (without regard to the order of the transfers);
>
> **(ii)** The partner treats the transfers other than as a sale for tax purposes; and
>
> **(iii)** The transfer of money or other consideration to the partner is not presumed to be a guaranteed payment for capital under § 1.707–4(a)(1)(ii), is not a reasonable preferred return within the meaning of § 1.707–4(a)(3), and is not an operating cash flow distribution within the meaning of § 1.707–4(b)(2).

229.      Here too, the result of Lacy's actions would be that Plaintiff was deemed to have sold Netpliance stock to the FLP in February 2000 at the inflated $5.1 million valuation Lacy obtained in April 2001 and disclosed to the IRS in August 2001. Moreover, Lacy's promissory note triggered the tax regulation's disclosure requirements, which required Lacy to disclose the FLP contribution on an IRS Form 8275, with detailed information as to the facts surrounding the contribution.

230.      Within months, Lacy had (a) valued Plaintiff's supposed Netpliance stock, which was trading for approximately 40 cents per share on a public exchange,  at $24 per share, for a fair market value of $5,136,000; (b) directly triggered a statutory provision that would create a 2000 tax-year gain for Plaintiff in the millions; and (c) issued a promissory note a few months later that separately triggered a tax regulation that not only presumed a sale causing a taxable gain to Plaintiff, but also triggered disclosure requirements.

231.      These were not obscure tax laws—they were statutory and regulatory presumptions and bright-line rules that any reasonable tax professional would know to evaluate as part of a partnership transfer such as the one Lacy executed for Plaintiff.

232. Lacy had done—with quite a bit of evident planning—precisely the two things under the tax laws that would create the clearest risk of a revenue event for Plaintiff: a taxable sale of $5 million in nearly worthless stock, retroactively occurring in 2000.

233. Lacy's maneuver was engineered. It was not reckless or unwitting. Lacy had planted the possibility that the transfer of Netpliance could be treated as a paper gain in the year 2000, meaning a gain based on an approximately $5 million sale that did not actually occur and did not result in any money flowing from the FLP to Plaintiff.

234. Notably, Plaintiff could have taken a tax loss by the end of 2000 by selling the Netpliance stock at a substantial loss, which Plaintiff could use to offset his other income. Lacy eliminated that option in favor of creating a potential (paper, taxable) gain of millions of dollars—the opposite of what any tax professional seeks to do for a client. Indeed, tax professionals seek to eliminate tax liability, not engineer a taxable event.

235. There was more to what Lacy had done. Lacy never disclosed the capital contribution on Plaintiff's personal returns in 2000 or 2001, nor did Lacy comply with disclosure obligations under 26 C.F.R.§§ 1.707-3(c) and 1.707-8 by filing an IRS Form 8275. Lacy had carefully and quietly engineered a springing taxable gain for the 2000 tax year—one large enough to be carried forward for years—but did not trigger it with disclosure to the IRS.

236. Lacy simultaneously caused the disclosure of the Netpliance investment as part of the FLP assets in 2002 and 2003, but never appeared to file a return for the FLP in 2001. Each year, Netpliance was kept on the FLP's books at the inflated $5.1 million valuation—all while the stock continued to trade below a dollar and face delisting. Each year, Lacy could have written down the Netpliance investment, creating a tax loss for the members of the FLP, but never did so. Year after year, the Netpliance investment sat on the books at the massively inflated—and

increasingly implausible—valuation. Then, in 2004, the Netpliance investment was suddenly written down entirely, causing an approximately $4 million loss to be passed through to the members of the FLP.

237.    As explained below, this write-down came as Morgan Stanley completed its four-year churn of hundreds of millions of dollars of securities transactions through Plaintiff's accounts—all while Morgan Stanley's bankers traded highly illiquid penny stocks, including Netpliance, using Plaintiff's accounts. Of course, Morgan Stanley's money laundering was unpredictable—it could not determine *a priori* whether its wash transactions would create a gain or loss over the four years its multi-year churn.

238.    Lacy had created a $5 million margin of error for Morgan Stanley. Indeed, if Morgan Stanley's hundreds of millions of dollars of money laundering transactions through Plaintiff's account resulted in a gain, Lacy could instantly take a multimillion-dollar loss and pass it through Plaintiff's taxes to mask the gains.

239.    If the trades through Plaintiff's accounts resulted in a loss, Lacy could simply disclose the Netpliance contribution along with the gain-triggering promissory note or transfer of the partnership interest to other FLP members. Disclosure, including by filing a Form 8275, would create an approximately $5 million gain recognition that would retroactively occur in 2000 upon disclosure—one that could be carried forward for several years after 2000 as needed.

240.    Lacy had engineered maximum optionality ahead of what Morgan Stanley did next.

**C.    Morgan Stanley Washes Hundreds of Millions of Dollars a Month Through Plaintiff's Managed Account**

241.    Morgan Stanley had discretion over Plaintiff's accounts and had been engaged to manage Plaintiff's money by making investments. The accounts were managed primarily by Morgan Stanley banker Jim Moriarity.

242.     Moriarity's biography on Morgan Stanley's website describes him as catering to "ultra-high net worth families and individuals":

> Jim Moriarity has over 30 years of experience working with ultra-high net worth families and individuals. Serving as the team's senior relationship manager, Jim oversees the development and implementation of highly customized and fully comprehensive wealth management strategies. He has particularly extensive experience crafting tax-efficient strategies to diversify concentrated public and private equity positions and is an invaluable resource for the team's elite clientele of successful entrepreneurs, senior executives and their families.

243.     In the late 1990s and early 2000s, Moriarity was a fixture in Jimmy Mansour's orbit and was also in direct contact with Plaintiff's brother Joe Mansour. Indeed, during the period that Plaintiff entrusted his assets to Morgan Stanley, Joe Mansour would meet in person with Moriarity and relay requests from Moriarty to speak with Plaintiff.

244.     Plaintiff relied on Moriarity and his team at Morgan Stanley to manage his accounts without Plaintiff's intervention. Indeed, Plaintiff did not create an account with Morgan Stanley's online trading portal and only occasionally called in transactions that he wanted to be executed. Nearly every transaction in Plaintiff's Morgan Stanley accounts was executed by Moriarity and his team at Morgan Stanley, who had agreed to manage Plaintiff's finances and accounts—and charged fees to do so.

245.     By the beginning of 2000, Moriarity and Morgan Stanley were actively trading securities through Plaintiff's accounts, particularly a trading account, 06-21394. Each year, Morgan Stanley ran hundreds of millions of dollars of trades through Plaintiff's accounts, with the amount increasing significantly each year.

246.     More notable, however, was the throughput of purchases and sales in the 06-21394 account. From 2001 to 2004, Moriarity and Morgan Stanley ran ***billions of dollars*** of securities purchases and sales through this single account.

247.     In 2001, Moriarity and his team executed $196 million of trades through Plaintiff's account; in 2002, approximately $718.6 million; in 2003, approximately $670.28 million; and in 2004, approximately $626.72 million. In total, Morgan Stanley traded **$2.21 billion** through Plaintiff's account, mostly through a single trading account.



248.     Against the backdrop of this trading volume, the value of Mansour's managed assets deflated continuously until he transferred additional funds into the account in May of 2004.



249. As explained below, Morgan Stanley was laundering money through Plaintiff's account, and the large number of trades obfuscated the nature of the transactions into which Morgan Stanley entered on his behalf.

**D. Morgan Stanley Engages in Highly Coordinated Money Laundering through Netpliance/TippingPoint Trades in Plaintiff's Managed Account**

250. Among the massive number of trades running through Plaintiff's 06-21394 account were relatively inconspicuous trades in Netpliance.

251. In March 2000, Netpliance made its debut on the Nasdaq at an $18 share price. Plaintiff's Morgan Stanley account immediately began making purchases. Within days of the IPO, Morgan Stanley had made approximately $1 million in Netpliance trades on Plaintiff's behalf, but fully exited the position by the end of March.

252.     Netpliance's share price rapidly fell in 2000. By the beginning of May, the stock had lost two-thirds of its value, and Plaintiff's Morgan Stanley account made a handful of trades worth approximately $400,000.

253.     On May 30, 2000, however, Morgan Stanley began a buying spree of Netpliance stock as the stock continued to fall in price. Morgan Stanley purchased $700,000 of Netpliance shares for Plaintiff's account. The stock price ranged from $4.87 to $8.47 that month.

254.     In July 2000, Morgan Stanley bought through Plaintiff's accounts $106,000 worth of Netpliance stock and sold approximately $734,000. The transactions were buried among the large throughput of trades that ran through Plaintiff's account.

255.     Morgan Stanley did not make another Netpliance trade in Plaintiff's accounts for approximately one year. By the end of July 2000, Morgan Stanley had kept 30,200 shares of Netpliance stock in Plaintiff's account. The stock was then valued at approximately $7.38 per share. By the end of April 2001, the stock was a penny stock, trading at 34 cents per share.

256.     Netpliance's sub-one dollar share price left it vulnerable to delisting from the Nasdaq exchange, which delists stocks that cannot maintain a $1 trading price for more than 30 consecutive days. Netpliance was internally planning a reverse stock split with a 15:1 ratio, meaning that 15 shares would be exchanged for a single share, increasing the price at which the stock would be traded on the exchange.

257.     As Investopedia explains, a reverse stock split "can signal a company in distress since it raises the value of otherwise low-priced shares," referred to as per-share price bumping:

> Per-share price bumping is the primary reason why companies opt for reverse stock splits, and the associated ratios may range from 1-for-2 to as high as 1-for-100. Reverse stock splits do not impact a corporation's value, although they usually are a result of its stock having shed substantial value. The negative connotation associated

with such an act is often self-defeating as the stock is subject to renewed selling pressure.

258.    If Netpliance was delisted from Nasdaq, it would lose access to the public markets, forcing the stock onto the so-called "pink sheets," which destroys a stock's liquidity. Netpliance's reverse stock split would stave off delisting, at least for a while. However, because a reverse split is regarded as an extremely negative signal for a company's stock price, a reverse split is often met with a significant decline in buyers and sellers of the stock, causing the stock to become illiquid.

259.    As explained above, on August 9, 2001, Lacy filed a gift tax return with the IRS on Plaintiff's behalf containing an implausible $24 per share valuation of the then-penny stock. The next day, Netpliance announced it was changing its name to TippingPoint and commencing a 15:1 reverse stock split.

260.    Although a reverse stock split frequently leads to illiquidity, Morgan Stanley stepped in with Plaintiff's account to provide needed liquidity for Netpliance leading up to and after the 1-for-15 reverse split. Although Morgan Stanley did not trade Netpliance stock in Plaintiff's accounts for almost a year across 2000 and the first half of 2001, it suddenly stepped in to buy Netpliance stock from May 2001 through the end of August, including a buy order at a 40 cent share price on the very same day Lacy filed a $24 per share valuation with the IRS. By October, after Netpliance completed its reverse stock split and rebranded itself as TippingPoint, Morgan Stanley sold off most of the accumulated position.

261.    Netpliance, now TippingPoint, had avoided delisting, but its stock remained illiquid, creating the conditions necessary for what came next.

262.    On February 19, 2002, Morgan Stanley began a buying spree of Netpliance stock in Plaintiff's accounts. Morgan Stanley made only purchases of Netpliance through September 8, 2003, totaling 36,501 shares at a total cost of $338,342.66. The illiquidity of the stock during this

streak of purchases created a high likelihood that the trades were coordinated, including with insiders such as Plaintiff's brother Jimmy and others affiliated with Netpliance. Coordination meant that counterparties were extracting funds from Plaintiff's account under the guise of TippingPoint trades—fully laundered through the public market. Any coordination as to these shares was virtually impossible to detect.

263.    Morgan Stanley's actions in July 2004, however, left faint breadcrumbs that neither Plaintiff nor any reasonable investor would have seen without extensive analysis and a bigger picture.

264.    Beginning in July 2004, Morgan Stanley began an aggressive selling spree of TippingPoint stock from Plaintiff's account. By then the stock price had stabilized at approximately $19 per share.

265.    From July 13 through August 3, 2004, Morgan Stanley sold approximately 42,000 shares of TippingPoint stock under Plaintiff's name. More than $700,000 flowed into Plaintiff's account from the sales.

266.    The sale orders were buried in the many other trades Morgan Stanley ran through Plaintiff's account. To the untrained eye, it looked like a liquidation. Forensic analysis performed in 2024, however, showed that the trades contained coded signals buried in the transaction details—namely, the order size.

267.    Many of the TippingPoint stock sales in July were for share amounts referred to as odd lots, meaning that they were not in 100-share increments. This reduced the likelihood that the trades would be consummated because of trading rules and technological constraints of the time.

268.    More notably, however, the odd lot trade sizes contained distinct codes. For example, trade sizes would repeatedly alternate among 489 and 511 shares, even across different

days. Thus, Morgan Stanley bought 489 shares of Tipping Point on July 20, 2004, then bought 489 shares twice on July 21, and three times on July 22. Morgan Stanley bought 511 shares on July 21, 2004, then bought 511 shares three times on July 22.

269.     Repeated patterns were striking. Trade sizes of 1,511, 511, 11, and 1 share(s) were repeated over and again across the July 2004 trades. Small trades, such as trades for 11 shares, punctuated blocks of trades, for example on July 21, 2004, then again on July 23. A 1-share order terminated a multi-day string of large orders. Small orders, with de minimis value, occurred only in prime numbered sizes, such as 2, 67, and 29.

270.     The trades appeared to contain coded coordination signals:

| 7/20/04 | 7/23/04 | Sell | 1511 | TIPPINGPOINT TECH Com | $ | 19.09 |
|---------|---------|------|------|-----------------------|---|-------|
| 7/20/04 | 7/23/04 | Sell | 489  | TIPPINGPOINT TECH Com | $ | 19.09 |
| 7/21/04 | 7/26/04 | Sell | 989  | TIPPINGPOINT TECH Com | $ | 19.04 |
| 7/21/04 | 7/26/04 | Sell | 11   | TIPPINGPOINT TECH Com | $ | 19.04 |
| 7/21/04 | 7/26/04 | Sell | 489  | TIPPINGPOINT TECH Com | $ | 18.94 |
| 7/21/04 | 7/26/04 | Sell | 511  | TIPPINGPOINT TECH Com | $ | 18.94 |
| 7/22/04 | 7/27/04 | Sell | 489  | TIPPINGPOINT TECH Com | $ | 18.73 |
| 7/22/04 | 7/27/04 | Sell | 511  | TIPPINGPOINT TECH Com | $ | 18.73 |
| 7/22/04 | 7/27/04 | Sell | 489  | TIPPINGPOINT TECH Com | $ | 18.70 |
| 7/22/04 | 7/27/04 | Sell | 511  | TIPPINGPOINT TECH Com | $ | 18.70 |
| 7/22/04 | 7/27/04 | Sell | 1000 | TIPPINGPOINT TECH Com | $ | 18.68 |
| 7/22/04 | 7/27/04 | Sell | 489  | TIPPINGPOINT TECH Com | $ | 18.74 |
| 7/22/04 | 7/27/04 | Sell | 511  | TIPPINGPOINT TECH Com | $ | 18.74 |
| 7/22/04 | 7/27/04 | Sell | 1000 | TIPPINGPOINT TECH Com | $ | 18.74 |
| 7/22/04 | 7/27/04 | Sell | 500  | TIPPINGPOINT TECH Com | $ | 18.60 |
| 7/23/04 | 7/28/04 | Sell | 1000 | TIPPINGPOINT TECH Com | $ | 18.05 |
| 7/23/04 | 7/28/04 | Sell | 1000 | TIPPINGPOINT TECH Com | $ | 18.14 |
| 7/23/04 | 7/28/04 | Sell | 989  | TIPPINGPOINT TECH Com | $ | 18.21 |
| 7/23/04 | 7/28/04 | Sell | 11   | TIPPINGPOINT TECH Com | $ | 18.21 |

271.     Morgan Stanley was engaging in order book signaling, a telltale sign of insider trading and money laundering. Order book signaling is the practice of coordinating trades with counterparties by using order information placed on an exchange's order book to communicate.

272.     For example, parties with Level 2 and Level 3 order book information—information about what others are asking or willing to pay for a stock—can see what bids and asks

are available and at what price, along with the order size being offered. In the case of an illiquid security, such as TippingPoint (neé Netpliance), the number of available bids and asks are limited. Thus, a trader that places an order at a bid price sufficiently below the current market price or an ask price sufficiently above it can identify him- or herself to another person trading the stock if they agree on a code or identifier in advance.

273. This and other forms of signaling are common among collusive securities or commodities transactions. As a survey of UK enforcement actions published in an article titled "Manipulative trading practices: a guide for banks' legal and compliance departments" notes, unusual order sizes coupled with other factors are indicative of unlawful or collusive trading:

> Red flags for potential misconduct will depend on, among other things, the type of asset class, the type of trading in question and the features of the particular market. However, previous enforcement action has highlighted the following potential indicators of market manipulation. These indicators do not, in themselves, constitute market manipulation, but may be taken into account when transactions or orders to trade are investigated by the FCA:
>
> • Unusual size of orders.
>
> • Orders placed on the order book for an unusually short time period.
>
> • Consistent buying interest at increasing prices regardless of market conditions.
>
> • Orders at prices above the prevailing market price.
>
> • Entering orders to "buy high and sell low." That is, entering orders to buy shares on one exchange at a certain price, while offering to sell the same security on another exchange at a lower price.
>
> • Using different systems to place orders on each side of the trade.
>
> • Different strategies or levels of visibility for buy and sell orders.
>
> • Orders representing a very high proportion of the orders placed in the market in relation to the shares in question.

- Very close correlation between the placing of the orders by traders and the price movement of the instrument in question.

 . . .

- High volume and frequency of rollover trades.

- Where a market has a small number of participants, two or more participants acting in concert to manipulate the price have the potential to have a greater impact that might otherwise be the case.

Other red flags for market abuse generally include using codes in communications . . . .

274.     Many forms of market manipulation use order book signals to either manipulate or collude with other market participants. For example, spoofing is when a trader rapidly posts orders above or below where they will likely be filled, then quickly withdraws them in order to manipulate prices. Mirror trading, discussed above, may also use order sizes to signal the identity of a counterparty.

275.     Morgan Stanley's trades fit the bill precisely. To place and integrate new funds into Plaintiff's account for laundering, Morgan Stanley's counterparty, who could have been a TippingPoint insider, could not simply wire the money to Plaintiff or engage in a direct securities transaction with Plaintiff. The source of the funds transferred to Plaintiff account had to be concealed. To send money through the stock market would be extremely difficult for liquid stocks with high volumes. A trade placed on the Nasdaq for IBM stock, for example, may be filled by any third party, not just Plaintiff.

276.     TippingPoint's lack of liquidity and the few market participants buying and selling the stock eliminated many of those hurdles. One hurdle, however, remained. For money to flow into Plaintiff's account through stock sales, a counterparty must make repeated purchases on the

open market, but only with Plaintiff. For that, Morgan Stanley employed a coded system, where it would identify itself and punctuate trading blocks with coded messages embedded in order sizes.

277.    Repeated numeric sequences ending in 1s, for example, wrapped large order blocks, likely signifying acknowledgements or delimiters for transactions. Prime numbered order sizes or other repeated order sizes provided means of identifying to Morgan Stanley's traders that it was buying from the right counterparty on the exchange. Moriarity and his team at Morgan Stanley merely needed to match the order size on the book signaling the correct counterparty for the trade.

278.    The result was minimal loss as money launderers transferred hundreds of thousands of dollars into Plaintiff's account for placement and eventual laundering.

279.    In addition to using coded messages and burying the transactions in a massive churn of securities, Morgan Stanley also manually journaled into Plaintiff's account large amounts of TippingPoint shares, then journaled them out of the account on the same day.

| | | | |
|---|---|---|---|
| 07/27/2004<br>07/27/2004 | SECURITY JOURNAL RECEIVED | TIPPINGPOINT TECH COM | 334.000 |
| 07/27/2004<br>07/27/2004 | SECURITY JOURNAL RECEIVED | TIPPINGPOINT TECH COM | 333.000 |
| 07/27/2004<br>07/27/2004 | SECURITY JOURNAL RECEIVED | TIPPINGPOINT TECH COM | 264.000 |
| 07/27/2004<br>07/27/2004 | SECURITY JOURNAL RECEIVED | TIPPINGPOINT TECH COM | 2.000 |
| 07/27/2004<br>07/27/2004 | SECURITY JOURNAL RECEIVED | TIPPINGPOINT TECH COM | 67.000 |
| 07/27/2004<br>07/27/2004 | SECURITY JOURNAL WITHDRAWAL | TIPPINGPOINT TECH COM<br>TIPPINGPOINT TECH COM FROM MARGIN TO CASH | 334.000 |
| 07/27/2004<br>07/27/2004 | SECURITY JOURNAL WITHDRAWAL | TIPPINGPOINT TECH COM<br>TIPPINGPOINT TECH COM FROM MARGIN TO CASH | 333.000 |
| 07/27/2004<br>07/27/2004 | SECURITY JOURNAL WITHDRAWAL | TIPPINGPOINT TECH COM<br>TIPPINGPOINT TECH COM FROM MARGIN TO CASH | 264.000 |
| 07/27/2004<br>07/27/2004 | SECURITY JOURNAL WITHDRAWAL | TIPPINGPOINT TECH COM<br>TIPPINGPOINT TECH COM FROM MARGIN TO CASH | 2.000 |
| 07/27/2004<br>07/27/2004 | SECURITY JOURNAL WITHDRAWAL | TIPPINGPOINT TECH COM<br>TIPPINGPOINT TECH COM FROM MARGIN TO CASH | 67.000 |

280. This served to obfuscate which shares had been purchased and which had been transferred during the month, allowing better placement and integration of the funds to be laundered.

281. Moreover, the large number of sales, including on margin, risked raising red flags at Morgan Stanley's compliance department. Thus, Moriarity and Morgan Stanley facilitated the transfer and exit of a large amount of TippingPoint stock, masking the effect on Plaintiff's margin limits. Morgan Stanley used the same method of concealment it had used to exfiltrate Plaintiff's Intermedia shares four years prior—false and misleading journal entries that showed neither the source nor destination of the received and withdrawn TippingPoint securities.

### E. Lacy Finally Causes the FLP to Take a Passthrough Tax Loss

282. In August 2001, Lacy placed Netpliance stock on the FLP's books at an implausible valuation of approximately $5.1 million. When the stock was placed on the FLP's books, its inflated fair market value meant that Lacy could take an approximate $5 million write down on the FLP's behalf that very year. She did not do so. Not only did Lacy not write off Netpliance in 2001, no tax return was ever filed for the FLP that year.

283. By 2002 and 2003, Netpliance had changed its name to TippingPoint and undergone a reverse stock split, causing a forced exchange of shares. Lacy caused the FLP to file tax returns in 2002 and 2003 that falsely stated that the partnership owned approximately the same amount of Netpliance shares, never writing down the stock to its actual fair market value or even updating its name.

284. In 2004, Lacy finally caused the FLP to file a tax return indicating a full write-down of its supposed Netpliance stock, with several million dollars passing through to Plaintiff's personal tax return. Lacy did not ultimately need to trigger the retroactive gain she had engineered in Plaintiff's tax returns back in August and November of 2001. Instead, the massive sale of

TippingPoint stock in July 2004 created a likely profit for Plaintiff. Lacy therefore opted for the tax loss she had placed on the FLP's books instead, providing cover for the overt money laundering that Morgan Stanley ran through Plaintiff's account.

**F.    Morgan Stanley's Trades Bear Every Hallmark of Money Laundering, Sophisticated Concealment, and Hidden Money**

285.    What Morgan Stanley had done fit squarely within the money laundering and collusive trading paradigms. First, Morgan Stanley executed a massive number of trades. However, Plaintiff's collateral, although in the tens of millions of dollars of value across accounts, was not sufficient to trade hundreds of millions of dollars of securities on margin. This indicates that Morgan Stanley likely relied on money in affiliated accounts outside of Plaintiff's control to collateralize the disproportionate size of trades executed (in the billions of dollars through a single one of Plaintiff's accounts from 2001 to 2004) to trading account collateral.

286.    Indeed, as explained above, Moriarity and his team at Morgan Stanley had moved approximately $20.5 million outside of the accounts Plaintiff controlled, likely in associated trust accounts created by Plaintiff's brother Jimmy Mansour and Plaintiff's trusts and estates lawyer Lacy. That Morgan Stanley could trade hundreds of millions of dollars of securities each year through Plaintiff's accounts implies the existence of separate accounts collateralizing the trades. Neither Moriarity nor anyone else at Morgan Stanley, however, disclosed the existence of such collateralizing accounts.

287.    Second, the large number of securities transactions flowing through Plaintiff's managed account made it virtually impossible for a reasonable account holder, particularly one that had delegated his investments to be managed by Morgan Stanley, to detect any irregularity. Indeed, Plaintiff relied on Moriarity and Morgan Stanley's bankers to tell him if anything was amiss. None of them told him the truth.

288.    Third, the existence of coded signals in the order sizes of Morgan Stanley's July 2004 trades strongly indicate collusion with a counterparty during the July 2004 sales of TippingPoint—likely TippingPoint insiders with access to a large number of shares to sell to, and buy from, Plaintiff's account.

289.    These coded signals may also have occurred in connection other securities traded in Plaintiff's account besides TippingPoint, but dhave not yet been identified because insufficient information exists absent discovery to detect them. Indeed, in addition to more complete information, extensive statistical analysis is required to discover additional money laundering that may exist in the Morgan Stanley accounts through which Moriarity and Morgan Stanley made billions of dollars in trades on Plaintiff's account.

290.    Fourth, Morgan Stanley carefully timed trades around Netpliance/TippingPoint corporate events, such as the 1:15 reverse stock split in August of 2001, which also indicates collusion. Neither Plaintiff nor any reasonable investor exercising available diligence could have detected coordination among Netpliance insiders at precisely the same time in August 2001, including Netpliance's General Counsel, board members, and officers; Lacy, who was Jimmy Mansour's lawyer as well as the lawyer for several others insiders at Netpliance; and Moriarity and his team at Morgan Stanley, who engaged in carefully timed transactions to support Netpliance's reverse stock split.

291.    Fifth, Morgan Stanley's money laundering was likely exempt from Morgan Stanley's anti-money-laundering controls while Netpliance traded below $1 per share. As explained earlier in this Complaint, Morgan Stanley failed to monitor penny stock trades for money laundering and was not caught by FINRA for this practice until 2015. Indeed, Morgan Stanley had,

by its own later admission, simply untethered its monitoring systems from the penny-stock Netpliance transactions at issue here.

292. Finally, Morgan Stanley's anti money laundering controls did not appear to prevent the transfer and withdrawal of stock in and out of Plaintiff's account, including the same-day transfer and withdrawal of TippingPoint stock in July 2004. Without the monitoring and reporting of suspicious activity, neither Plaintiff nor any reasonable client of Morgan Stanley's could detect money laundering in their accounts. Indeed, only Morgan Stanley possessed longitudinal information sufficient to determine where assets were coming from and where they were going. And only Morgan Stanley could have properly monitored its own bankers, including Moriarity. Morgan Stanley's abdication of its monitoring responsibilities created fertile ground for the undetectable money laundering and collusive trading that deprived Plaintiff of the use of the money he thought he had invested with the bank.

## V. THE BLIPS STRATEGY FAILS, MASKING THE PROCEEDS OF THE SHARES ASSOCIATED WITH "MISSING" STOCK CERTIFICATE NO. 3 AND MORGAN STANLEY'S ILLICIT TRADES

293. By 2004, Morgan Stanley had siphoned away $20.5 million of Plaintiff's money into other accounts, associated with him but out of his control. Morgan Stanley had also engaged in hundreds of millions of dollars' worth of trades in Plaintiff's his managed account, which in addition to generating massive fees and commissions for Moriarity and the bank, hid a scheme to launder money in and out of Plaintiff's account through illicit securities trades.

294. Morgan Stanley's movement of significant amounts of Plaintiff's money and assets had serious tax implications, which would have subjected Morgan Stanley's conduct to scrutiny by the IRS. For example, the sale of the Intermedia stock that Morgan Stanley siphoned out of Plaintiff's accounts in 1998 and 1999 would generate taxable events and a myriad of tax forms. The large churn of trades through the accounts generated both potential gains and losses in

Plaintiff's accounts. Further, Morgan Stanley's July 2004 sale of TippingPoint stock through coded messages and collusive transactions had created a significant short-term capital gain for Plaintiff, spurring Lacy to immediately take the Netpliance write-off that year.

295.    The large number of trades through Plaintiff's accounts created a voluminous tax filing for Plaintiff in 2004. In addition, Lacy's write-down was relatively large and likely to garner attention in isolation. That year, however, the BLIPS strategy had failed, creating the perfect cover for the tax events generated by Morgan Stanley's conduct.

296.    The BLIPS strategy executed what the IRS referred to as a "Son of Boss" tax shelter. In August 2000, the IRS cracked down, broadly investigating anyone who bought into such shelters, including many of KPMG and Lacy's clients.

297.    In an August 2000 press release, the IRS disclosed that it was issuing a notice to shut down the tax shelters:

> The Treasury Department and the Internal Revenue Service issued a notice to shut down another abusive tax shelter that is being marketed and sold. This new scheme is similar in design to the so-called Bond and Option Sales Strategy, or BOSS tax shelter, which the Treasury and IRS shut down last December with Notice 99-59. . . .
>
> As in the BOSS shelter, this new scheme uses a series of contrived steps (in this case involving interests in a partnership) to generate artificial tax losses designed to offset income from other transactions. Notice 2000-44 issued today would deny taxpayers the purported losses resulting from this shelter transaction because they do not represent bona fide losses reflecting actual economic consequences as required under the tax law. The notice informs taxpayers and promotes that appropriate penalties may be imposed on participants in these transactions. The notice also warns that taxpayers and promoters who participate in these transactions and willfully conceal their efforts on tax returns may be subject to criminal penalties.

298.    The IRS crackdown resulted in an audit of Plaintiff's taxes, including the entities created to invest in the BLIPS tax shelter.

299.    In 2004, Plaintiff settled with the IRS, agreeing to pay approximately $5.2 million in taxes and interest. The settlement with the IRS did not call for a tax penalty. The tax penalty was strikingly similar to the size of the supposed tax loss Lacy had generated in 2004, creating the illusion that Plaintiff's overall tax liability had not increased.

300.    Plaintiff's liability, however, had in fact increased. Plaintiff had already paid almost $10 million in taxes on his Intermedia shares. The BLIPS tax shelter seemed unnecessary to him. The $16 million tax loss generated by the shelter, however, masked that Plaintiff had not only paid taxes on his share of the Intermedia shares received as part of the sale of his company, but had also paid taxes on an additional pool of merger consideration.

301.    In all, Plaintiff had paid approximately $4,606,949 in back taxes on top of the approximately $9.81 million he had paid on the proceeds of the Intermedia consideration he received from the NTF-Intermedia merger. The additional $4.6 million corresponded to the $23-25 million in value that would have been associated with the shares issued as part of NTF Stock Certificate Number 3, which was falsely stated in the Intermedia merger documents to be missing.

302.    When Plaintiff asked his accountants at KPMG why he had paid an additional $4.6 million to the IRS, he was told it was due to the IRS's disallowance of the BLIPS transaction. Unable to parse the complex tax consequences of the Intermedia merger, Lacy's recent write-down of assets in the FLP, and the settlement with the IRS, Plaintiff accepted what he was told.

303.    There was no reason to suspect that he had unwittingly paid taxes on Intermedia stock he never received. The chaos also helped mask the tax consequences of Morgan Stanley's aggressive money laundering and collusive trading through Plaintiff;s managed account.

## VI.    A BRIEF STINT AT DEUTSCHE BANK AND THE $6 MILLION FRAUDULENT LOAN

### A.    The Transfer to Deutsche Bank

304.    By August 2005, Terri Lacy and Jimmy Mansour planned to transition Plaintiff's accounts to new bankers at Deutsche Bank. In this regard, Lacy had a long relationship with the wife of a Deutsche Bank banker named Edwin "Boots" Nowlan.

305.    That month (August 2005), Lacy sent Nowlan all of Plaintiff's financial information, including information about Plaintiff's trusts and other entities—five months before Plaintiff became a Deutsche Bank client. Plaintiff was never told about this, and had never authorized Lacy to send his information to anyone at Deutsche Bank (or at any other new bank) in this time period. In fact, Plaintiff did not know that Lacy had sent his private information to Nowlan until Lacy (seemingly unwittingly) disclosed the fact in a 2022 text message many years later.

306.    At the urging of his brother Jimmy Mansour and of Lacy, Plaintiff migrated his money and assets from Morgan Stanley to Deutsche Bank in the beginning of 2006, with Nowlan designated to manage Plaintiff's accounts.

307.    When Plaintiff's accounts arrived at Deutsche Bank, the financial institution was heavily pushing its "structured" products. These were investments in securities backed by various asset-based collateral. Most famous among Deutsche Bank's structured products were those backed by real estate mortgages. Deutsche Bank, however, sold an assortment of structured products that collateralized loans, commodities, and derivatives.

308.    Deutsche Bank had moved into this business in the late 1990s, originally in Europe, then later in the United States. As *The Wall Street Journal* reported in a July 28, 1998 article titled "Deutsche Bank Offers a New CLO as Financing Method Hits Germany":

> German banks are finally beginning to use a new financing technique that will allow them to increase value for their shareholders.
>
> Collateralized loan obligations, or CLOs, allow banks to free up capital that would otherwise be tied up insuring the bank against loan defaults. The bank can then deploy the capital toward more-profitable ventures.
>
> On Monday, Deutsche Bank offered 4.3 billion marks ($2.41 billion) of such CLOs in a deal that could ignite a new market for bank financing in Germany.

309.     Deutsche Bank's new structured products were sold extensively in the United States, as the assets backing the instruments were dollar-denominated:

> Deutsche Bank sold $600 million of the offering in the U.S. The bank originally planned to sell these bonds denominated in marks, but when it became clear that U.S. investors were supplying most of the demand for the bonds, the bank decided to redenominate them into dollars.

310.     By 2005, structured products were a massive profit center at Deutsche Bank—and also a hotbed for abuse and fraud. Indeed, the products would ultimately help cause one of the largest financial disasters in global history just a few years after Plaintiff opened his accounts.

311.     Deutsche Bank proposed selling Plaintiff its structured loan products. However, rather than purchase the products outright with cash, Deutsche Bank recommended that Plaintiff *borrow* funds from Deutsche Bank and then invest the borrowed cash in Deutsche Bank structured loans. When Nowlan and Deutsche Bank made the recommendation, Plaintiff had more than enough cash to purchase the structured loans without incurring debt.

312.     At bottom, Deutsche Bank's proposal was complex, but Nowlan, Edrington, and Deutsche Bank were being hired to manage the complexity, and Plaintiff relied on their expertise. Plaintiff agreed to take out loans to buy Deutsche Bank's structured loan products in late 2006.

## B. The Deutsche Bank Loans

313. On February 9, 2007, Plaintiff entered into a Borrower Security and Pledge Agreement with a Deutsche Bank affiliate, DB Structured Products, Inc., and two additional affiliated entities listed on Schedule A to the agreement: Deutsche Bank Trust Company Americas and DB Private Clients Corp. The agreement pledged as collateral the assets listed in two collateral accounts in Plaintiff's name, as well as a first-lien interest in any funds relating to the assets in those accounts.

| Collateral Account | |
| --- | --- |
| | Name of Collateral holder and office at |
| Account Number | which Collateral Account is held |
| Primary – 5XJ 007677 | In the name of John A. Mansour held at the New York |
| Secondary – 5XJ 007735 | offices of Deutsche Bank Securities, Inc. |

314. Under the agreement, loan proceeds would be funded only to the two listed "Primary" and "Secondary" accounts, as only those accounts could collateralize the loan. Moreover, if the loans were not paid, Deutsche Bank and its affiliates only had recourse as to the assets in the two accounts collateralizing the loans. There were no other assets securing the loans, making the loans under the facility "limited recourse."

315. On February 9, 2006, Plaintiff also entered into a Demand Promissory Note with DB Structured Products, Inc. and its affiliates, providing a loan facility of $2 million. The facsimile transmission header for the signature page bears the date February 14, 2007. The promissory note itself did not result in the making of a loan. Plaintiff would have to execute a "Notice of Borrowing" to actually borrow funds through the facility. As Section 2.1 of the February 9, 2006 note states:

Section 2.1 The Loan. (a) This Note evidences advances that Lender, in its sole discretion, may make to Borrower from time to time. Borrower acknowledges and agrees that no provision of this Note or any other agreement securing or relating to this Note shall be deemed to impose on Lender any obligation to make any advances of the Loan to Borrower or to affect Lender's unrestricted right to demand payment in full of this Note at any time. . . . In the event Lender, in its sole discretion, agrees to make any advances of the Loan, Borrower shall deliver a notice of borrowing in the form of <u>Exhibit A</u> attached hereto (a "Notice of Borrowing") to Lender prior to 11:00 a.m. (New York City time) at least 3 Business Days before the date of such requested borrowing.

316. Plaintiff did not execute a Notice of Borrowing associated with the note until February 9, 2007, borrowing $2 million. The same day, Plaintiff signed a Federal Reserve Form G-3, which gave the regulator notice of the loan, as well as its purpose, which was stated on the form as "Purchase Deutsche Bank Structured Notes." The loan proceeds were not to "carry margin stock."

317. On March 9, 2007, Plaintiff executed a Demand Promissory Note for an additional $3 million, expanding the overall facility's capacity to $5 million. Plaintiff also filed a Federal Reserve Form G-3 notifying the regulator of the expansion of the credit facility by the $3 million note amount. Plaintiff, however, submitted a Notice of Borrowing for only an additional $2 million on March 19, 2007. In all, Plaintiff had borrowed $4 million, leaving an additional $1 million available in the facility.

318. Deutsche Bank made investments in its structured loan products after the two loans were funded. The May 2007 statement for Plaintiff's Primary collateral account ending -7735 showed approximately $8.5 million invested in Deutsche Bank structured loan products, meaning that at least $4.5 million of Plaintiff's funds had been swept into the Primary collateral account to fund the purchase of the leveraged loans and were now subject to a first lien in favor of Deutsche Bank and its affiliates.

319.    In July 2007, Boots Nowlan and John Edrington advised Plaintiff to borrow an additional $3 million and invest it in a Deutsche Bank-controlled fund referred to on statements as "Deutsche Bank AG X-Alpha ER & CROCI US," which Nowlan and Edrington referred to as CROCI. Plaintiff ultimately agreed to make the investment with loan proceeds.

320.    On July 17, 2007, $3 million entered Plaintiff's Secondary collateral account under the loan facility (ending -7677), and the entire amount was transferred to the Primary collateral account (ending -7735) the same day, where it was invested in CROCI on July 19, 2007.

321.    The CROCI investment, which was supposed to be hedged against risk from significant volatility, immediately plummeted in value. Plaintiff contacted Nowlan and Edrington, asking to redeem the investment after he had sustained a 10% unrealized loss on CROCI. Nowlan and Edrington aggressively sought to deter the redemption, including by noting that redemption would result in a fee. Plaintiff persisted:

> From: johnnym
> Sent: 08/06/2007 05:40 AM
> To: John A Edrington/Dallas/DBNA/DeuBa@DBAmericas
> Subject: Re: Misc.
>
> John,
> You are the person able to give me the x-alpha performance. Do you have its month to date number. Also, tomorrow I wish to sell 600k of croci bought in June and I wish to sell 500K of eaemx. Use the proceeds from croci to pay down on the note. This payment shoiuld close out the 3M loan used for the ill timed purchase oj croci in july. Please let me know when the call with sanford will happen.
> Johnny mansour
> Sent via BlackBerry by AT&T

322.    Plaintiff demanded that the CROCI position be unwound and the $3 million debt he was told he incurred to purchase the investment be extinguished.

## C. The Fraudulent $6 Million Loan

323. The truth about what happened in July 2007 would not be revealed until years later. As explained below, a forensic investigation of Plaintiff's finances revealed inconsistencies in Deutsch Bank's management of Plaintiff's assets. On July 11, 2022, Plaintiff's lawyer wrote to Deutsche Bank to ask for all relevant bank account numbers, records, and statements.

324. On September 23, 2022, Justin Dixon, Vice President in Deutsche Bank's legal department, wrote back. Deutsche Bank's search for accounts associated with Mansour revealed *twenty-seven* account numbers. Mansour, however, was not aware of many of them and had not received statements for them. Deutsche Bank enclosed the statements it could locate. Notably, it could not locate account statements for Plaintiff's two collateral accounts from before May 2007. Indeed, for fifteen accounts apparently associated with Plaintiff, Deutsche Bank could not locate records before May 1, 2007.

325. Deutsche Bank's late-2022 letter also included an attached Exhibit B, which was a compilation of documents associated with Plaintiff's loans at Deutsche Bank:

The Letter also demands "all documents relating to a $6.14 million non-collateral loan from DB Trust Company that was paid from Mr. Mansour's accounts, which he did not authorize ...." After conducting a good-faith search for documents, DB has located the following documents relating to the Loan, which are attached as **Exhibit B**:

- Borrower Security and Pledge Agreement dated February 9, 2007;
- Notice of Borrowing dated February 9, 2007;
- Demand Promissory Note dated February 9, 2006;
- Demand Promissory Note dated March 9, 2007;
- Demand Promissory Note dated July 6, 2007;
- Federal Reserve Form G-3 dated February 15, 2007;
- Federal Reserve Form G-3 dated March 28, 2007;
- Federal Reserve Form G-3 dated July 16, 2007; and
- Securities Account Control Agreement dated February 6, 2006.

As shown in the documents comprising Exhibit B, Mr. Mansour personally executed the security and pledge agreement, securities account control agreement, and multiple demand promissory notes. Thus, Mr. Mansour's contention that "he only recently became aware" of the Loan is without merit.

326.    Exhibit B revealed, for the first time, information that could not previously have been discovered—an outright fraud at Deutsche Bank perpetrated against Plaintiff and in connection with his accounts.

327.    First, Exhibit B disclosed for the first time that Nowlan and Edrington had filed a Federal Reserve G-3 in July 2007 for a ***$6 million*** loan, not a ***$3 million*** loan as Deutsche Bank had represented to Plaintiff. An examination of the document itself was more troubling. Plaintiff's signature had been forged.

FRG-3
OMB No. 7100-0018
Approval expires March 31, 2008

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
## Statement of Purpose for an Extension of Credit Secured by Margin Stock
## by a Person Subject to Registration Under Regulation U
### (Federal Reserve Form G-3)
### DB Structured Products, Inc.
Name of Lender

This form is required by law (15 U.S.C. 78g and 78w: 12 CFR 221).

The Federal Reserve may not conduct or sponsor, and an organization (or a person) is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

Public reporting burden for this collection of information is estimated to average 10 minutes per response, including the time to gather and maintain data in the required form and to review instructions and complete the information collection. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Secretary, Board of Governors of the Federal Reserve System, 20th and C Streets, N.W., Washington, D.C. 20551; and to the Office of Management and Budget, Paperwork Reduction Project (7100-0018), Washington D.C. 20503.

## Instructions

1. This form must be completed when a lender subject to registration under Regulation U extends credit secured directly or indirectly, in whole or in part, by any margin stock.

2. The term "margin stock" is defined in Regulation G (12 CFR 221) and includes, principally: (1) stocks that are registered on a national securities exchange or any OTC security designated for trading in the National Market System; (2) debt securities (bonds) that are convertible into margin stock; and (3) shares of most mutual funds.

3. Please print or type (if space is inadequate, attach separate sheet).

Part 1  To be completed by borrower(s)

1. What is the amount of the credit being extended? $6,000,000

2. Will any part of this credit be used to purchase or carry margin stock?          Yes          X No

If the answer is "no," describe the specific purpose of the credit To Purchase Deutsche Bank Structured Notes

I (We) have read this form and certify that to the best of my (our) knowledge and belief the information given is true, accurate and complete.

Signed                                               Signed

_John A. Mansour_____               _____
John A. Mansour          Date                     Borrower's signature          Date
          As of July 6, 2007
_____               _____
Print or type name      Date                      Print or type name          Date

**This form should not be signed if blank.**

A borrower who falsely certifies the purpose of a credit on this form or otherwise willfully or intentionally evades the provisions of Regulation U will also violate Federal Reserve Regulation X, "Borrowers of Securities Credit".

RM | A-1 | PLC

328.    The signature on the Federal Reserve form was not Plaintiff's. The $6 million amount had never been authorized by Mansour, and he had never signed a Notice of Borrowing associated with a July promissory note, which would have been required to borrow additional funds under the facility.

329. The file of agreements sent by Deutsche Bank's lawyer also included a confirmation of a faxed copy of the Form G-3 to the Federal Reserve:

330.    This version included the signature of Plaintiff's banker, John Edrington. The fax header indicated it had been sent from "DB PWM LENDING" and also included source and destination phone numbers.

331.    None of this had previously been disclosed to Plaintiff. The newly revealed documents—sent to Plaintiff for the first time in late 2022—showed that Nowlan and Edrington had made false statements to Plaintiff, as they had represented that Plaintiff was taking a $3 million dollar loan to invest in CROCI, not borrowing $6 million.

332.    The newly produced file also showed that Deutsche Bank's Edrington had filed a false form, with a forged signature, with the Federal Reserve and transmitted it over the wires through a fax.

333.    The statements produced by Deutsche Bank revealed additional indicia of fraud. The transfer of $3 million into the secondary control account was made to look like the funding of a $3 million loan. Analysis of the journal entry associated with the $3 million deposit, however, shows that the $3 million was transferred in from another account associated with Plaintiff, not from Deutsche Bank as loan proceeds:

**Transactions by Type of Activity**

| Process/Settlement Date | Activity Type | Description | Quantity | Price | Accrued Interest | Amount | Ccy |
|---|---|---|---|---|---|---|---|
| **Cash Withdrawals and Deposits** | | | | | | | |
| 07/17/07 | FEDERAL FUNDS RECEIVED | MANSOUR JOHN A 04547 | | | | 3,000,000.00 | USD |
| 07/20/07 | CUSTOMER AUTHORIZED TRANSFER | TRANS TO SXJ-007735 | | | | -3,000,000.00 | USD |
| 07/20/07 | CUSTOMER AUTHORIZED TRANSFER | TRANS TO SXJ-007735 | | | | -209.14 | USD |
| **Total Cash Withdrawals and Deposits - UNITED STATES DOLLAR** | | | | | | -209.14 | USD |

334.    The journal entry stated, "MANSOUR JOHN A 04547," indicating that the source of the funds was an account associated with Plaintiff ending -04547. Mansour was not, however, aware of any such account number, and when Deutsche Bank produced account numbers associated with Mansour in 2022, there was no account ending -04547 among them. The $3 million

had come from a side account to which Mansour had no access—an account that likely followed him from Morgan Stanley.

335.    The journal entry on July 17, 2007, was designed to conceal the source of the funds. Moreover, the entry itself was false and misleading, as it omitted the true source of the funds and the fact that the funds did not originate from Deutsche Bank in connection with a new $3 million loan that Edrington falsely told Plaintiff he was undertaking.

336.    The newly produced documents showed that Plaintiff had not received any portion of a $6 million dollar loan fraudulently taken by his Deutsche Bank bankers on his behalf. Not a dollar of either a $3 million or $6 million loan had entered any of the two collateral accounts—or any of the accounts for which Plaintiff had statements.

337.    Deutsche Bank had also purchased the CROCI investment, but had done so with Plaintiff's own money, not loan proceeds as represented to him by Edrington and Nowlan. Both bankers had a duty to speak fully and truthfully—in fact, they were acting as Plaintiff's fiduciaries and as his trusted advisers. Instead, they had perpetrated a fraud—one that could not have been revealed until Deutsche Bank's own lawyer unwittingly provided the hard evidence.

338.    In 2007, Plaintiff's dissatisfaction with the performance of Nowlin and Edrington's investments on his behalf led him to leave Deutsche Bank in favor of yet another bank to manage his money. Plaintiff asked Deutsche Bank to begin exiting his positions and transitioning his account to Merrill Lynch, which had again been recommended to Plaintiff by his brother Jimmy Mansour and Plaintiff's lawyer, Terri Lacy.

339.    On August 7, 2007 Deutsche Bank transferred $500,000 to Plaintiff's secondary collateral account; then $2,595,598.93 on August 13; and $1,008,702.50 on August 15, 2007. The funds were immediately sent on to Deutsche Bank Trust, which was designated to take receipt of

loan payments. Additional payments had been made to Deutsche Bank Trust prior to these transfers. On June 5, 2007, Deutsche Bank had sent $32,880 to the Deutsche Bank Trust; on June 29, 2007, it had sent $16,799; on July 26, 2007, it had sent $1,469,395.50; and on July 31, 2007, it had sent $476,291.50. In total, Deutsche Bank had transferred $6,099,645.50 to pay back loans.

340.     Deutsche Bank had taken $11 million of loans in Plaintiff's name. When Plaintiff paid back amounts from the redemptions of his investments to the Deutsche Bank Trust, he was not using loan proceeds—he was sending Deutsche Bank his own money.

341.     Deutsche Bank had indeed made investments in its structured loans, but it had made transfers from other accounts associated with Plaintiff to obscure the fact that Plaintiff had in fact purchased these structured loan assets *outright, with his own cash*. Mansour had also paid back approximately $6.1 million on only $4 million in loans he had actually incurred.

342.     The additional $3 million loan Plaintiff was told he incurred had never reached Plaintiff's accounts, and Deutsche Bank carefully hid it from him. What's more, Deutsche Bank had taken a $6 million dollar loan in Plaintiff's name and never even told him about it.

343.     When the two collateral accounts closed, all of their contents were subject to Deutsche Bank's lien. By the time Plaintiff's money was transferred to Merrill Lynch, approximately $6 million was missing from his aggregate NAV, the exact amount of money Deutsche Bank had secretly borrowed in his name.

344.     In 2007, when Plaintiff began the transition to Merrill Lynch, all of this had been actively concealed by Deutsche Bank, Nowlan, and Edrington. It would not be until years later when Deutsche Bank's in-house lawyer revealed the documents Nowlan, Edrington, and Deutsche Bank had used to fraudulently borrow $6 million in Plaintiff's name and conceal it.

## VII.   MERRILL LYNCH COVERS UP ITS FAILURE TO OBTAIN THE MISSING $6 MILLION FROM DEUTSCHE BANK

### A.   Plaintiff Opens Accounts at Merrill Lynch

345.   Unsatisfied with Deutsche Bank's performance, Plaintiff sought another place for his assets. Once again, Plaintiff turned to his brother Jimmy Mansour and to his lawyer Terri Lacy. This time they referred Plaintiff to Reed Smith, a wealth manager for ultra-high-net-worth individuals at Merrill Lynch, Pierce, Fenner & Smith. A scion of Merrill Lynch founding partner Winthrop Smith, Reed Smith helped found Merrill Lynch's wealth management business.

346.   In September 2007, Smith and his assistant Patricia Taylor began the process of transferring accounts from Deutsche Bank to Merrill Lynch. On September 7, 2007, Deutsche Bank transmitted a spreadsheet of account holdings to Smith and Taylor, and Smith began the process of verifying transfers as they occurred.

347.   On September 13, 2007, Merrill Lynch opened seven accounts associated with Plaintiff. Taylor e-mailed Plaintiff the account numbers that same day:

| | |
|---|---|
| **Subject:** | Account Update |
| **Date:** | Thursday, September 13, 2007 at 10:43:44 AM Central Daylight Time |
| **From:** | Taylor, Patricia (Private Banking and Investment Group) |
| **To:** | Johnny Mansour |
| **Attachments:** | image001.gif |

Good Morning, Mr. Mansour!

Your accounts were opened yesterday, and the account numbers are as follows:

xxx-02421 John Mansour Family Ltd. Partnership
xxx-12687 John A. Mansour IRA
xxx-12688 John A. Mansour, Separate Property
xxx-12689 John A. Mansour, BlackRock Municipal Bond Account
xxx-12690 John A. Mansour, Income Account
xxx-12691 John A. Mansour, Separate Property, FX Account
xxx-12693 JAM/KMM Mansour Children's Trust

348.     As part of the transition, Deutsche Bank reported accounts associated with three hedge funds, Horizon Asset Management, Lateef Investment Management, and Aletheia Research Management, Inc. Merrill Lynch advised Plaintiff to continue Plaintiff's investments in these funds under Merrill Lynch's supervision and created three accounts, marked FX (foreign exchange), to hold the interests in the three funds.

| | | | MERRILL LYNCH STRATEGIC PORTFOLIO ADVISOR<br>PORTFOLIO INFORMATION FORM | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Existing Relationship Total | $6,000,000 | | | | | | | | | |
| Account # | Assets: | Fund Type: | Manager: | 28B Code | Waiver | AIM Type | Historical Composite | Stock Analysis | Bond Analysis | Client Rate in Basis Points |
| 83V | 3,000,000 | Equity | HORIZON ASSET MGMT (CORE VALUE U | 28B0002J | No | Basic | No | No | No | 60 |
| 83V | 1,500,000 | Equity | LATEEF(ACG) | 28B0002O | No | Basic | No | No | No | 60 |
| 83V | 1,500,000 | Equity | ALETHEIA RESEARCH (LCG) | 28B0001S | No | Basic | No | No | No | 60 |

349.     Merrill Lynch noted an "Existing Relationship Total" of $6,000,000, roughly the same amount that Deutsche Bank's bankers had diverted as part of the undisclosed $6 million debt they incurred on Plaintiff's behalf.

350.     Merrill Lynch represented that it was continuing the investments made in the three funds and allocated $3 million to Horizon, $1.5 million to Lateef, and $1.5 million to Aletheia. As part of the transition, Merrill Lynch provided subscription agreements for each fund, which Plaintiff signed.

**B.     Merrill Lynch Loses the Horizon, Lateef, and Aletheia Investments and Covers It Up with Plaintiff's Own Money**

351.     Merrill Lynch represented that it had taken over Plaintiff's Horizon, Lateef, and Aletheia investments and had divided the investment across three accounts. Merrill Lynch, however, did not actually fund the accounts associated with Horizon, Lateef, and Aletheia when it onboarded them from Deutsche Bank.

352.     Instead, Merrill failed to disclose that from September 2007 through January 2011, it maintained a zero balance in each of these three accounts. A forensic analysis of Plaintiff's

Merrill Lynch accounts conducted in 2021 shows that the three accounts were not in fact funded until February 2011.

353.    The accounts, moreover, were not carried over from Deutsche Bank. By February 2011, Merrill Lynch likely realized that it had lost $6 million during the transition from Deutsche Bank. Rather than disclose the loss and risk scrutiny into conduct described *infra*, Merrill Lynch sought to cover it up.

354.    Documents produced by Merrill Lynch in 2021 showed for the first time that Merrill Lynch backfilled the Horizon, Lateef, and Aletheia accounts to create the illusion that it had carried over Plaintiff's $6 million of investments in them from Deutsche Bank.

355.    Specifically, on February 3, 2011, Merrill Lynch transferred $3,100,719 from one of Plaintiff's other accounts into the account earmarked for Horizon (83V-12867). From there, it transferred $622,152 into the account earmarked for Aletheia (83V-12866).

| CASH/OTHER TRANSACTIONS | | | | | |
|---|---|---|---|---|---|
| Date | Transaction Type | Quantity | Description | Debit | Credit |
| 02/03 | Journal Entry | | TR FROM 83V12688 | | 3,100,719.00 |
| 02/25 | Journal Entry | | TR TO 83V12866 | 622,152.00 | |
| | | | N/O JOHN A MANSOUR | | |
| | Subtotal (Other Debits/Credits) | | | 622,152.00 | 3,100,719.00 |
| | NET TOTAL | | | | 2,478,567.00 |

356.    Records produced in 2021 by Merrill Lynch showed that the account had previously been empty since inception until February 2011.

357.    Also in February 2011, the account associated with Aletheia (83V-12866) received the $622,152 transferred from the Horizon (83V-12867) account, but also received another $1,240,867 from another account belonging to Plaintiff (83V-12688).

| YOUR CMA TRANSACTIONS | | | | | February 01, 2011 - February 28, 2011 |
|---|---|---|---|---|---|
| CASH/OTHER TRANSACTIONS | | | | | |
| Date | Transaction Type | Quantity | Description | Debit | Credit |
| 02/03 | Journal Entry | | TR FROM 83V12688 | | 1,240,867.00 |
| 02/25 | Journal Entry | | TR FROM 83V12865 | | 622,152.00 |
| | Subtotal (Other Debits/Credits) | | | | 1,863,019.00 |
| | NET TOTAL | | | | 1,863,019.00 |

358.     Merrill Lynch began to fill the account with investments. This time, Merrill Lynch purchased $400,000 of blue-chip equities and ETFs. The account had had a zero balance prior to the transfer in February 2011.

359.     The Lateef account received a similar transfer. On February 3, 2011, Merrill Lynch transferred $3,100,719 from one of Plaintiff's other accounts. Then on February 25, Merrill Lynch passed on $622,152 to the Aletheia (83V-12866) account (shown above).

| CASH/OTHER TRANSACTIONS | | | | | |
|---|---|---|---|---|---|
| Date | Transaction Type | Quantity | Description | Debit | Credit |
| 02/03 | Journal Entry | | TR FROM 83V12688 | | 3,100,719.00 |
| 02/25 | Journal Entry | | TR TO 83V12866 | 622,152.00 | |
| | | | N/O JOHN A MANSOUR | | |
| | Subtotal (Other Debits/Credits) | | | 622,152.00 | 3,100,719.00 |
| | NET TOTAL | | | | 2,478,567.00 |

360.     As with the other two accounts, Merrill Lynch filled the Lateef account with approximately $1 million in mutual funds and other similar securities. The account had been empty since inception.

361.     In total, Merrill Lynch had shuffled $5,982,677 into the three accounts, creating the illusion that they held the approximately $6 million of Plaintiff's money that Merrill Lynch had lost in transition from Deutsche Bank. Plaintiff's overarching account statements reflected no change in total net asset value across accounts, but the statements were false and misleading. Indeed, Merrill Lynch's account statements never disclosed that the Lateef, Horizon, and Aletheia accounts had never held a $6 million investment in the funds.

362.     Statements after February 2011 also failed to disclose the entire truth. The approximately $6 million in transfers were designed to hide the fact that Plaintiff's money had been lost and was unaccounted for. Moreover, the securities purchases created volatility in those accounts to create the perception that they contained investments carried over from the Deutsche

Bank relationship. Each statement Merrill Lynch sent was false and misleading because it omitted all of that information.

363.    Indeed, Merrill Lynch actively managed Plaintiff's money, and Plaintiff relied on Merrill's investment expertise. Merrill Lynch actively made investments on Plaintiff's behalf and enjoyed discretion to do so, particularly in the three unfunded accounts. Merrill Lynch, including its lead banker, Reed Smith, had a duty to speak fully and truthfully. Instead, Merrill and Smith said nothing, and worse, actively concealed the truth with internal transfers of Plaintiff's own money into the accounts.

364.    Plaintiff did not know that the accounts had never been funded with the $6 million Merrill Lynch told him would be transferred into them, nor did Plaintiff know that his own money had been transferred into the account to hide the bank's loss of customer assets. It was not until Merrill Lynch began to produce more detailed account information in 2021 that Plaintiff could begin to piece together that his millions of dollars had never made it to the Horizon, Lateef, and Aletheia accounts, and that Merrill Lynch had tried to cover it up.

**C.     Plaintiff Discovers that Merrill Lynch Never Invested in Horizon, Aletheia, or Lateef on His Behalf**

365.    In late 2021, Plaintiff personally investigated what happened to his investments in Horizon, Aletheia, and Lateef.

366.    In August 2021, Mansour contacted Tran Capital Management, which had acquired Lateef in 2017, to obtain account records. Amir Baker from Tran Capital responded to Mansour's inquiry on August 31, 2021:

From: Amir Baker <abaker@trancapital.com>
Date: Tuesday, August 31, 2021 at 1:01 PM
To: Johnny Mansour <johnnym@3000partners.com>
Cc: scott@familyofficeresearch.com <scott@familyofficeresearch.com>
Subject: Deutsche Bank account 2006 - Lateef

Hi Johnny,

It was nice speaking with you today.  Please find the attached account documents from our files relating to your account from 2006.  This includes the manager appointment form, rescission of manager form and funding balance as of 04/05/2006.  So it's not confusing, note that the initial funding estimate on the application was $3.1mm; however, the account was only funded with $1mm.  We had some notes that Deutsche bank had confirmed the funding amount of $1mm and that further funding would come if they choose.  The holdings summary provided by Deutsche Bank confirms the $1mm balance. I believe the broker at the time was John Edrington, who is now with CITI Private Bank in Dallas, TX.  Please let me know if I can help further in any way.

Best regards,

Amir

367.     Baker noted that Deutsche Bank had invested only $1 million, though it had initially estimated $3.1 million in funding for the investment. When Plaintiff inquired about the Merrill Lynch account numbers that were supposedly associated with an investment in Lateef, Baker replied on December 10, 2021 that he had no record of any investment from Merrill Lynch:

On Dec 10, 2021, at 6:46 PM, Amir Baker <abaker@trancapital.com> wrote:

Hello Johnny,

I hope you are well.  We have reviewed our files, and the Merrill Lynch account numbers provided were not found in our records. If you have any additional records related to Merrill Lynch that you would like us to review, please let us know.

Regarding Deutsche Bank account 5XJ941164, the account was funded with $1 million, and our firm received trading authorization from Deutsche Bank on April 5, 2006 to manage the assets in the account. On May 25, 2006 we received a management rescission letter.  Note that the assets in this account were custodied by Deutsche Bank during the time of our firm's management of the portfolio. Our firm's services to Deutsche Bank were related to portfolio management, and our firm was not involved with wire transfers or fund outflows. Below is the record we have of the account holdings as of May 25, 2006. If you have any further questions, please let us know.

368.     It was clear that Merrill Lynch had lied to Plaintiff about holding his investments in Lateef. Each account statement failed to disclose that there was no investment in Lateef in any

of Plaintiff's accounts and that Merrill's representations about Lateef were false and misleading. In addition, Merrill Lynch had sent Plaintiff a subscription agreement for Lateef, which Plaintiff signed. Merrill Lynch, however, never invested any money in Lateef on his behalf—and never disclosed this when it presented a subscription agreement for the Lateef fund for Plaintiff's signature.

369. Mansour had also contacted Horizon Kinetics LLC for information about his supposed investment in Horizon. Horizon's Jessica Sullivan responded to Mansour's inquiries about statements associated with his investment in Horizon on August 30, 2021. Again, Horizon only had records associated with Deutsche Bank, not Merrill Lynch:

---

**From:** "Sullivan, Jessica" <jsullivan@horizonkinetics.com>
**Date:** Monday, August 30, 2021 at 3:30 PM
**To:** 'Scott Freund' <scott@familyofficeresearch.com>, Johnny Mansour <johnnym@3000partners.com>
**Subject:** RE: Merrill Account

Hi Scott,

No, we do not generate statements as the investments are not directly held with us. The account we have on file is John Mansour Family LP, account number 5XJ740145. The information for the broker who held the account is as follows:

Bank: Deutsche Bank
Broker: John Edrington
Branch Address: 200 Crescent Court, Suite 500, Dallas, TX 75201
Phone: (214)740-7700

I hope this helps.

Thank you,
Jess

---

370. John Edrington at Deutsche Bank had made an investment, but Merrill Lynch had not. When Plaintiff directly followed up about Merrill Lynch, he was given a clear answer—Merrill had never invested in Horizon on his behalf, as the account had opened and closed in March of 2007 and no instructions had been received to transfer the investment to Merrill Lynch:

From: "Sullivan, Jessica" <jsullivan@horizonkinetics.com>
Date: Tuesday, August 31, 2021 at 8:15 AM
To: Johnny Mansour <johnnym@3000partners.com>, 'Scott Freund' <scott@familyofficeresearch.com>
Subject: RE: Merrill Account

Hi John,

It looks like it opened in January 2007 and closed in March of the same year. That's all the information we have. We have no record of it transferring after receiving instructions to terminate the account on our side.

Thank you,
Jess

371.     Merrill Lynch had lied to Plaintiff about Horizon too. There had never been an investment made by Merrill Lynch in the fund, and contrary to affirmative representations that an "existing relationship" would continue in the amount of $6 million through three earmarked accounts at Merrill Lynch, no investments were ever made by Merrill Lynch into either Lateef or Horizon.

372.     Merrill Lynch and its banker Reed Smith had a duty to speak fully and truthfully about the investments (or non-investments) in Horizon and Lateef. In fact, Merrill Lynch sent Plaintiff statements that were false and misleading because they omitted the truth about Horizon and Lateef, and Smith discussed investment strategies with Plaintiff and was responsible for the transfers to empty accounts and related securities purchases designed to hide the truth from Plaintiff. Neither Smith nor anyone at Merrill ever disclosed to Plaintiff that no investment had actually been made in either Horizon or Lateef.

373.     As for Aletheia, the fund was bankrupt by the time Plaintiff learned about the missing investment and Merrill Lynch. Neither Smith nor Merrill Lynch ever said a word about Aletheia, let alone that it had been in distress. To the contrary, Smith and Merrill Lynch backfilled Plaintiff's account associated with Aletheia, preventing any inquiry into the fund, its performance, or the status of Plaintiff's investment.

374.     Merrill Lynch and Smith had agreed to manage the account associated with Aletheia on Plaintiff's behalf—they were his fiduciaries. They had a duty to speak fully and truthfully, but did the opposite. Beginning in September 2008, they hid the fact that they had never made any investment in Aletheia at all on Plaintiff's behalf. Moreover, each set of account statements beginning in September 2008 and through and after February 2011 spoke partially on the subject of Plaintiff's investments, creating the duty to speak fully and truthfully, but none of the statements disclosed that no investment in Aletheia ever existed at Merrill Lynch, making them false and misleading.

375.     At bottom, Merrill Lynch had defrauded Plaintiff about Horizon, Lateef, and Aletheia from September 2009 through August 2021. Moreover, Merrill Lynch and Smith covered their deception up with phony inter-account transfers designed to disguise that $6 million of investments were never made as represented in September 2008 when Plaintiff opened his Merrill Lynch accounts.

376.     As explained below, there was in fact far more money missing than the $6 million that was never actually invested in Horizon, Lateef, and Aletheia, and any inquiry by Plaintiff would have jeopardized the widespread money laundering and outright fraud in Plaintiff's accounts at Merrill Lynch—particularly as to hidden accounts out of Plaintiff's reach that contained money cumulatively siphoned out of Plaintiff's accounts and secretly moved with Plaintiff from bank to bank. That is why Merrill actively concealed the missing $6 million, and as explained below, the suspicious trading activity and the large movements of money in and out of Plaintiff's accounts.

## VIII. MERRILL LYNCH MASKS COORDINATED MONEY LAUNDERING WITH BILLIONS OF DOLLARS OF TRADES THROUGH PLAINTIFF'S MERRILL LYNCH AND SCHWAB ACCOUNTS

### A. Merrill Lynch Engaged in Large-Scale, Coordinated Trading in Managed Merrill Lynch Accounts with Plaintiff's Charles Schwab Account

377. In 2009, Merrill Lynch began actively investing on behalf of Plaintiff in managed accounts created in his name and in the name of affiliated entities, including the FLP. Merrill's trades, however, followed a notable pattern—they involved hundreds of millions of dollars of trades.

378. Specifically, from October 2008 through December 2009, Merrill Lynch executed $612,919,707 in trades through Mansour's managed accounts.

379. Notably, Mansour also maintained a separate trading account with Charles Schwab. More than $2 billion of trades flowed through that account at the same time as hundreds of millions in trades flowed through the Merrill account.

380. The pattern was unmistakable. The trades in the Merrill Lynch account and Schwab accounts correlated directly in volume from February through December of 2009. A normalized plot of the trade volumes across the two accounts shows that the trading patterns in the two accounts are highly correlated.



381.    A common measure of statistical correlation is the Pearson correlation coefficient associated with a set of data. As Investopedia explains:

> The correlation coefficient is a statistical measure of the strength of a linear relationship between two variables. Its values can range from -1 to 1. A correlation coefficient of -1 describes a perfect negative, or inverse, correlation, with values in one series rising as those in the other decline, and vice versa. A coefficient of 1 shows a perfect positive correlation, or a direct relationship. A correlation coefficient of 0 means there is no linear relationship.

> Correlation coefficients are used in science and finance to assess the degree of association between two variables, factors, or data sets. For example, since high oil prices are favorable for crude producers, one might assume the correlation between oil prices and forward returns on oil stocks is strongly positive.

382.    A correlation analysis of the trade volumes across these two accounts can be performed using the commonly used Pearson Correlation Coefficient. The co-efficient can be calculated as follows:

$$\rho_{xy} = \frac{\text{Cov}(x, y)}{\sigma_x \sigma_y}$$

**where:**

$\rho_{xy}$ = Pearson product-moment correlation coefficient

$\text{Cov}(x, y)$ = covariance of variables $x$ and $y$

$\sigma_x$ = standard deviation of $x$

$\sigma_y$ = standard deviation of $y$

383.     A correlation analysis of the trade volumes in Mansour's Merrill Lynch and Schwab accounts yields a statistically significant result. Specifically, the trading volumes have a correlation co-efficient of 0.69, meaning that there is a strong positive correlation between the trading volumes in the accounts.

384.     In other words, the strong correlation between trade volumes indicates that the trades in the managed Merrill Lynch account were likely coordinated with the trades in Mansour's Schwab account.

385.     Directionally, the trades are also highly coordinated. Indeed, normalized buy order volumes show a direct correlation between the two accounts:



386.    The correlation score for buy order trade volumes is 0.703, also indicating a high,

positive statistical correlation.

387.    Likewise, sell orders are also highly correlated between the two accounts.



388.     The correlation coefficient for sell orders is 0.687, again indicating a high statistical correlation between the two accounts.

389.     The pattern is unmistakable: either Merrill Lynch and Reed Smith's team at the bank were actively coordinating trades with someone controlling Plaintiff's Schwab account, or the same person was controlling both Plaintiff's managed Merrill Lynch accounts and Plaintiff's Schwab account. Merrill Lynch did not disclose either—or anything on the matter at all. Merrill Lynch, however, was a fiduciary with an affirmative duty to speak fully and truthfully. At the least, it had the duty to disclose the correlated/coordinated trading fully and truthfully as part of statements disclosing the trading activity. Merrill did not do so.

390.     The coordinated trading is highly indicative of money laundering. Indeed, years prior, Morgan Stanley had used coordinated trades to place, integrate, and launder funds in and out of Plaintiff's accounts. Moreover, Morgan Stanley had cloaked the trades in large transaction volumes. The trades here follow the same pattern. The two Merrill Lynch accounts engaged in unusually high trade volumes—significantly larger than supportable by the collateral in each of the accounts. Moreover, the trades appear coordinated across accounts, with the market likely serving as an intermediary eliminating any information about the source of funds traded on the open exchanges.

**B.      Merrill Lynch's Trade Volume Was Also Part of an Unlawful Scheme to Fund Its Own Proprietary Trades with Client Reserves**

391.     The hundreds of millions of dollars of trade volume flowing through Plaintiff's accounts at Merrill Lynch also followed another distinct pattern. The securities purchased and sold were subject to unique clearing and settling requirements, particularly with respect to reserves.

| Description | Quantity | Acquired/ Cover Short Date | Liquidation/ Short Sale Date | Sales Price | Cost Basis | Gains-/(Losses) * This Statement | Year to Date |
|---|---|---|---|---|---|---|---|
| CALL GOP APR 0420 | 14.0000 | 04/20/09 | 04/16/09 S | 6,103.84 | .00 | 6,103.84 | |
| PUT GGD APR 0360 | 17.0000 | 04/20/09 | 04/16/09 S | 6,051.84 | .00 | 6,051.84 | |
| PROSHARES ULTRASHORT S&P | 1500.0000 | 03/30/09 | 03/30/09 | 120,719.32 | 119,382.00 | 1,337.32 | |
| PROSHARES ULTRASHORT S&P | 1500.0000 | 03/30/09 | 03/30/09 | 120,749.92 | 120,733.65 | 16.27 | |
| PROSHARES ULTRASHORT S&P | 750.0000 | 03/30/09 | 03/30/09 | 60,374.96 | 60,617.38 | (242.42) | |
| PROSHARES ULTRASHORT S&P | 1500.0000 | 03/30/09 | 03/30/09 | 121,315.87 | 120,355.35 | 960.52 | |
| PROSHARES ULTRASHORT S&P | 750.0000 | 03/30/09 | 03/30/09 | 60,657.93 | 60,393.65 | 264.28 | |
| PROSHARES ULTRASHORT S&P | 750.0000 | 03/30/09 | 03/30/09 | 60,657.94 | 60,405.50 | 252.44 | |
| PROSHARES ULTRASHORT S&P | 750.0000 | 03/30/09 | 03/30/09 | 60,657.94 | 60,685.70 | (27.76) | |
| PROSHARES ULTRASHORT S&P | 1500.0000 | 03/30/09 | 03/30/09 | 121,694.31 | 121,587.30 | 107.01 | |
| PROSHARES ULTRASHORT S&P | 1500.0000 | 03/30/09 | 03/30/09 | 121,384.26 | 121,841.40 | (457.14) | |
| PROSHARES ULTRASHORT S&P | 1500.0000 | 03/30/09 | 03/30/09 | 120,995.32 | 121,841.40 | (846.08) | |
| PROSHARES ULTRASHORT S&P | 750.0000 | 03/31/09 | 03/31/09 | 57,299.67 | 57,987.50 | (687.83) | |
| PROSHARES ULTRASHORT S&P | 750.0000 | 03/31/09 | 03/31/09 | 57,299.68 | 57,800.00 | (500.32) | |
| PROSHARES ULTRASHORT S&P | 1500.0000 | 04/01/09 | 04/01/09 | 119,864.32 | 121,545.00 | (1,680.68) | |
| PROSHARES ULTRASHORT S&P | 1500.0000 | 04/01/09 | 04/01/09 | 119,864.33 | 121,467.00 | (1,602.67) | |
| PROSHARES ULTRASHORT S&P | 3000.0000 | 04/01/09 | 04/01/09 | 237,399.46 | 241,920.00 | (4,520.54) | |
| PROSHARES ULTRASHORT S&P | 1500.0000 | 04/02/09 | 04/03/09 | 106,904.40 | 107,650.95 | (746.55) | |
| PROSHARES ULTRASHORT S&P | 1500.0000 | 04/02/09 | 04/03/09 | 107,654.99 | 108,223.95 | (568.96) | |
| PROSHARES ULTRASHORT S&P | 1500.0000 | 04/03/09 | 04/03/09 | 107,655.00 | 106,933.95 | 721.05 | |
| PROSHARES ULTRASHORT S&P | 900.0000 | 04/06/09 | 04/07/09 | 66,487.05 | 64,553.00 | 1,934.05 | |
| PROSHARES ULTRASHORT S&P | 900.0000 | 04/06/09 | 04/07/09 | 66,487.05 | 65,271.38 | 1,215.67 | |
| PROSHARES ULTRASHORT S&P | 900.0000 | 04/06/09 | 04/07/09 | 66,487.05 | 64,328.00 | 2,159.05 | |
| PROSHARES ULTRASHORT S&P | 8700.0000 | 04/07/09 | 04/07/09 | 642,708.15 | 642,270.53 | 437.62 | |
| PROSHARES ULTRASHORT S&P | 3000.0000 | 04/07/09 | 04/08/09 | 219,054.36 | 221,472.61 | (2,418.25) | |
| PROSHARES ULTRASHORT S&P | 9000.0000 | 04/13/09 | 04/13/09 | 606,812.09 | 612,659.70 | (5,847.61) | |
| PROSHARES ULTRASHORT S&P | 3000.0000 | 04/27/09 | 04/27/09 | 196,315.85 | 200,010.00 | (3,694.15) | |
| PROSHARES TRUST | 750.0000 | 03/30/09 | 03/30/09 | 78,578.05 | 77,993.00 | 585.05 | |
| PROSHARES TRUST | 868.0000 | 04/06/09 | 04/07/09 | 75,029.98 | 75,030.62 | (.64) | |
| PROSHARES TRUST | 530.0000 | 04/06/09 | 04/07/09 | 45,813.24 | 44,967.64 | 845.60 | |

392. As shown above, Plaintiff's managed account contained repeated trades of ultrashort ETFs and stock options. These leveraged ETFs are extremely risky and volatile, and importantly, they can result in losses or gains significantly out of proportion to the amount invested. As Investopedia explains:

> A leveraged exchange-traded fund (LETF) is a security that uses financial derivatives and debt to amplify the returns of an underlying index or other asset it tracks. Some leveraged or "geared" ETFs track specific stocks, which were introduced in 2022, and crypto, which can make an already volatile trading strategy far more combustible. While a traditional ETF typically tracks the securities in its underlying indexes on a one-to-one basis, an LETF will aim for a 2:1 or 3:1 ratio. These products are available for most indexes, such as the Nasdaq 100 Index and the Down Jones Industrial Average.

393. The ProShares Ultrashort ETF is designed to provide -2x leverage. As ProShares explains on its website:

**Investment Objective**

ProShares UltraShort® S&P500 seeks daily investment results, before fees and expenses, that correspond to two times the inverse (-2x) of the daily performance of the S&P 500®.

394. The trades in Plaintiff's Merrill Lynch account reflected no apparent investment thesis. Indeed, Smith and Merrill Lynch appeared to have repeatedly purchased leveraged short positions in the S&P index as the stock market roared to a rebound after the 2008 market crash, beginning one of the largest bull runs in U.S. history. Absent the immediate buy and sell positions, a leveraged short of the market would have been catastrophic in 2009 as the market bottomed and recovered.

395. The repeated trades of leveraged products and options were not a coincidence. These positions required larger margin maintenance and clearing/settlement amounts. The more margin a client uses, the less the bank owes the customer and must reserve for.

396. Leveraged ETFs require larger margin and clearing requirements, meaning repeated sham trades in the account of a high-net-worth individual, such as Plaintiff, resulted in a reduction of the bank's required reserves.

397. Indeed, in August of 2009, FINRA increased margin and clearing reserve requirements for leveraged ETF and highly leveraged options—precisely what Merrill Lynch repeatedly traded. As FINRA Regulatory Notice 09-53, *Increased Margin Requirements for*

*Leveraged Exchange-Traded Funds and Associated Uncovered Options*, explains, these securities require higher margin requirements because of their volatility:

**Strategy-Based Margin Account**

In general, FINRA is increasing the maintenance margin requirements for leveraged ETFs and associated uncovered options by a factor commensurate with their leverage.

In a strategy-based margin account, the current maintenance margin requirement for any long ETF is 25% of the market value, and for any short ETF, the current maintenance margin requirement is generally 30% of the market value.[3] Effective December 1, 2009, these maintenance margin requirements will increase by a percentage commensurate with the leverage of the ETF, not to exceed 100% of the value of the ETF, as detailed in the following examples:

> Long 100 shares ABC ETF @ 28.00 (200% leverage)
> Market Value: 2,800
> Maintenance Requirement: 2 × .25 = .50
> 2,800 × .50 = 1,400

> Short 100 shares DEF ETF @ 26.00 (300% leverage)
> Market Value: 2,600
> Maintenance Requirement: 3 × .30 = .90
> 2,600 × .90 = 2,340[4]

398.    As explained *supra*, § I, Merrill Lynch had gamed this system to supercharge its own proprietary trading business. Indeed, in 2009, precisely when Merrill Lynch's repeated trades of these leveraged securities occurred, Merrill Lynch, with the knowledge and support of its Acting Chief Financial Officer, was engaging in sham trades that lacked economic substance in order to cause large sums to reduce its reserve requirements, freeing up capital for its own trades. As a June 23, 2016 SEC press release explained:

> An SEC investigation found that Merrill Lynch violated the SEC's Customer Protection Rule by misusing customer cash that rightfully should have been deposited in a reserve account. ***Merrill Lynch engaged in complex options trades that lacked economic substance and artificially reduced the required deposit of customer cash in the reserve account. The maneuver freed up billions of dollars per week from 2009 to 2012.***
>
> According to the SEC's order instituting a settled administrative proceeding. Merrill Lynch further violated the Customer Protection

Rule by failing to adhere to requirements that fully-paid for customer securities be held in lien-free accounts and shielded from claims by third parties should a firm collapse. From 2009 to 2015, Merrill Lynch held up to $58 billion per day of customer securities in a clearing account that was subject to a general lien by its clearing bank and held additional customer securities in accounts worldwide that similarly were subject to liens. Had Merrill Lynch collapsed at any point, customers would have been exposed to significant risk and uncertainty of getting back their own securities.

399.    The mechanics of Merrill Lynch's scheme were complex, but as the SEC explained in its Cease and Desist Order against William Tirrell, who was at the time Merrill Lynch's Head of the Regulatory Reporting Department and, concurrent with that role, Acting Chief Financial Officer, the scheme took advantage of the FINRA Rule setting reserve requirements:

6. Rule 15c3(e) requires a broker-dealer that maintains custody of customer securities and cash (a "carrying broker-dealer") to maintain a reserve of funds and/or certain qualified securities in an account at a bank ("Reserve Account") that is at least equal in value to the net cash owed to customers. 17 CFR 240.15c3-3(e).

7. The amount of net cash owed to a customer is computed pursuant to a formula set forth in Exhibit A to Rule 15c3-3 ("Reserve Formula"), which most carrying broker-dealers calculate on a weekly basis. 17 CFR 240.15c3-3a. Under the Reserve Formula, the carrying broker-dealer adds up customer credit items that it owes its customers (*e.g.*, cash in customer securities accounts) and then subtracts that from the amount customer debit items that its customers owe it (*e.g.*, margin loans). If credit items exceed debit items, that net amount must be deposited, or already be on deposit, in the Reserve Account in the form of cash and/or qualified securities. 17 CFR 240.15c3-3(e). A broker-dealer generally cannot make a withdrawal from the Reserve Account until the next computation and even then only if the computation shows that the reserve requirement has decreased. *Id.* The broker-dealer must make a deposit into the Reserve Account if the computation shows an increase in the reserve requirement.

8. If a broker-dealer owes more to its customers than its customers owe it, the broker-dealer must set aside at least an amount equal to that difference so that it is readily available to repay customers.

400.     In other words, if a customer has cash or securities in an account, the bank owes the customer money and must set aside some fraction of what is owed in a reserve. When a customer incurs a debt to the bank, such as when a margin-based trade occurs, the bank can reduce the reserve. Thus, by repeatedly engaging in sham transactions that increase a customer's indebtedness to the bank, including by using up a customer's margin capacity, the bank can relieve itself of reserve requirements, meaning it can trade more money for its own proprietary book.

401.     Merrill Lynch's repeated trades of leveraged ETFs in Plaintiff's account unlawfully reduced the bank's reserve requirements. With every leveraged trade Merrill executed in Plaintiff's account, it created capital the bank could use to trade for its own account. Plaintiff, on the other hand, lost the use of the money in his account until the settlement of the trades Merrill Lynch had made on his behalf.

402.     The repeated trades freed up capital from Merrill Lynch's reserves, which could then be used to launder money. Indeed, as explained above, Merrill Lynch and Schwab were simultaneously investigated for laundering money through their Texas offices at the same time, including money laundering in connection with drug cartels in Mexico.

C.     **Merrill Lynch's Account Statements and Omissions Were Fraudulent as to the Trades Disclosed from February through December 2009**

403.     Merrill Lynch failed to disclose that its trades in Plaintiff's accounts were not part of an investment strategy, but were designed to manipulate Merrill's reserve requirements and facilitate money laundering. From February 2009 through December 2009, Merrill Lynch sent Plaintiff account statements. Each account statement was false and misleading because it omitted information about the true purpose of the repeated trades through Plaintiff's accounts.

404.     Neither the account statements nor Reed Smith disclosed that trades were being coordinated with Plaintiff's Schwab account. Merrill Lynch and Smith had an affirmative duty to

speak fully and truthfully, including because they owed a fiduciary duty to Plaintiff. Indeed, Plaintiff relied on Smith and Merrill Lynch to manage his money on his behalf, and Smith and Merrill Lynch knew it.

405.     Merrill Lynch and Smith held themselves out as having superior skill in investing and to be investing in Plaintiff's best interests, but failed to fully disclose that they were using Plaintiff's accounts for personal gain and to further the long-running conspiracy to exfiltrate his assets and facilitate money laundering through his accounts.

406.     Merrill Lynch and Smith also failed to disclose in account statements from February 2009 to December 2009 that either (a) a Merrill Lynch employee or affiliate had access to Plaintiff's Schwab account and was using it to trade in concert with his managed Merrill Lynch account; or (b) that Merrill Lynch and its employees were trading in concert with a third party with access to Plaintiff's Schwab account. Merrill Lynch's omission of this material information rendered its statements—and silence in the face of a duty to speak fully and truthfully—false and misleading.

407.     Merrill Lynch also failed to disclose that its management of his trading account had artificially reduced his buying power while increasing the funds and leverage available to Merrill Lynch when it traded for its own account. Merrill Lynch had a duty of candor and loyalty to Plaintiff, as well as a duty to speak fully and truthfully, but never disclosed that its repeated trades were reducing his buying power while unlawfully benefiting the bank.

### D.     Schwab Failed to Disclose or Stop the Coordinated Trades, Unauthorized Access, and Unusual Trade Volume in Plaintiff's Account

408.     Schwab provided Plaintiff's account statements from February 2009 through December 2009. Each of the account statements were false and misleading, as none of them disclosed coordinated trading with those in control of Mansour's Merrill Lynch trading account.

409.    In addition, Schwab did not provide any trade confirmations via e-mail or otherwise to Plaintiff during this period, in contravention of FINRA Rules and other regulations. Schwab's account statements failed to disclose that Plaintiff was not receiving trade confirmations as trades occurred.

410.    Schwab also failed to prevent unauthorized access to Plaintiff's account, including by monitoring unusual trade volume. Schwab did not disclose that any other individual but Plaintiff had access to his account. It is clear, however, that someone did have access to trade in Plaintiff's Schwab account. Indeed, Mansour did not engage in the **_billions of dollars_** of transactions that flowed through his Schwab account.

## IX.    MERRILL LYNCH MISAPPROPRIATED FUNDS AND LIED ABOUT IT IN INFLATED ACCOUNT STATEMENTS SENT TO PLAINTIFF

411.    From September 2007 through March 2021, Merrill Lynch provided Plaintiff with statements reflecting the net asset values ("NAVs") of each of his accounts. The NAV is a measure of the overall value in a securities account, which will sometimes be different than the account balance. For example, an account may reflect a balance that does not reflect the offsetting value of other securities that hedge the position. A balance may also fail to reflect the value of securities purchased on margin or netted against short-sale positions. In other words, the NAV is the measure of the total value in an account.

412.    Because Plaintiff had several accounts containing different types of investments, he relied heavily on the NAVs in his account statements to monitor the performance of his investments and to track his funds across various accounts.

413.    From September 2007 through March 2021, Merrill Lynch reported largely consistent NAVs across accounts visible to Plaintiff. As such, Plaintiff had no reason to believe that any of his funds were unavailable.

414. The truth, however, was that the NAVs in Plaintiff's account statements did not reflect the true value in his accounts. Merrill Lynch was routinely using Plaintiff's funds both for its own benefit and to populate accounts outside of Plaintiff's control. Indeed, Merrill Lynch had been secretly acting to move money outside of Plaintiff's control, where money could be laundered out of sight, then returned and integrated into his accounts.

415. In addition to the large number of coordinated trades flowing through Plaintiff's accounts discussed above, Merrill Lynch continued the money laundering through his accounts by misreporting NAVs across Plaintiff's accounts. Merrill Lynch did so to ensure that Plaintiff did not notice significant movements of funds in and out of his accounts, which would have jeopardized the scheme to launder money through his accounts.

416. As explained below, Plaintiff began his forensic investigation of irregularities in his accounts in 2021, and in February 2021, Merrill Lynch generated a report of Plaintiff's balances, called a "Monthly Performance Report" (the "MPR"). Merrill Lynch produced the MPR in response to a series of requests from Plaintiff's lawyers in 2021.

417. The MPR revealed NAVs quite different than those reported on Plaintiff's statements. Merrill Lynch had produced additional statements in response to Plaintiff's requests, and after the production of the MPR, Plaintiff's investigators compiled all of the account information they received from Merrill.

418. On May 17, 2021, Plaintiff's investigators compiled an initial report tabulating NAVs across each of the accounts disclosed by Merrill Lynch during the investigation. The result confirmed what the MPR showed—the NAVs in the accounts were not the NAVs stated on Plaintiff's contemporaneous account statements. The initial report revealed that Merrill Lynch was keeping two sets of books.

419.    From September 2007 through January 2011, Plaintiff's account statements contained inflated balances averaging approximately $5.53 million. Each account statement sent to Plaintiff during that period was false and misleading, including because they overstated Plaintiff's balances across accounts he controlled and failed to disclose that approximately $5.53 million of Plaintiff's money was unavailable to him each month and being used by Merrill Lynch and/or deposited in accounts controlled by other Merrill Lynch clients.

| Month | Disclosed Balance | 2021 Initial Forensic Analysis | Balance Inflation |
|---|---|---|---|
| Sep-07 | $ 17,246,053.00 | $ 11,980,673.00 | $ 5,265,380.00 |
| Oct-07 | $ 21,308,817.00 | $ 16,025,643.00 | $ 5,283,174.00 |
| Nov-07 | $ 22,134,408.00 | $ 16,797,397.00 | $ 5,337,011.00 |
| Dec-07 | $ 22,143,802.00 | $ 16,694,835.00 | $ 5,448,967.00 |
| Jan-08 | $ 30,603,668.00 | $ 25,091,134.00 | $ 5,512,534.00 |
| Feb-08 | $ 30,750,273.00 | $ 25,432,768.00 | $ 5,317,505.00 |
| Mar-08 | $ 30,841,929.00 | $ 25,428,800.00 | $ 5,413,129.00 |
| Apr-08 | $ 30,529,928.00 | $ 25,268,574.00 | $ 5,261,354.00 |
| May-08 | $ 30,575,961.00 | $ 25,310,343.00 | $ 5,265,618.00 |
| Jun-08 | $ 30,584,469.00 | $ 25,391,404.00 | $ 5,193,065.00 |
| Jul-08 | $ 30,434,271.00 | $ 24,255,749.00 | $ 6,178,522.00 |
| Aug-08 | $ 30,740,258.00 | $ 24,529,394.00 | $ 6,210,864.00 |
| Sep-08 | $ 30,281,826.00 | $ 24,346,136.00 | $ 5,935,690.00 |
| Oct-08 | $ 30,634,102.00 | $ 24,738,741.00 | $ 5,895,361.00 |
| Nov-08 | $ 30,488,945.00 | $ 24,526,234.00 | $ 5,962,711.00 |
| Dec-08 | $ 30,128,595.00 | $ 23,928,082.00 | $ 6,200,513.00 |
| Jan-09 | $ 30,309,198.00 | $ 23,976,890.00 | $ 6,332,308.00 |
| Feb-09 | $ 14,957,363.00 | $ 9,627,625.00 | $ 5,329,738.00 |
| Mar-09 | $ 13,155,835.00 | $ 7,833,198.00 | $ 5,322,637.00 |
| Apr-09 | $ 13,463,301.00 | $ 8,047,138.00 | $ 5,416,163.00 |
| May-09 | $ 13,504,686.00 | $ 8,016,693.00 | $ 5,487,993.00 |
| Jun-09 | $ 13,632,688.00 | $ 8,191,282.00 | $ 5,441,406.00 |
| Jul-09 | $ 13,689,503.00 | $ 8,199,153.00 | $ 5,490,350.00 |
| Aug-09 | $ 13,699,917.00 | $ 8,196,516.00 | $ 5,503,401.00 |
| Sep-09 | $ 13,702,193.00 | $ 8,100,556.00 | $ 5,601,637.00 |
| Oct-09 | $ 13,503,775.00 | $ 8,030,541.00 | $ 5,473,234.00 |
| Nov-09 | $ 13,486,752.00 | $ 7,913,064.00 | $ 5,573,688.00 |
| Dec-09 | $ 13,397,604.00 | $ 7,858,801.00 | $ 5,538,803.00 |
| Jan-10 | $ 13,272,269.00 | $ 7,841,834.00 | $ 5,430,435.00 |
| Feb-10 | $ 13,426,632.00 | $ 7,849,664.00 | $ 5,576,968.00 |
| Mar-10 | $ 13,329,353.00 | $ 7,832,982.00 | $ 5,496,371.00 |
| Apr-10 | $ 13,376,540.00 | $ 7,846,960.00 | $ 5,529,580.00 |
| May-10 | $ 12,346,255.00 | $ 6,776,026.00 | $ 5,570,229.00 |
| Jun-10 | $ 12,441,448.00 | $ 7,755,077.00 | $ 4,686,371.00 |
| Jul-10 | $ 12,456,258.00 | $ 7,604,803.00 | $ 4,851,455.00 |
| Aug-10 | $ 13,302,117.00 | $ 7,618,764.00 | $ 5,683,353.00 |
| Sep-10 | $ 13,224,044.00 | $ 7,608,137.00 | $ 5,615,907.00 |
| Oct-10 | $ 13,178,282.00 | $ 7,581,277.00 | $ 5,597,005.00 |
| Nov-10 | $ 13,147,916.00 | $ 7,615,146.00 | $ 5,532,770.00 |
| Dec-10 | $ 13,087,332.00 | $ 7,625,852.00 | $ 5,461,480.00 |
| Jan-11 | $ 18,030,722.00 | $ 12,621,417.00 | $ 5,409,305.00 |

420.    From February 2011 to February 2012, the NAVs in Plaintiff's account statements were further inflated. During that period, the inflated NAV amount averaged approximately $8.66 million.

| Month | Disclosed Balance | 2021 Initial Forensic Analysis | Balance Inflation |
|---|---|---|---|
| Feb-11 | $ 18,099,077.00 | $ 9,373,450.00 | $ 8,725,627.00 |
| Mar-11 | $ 18,126,787.00 | $ 9,383,157.00 | $ 8,743,630.00 |
| Apr-11 | $ 18,507,422.00 | $ 9,501,966.00 | $ 9,005,456.00 |
| May-11 | $ 18,374,549.00 | $ 9,467,974.00 | $ 8,906,575.00 |
| Jun-11 | $ 18,224,624.00 | $ 9,470,718.00 | $ 8,753,906.00 |
| Jul-11 | $ 18,114,265.00 | $ 9,420,828.00 | $ 8,693,437.00 |
| Aug-11 | $ 17,601,404.00 | $ 9,335,178.00 | $ 8,266,226.00 |
| Sep-11 | $ 17,289,568.00 | $ 9,220,155.00 | $ 8,069,413.00 |
| Oct-11 | $ 17,443,651.00 | $ 9,327,585.00 | $ 8,116,066.00 |
| Nov-11 | $ 17,283,093.00 | $ 9,205,628.00 | $ 8,077,465.00 |
| Dec-11 | $ 17,330,541.00 | $ 9,325,187.00 | $ 8,005,354.00 |
| Jan-12 | $ 17,737,261.00 | $ 8,248,703.00 | $ 9,488,558.00 |
| Feb-12 | $ 17,904,278.00 | $ 8,207,260.00 | $ 9,697,018.00 |

421.    From March 2012 to November 2013, the discrepancy heightened significantly, increasing from approximately $12.27 million to $18.64 million. The true balance under Plaintiff's control had dropped as low as $2.43 million in October 2012, and Merrill Lynch falsely represented that his balance was instead approximately $15.7 million more than the actual value. This created a false and misleading impression that Plaintiff had not lost control over most of his assets.

| Month | Disclosed Balance | 2021 Initial Forensic Analysis | Balance Inflation |
|---|---|---|---|
| Mar-12 | $ 17,923,446.00 | $ 5,651,619.00 | $ 12,271,827.00 |
| Apr-12 | $ 17,936,949.00 | $ 5,664,053.00 | $ 12,272,896.00 |
| May-12 | $ 17,445,623.00 | $ 5,580,390.00 | $ 11,865,233.00 |
| Jun-12 | $ 17,716,846.00 | $ 5,667,881.00 | $ 12,048,965.00 |
| Jul-12 | $ 17,890,952.00 | $ 5,703,609.00 | $ 12,187,343.00 |
| Aug-12 | $ 17,974,479.00 | $ 2,465,482.00 | $ 15,508,997.00 |
| Sep-12 | $ 18,139,645.00 | $ 2,444,287.00 | $ 15,695,358.00 |
| Oct-12 | $ 18,076,340.00 | $ 2,433,179.00 | $ 15,643,161.00 |
| Nov-12 | $ 18,120,456.00 | $ 2,455,336.00 | $ 15,665,120.00 |
| Dec-12 | $ 19,366,330.00 | $ 3,720,192.00 | $ 15,646,138.00 |
| Jan-13 | $ 23,110,561.00 | $ 5,331,583.00 | $ 17,778,978.00 |
| Feb-13 | $ 23,021,688.00 | $ 5,286,563.00 | $ 17,735,125.00 |
| Mar-13 | $ 23,379,909.00 | $ 3,520,264.00 | $ 19,859,645.00 |
| Apr-13 | $ 23,740,880.00 | $ 3,615,688.00 | $ 20,125,192.00 |
| May-13 | $ 23,585,236.00 | $ 3,603,979.00 | $ 19,981,257.00 |
| Jun-13 | $ 23,067,379.00 | $ 3,564,878.00 | $ 19,502,501.00 |
| Jul-13 | $ 23,642,657.00 | $ 9,969,762.00 | $ 13,672,895.00 |
| Aug-13 | $ 23,177,947.00 | $ 7,929,888.00 | $ 15,248,059.00 |
| Sep-13 | $ 23,872,291.00 | $ 6,306,212.00 | $ 17,566,079.00 |
| Oct-13 | $ 24,384,333.00 | $ 6,035,903.00 | $ 18,348,430.00 |
| Nov-13 | $ 24,682,006.00 | $ 6,045,873.00 | $ 18,636,133.00 |

422.    By December 2012, Merrill Lynch had returned the money it had moved out of Plaintiff's control. However, beginning in April 2020, millions were again missing, and Plaintiff's account statements again became materially inflated.[2]

| Month | Disclosed Balance | 2021 Initial Forensic Analysis | Balance Inflation |
|---|---|---|---|
| Apr-20 | $ 26,236,144.00 | $ 24,437,174.00 | $ 1,798,970.00 |
| May-20 | $ 26,654,686.00 | $ 24,798,677.00 | $ 1,856,009.00 |
| Jun-20 | $ 26,423,242.00 | $ 24,247,294.00 | $ 2,175,948.00 |
| Jul-20 | $ 26,275,038.00 | $ 24,319,385.00 | $ 1,955,653.00 |
| Aug-20 | $ 26,873,319.00 | $ 24,762,994.00 | $ 2,110,325.00 |
| Sep-20 | $ 26,304,498.00 | $ 23,981,266.00 | $ 2,323,232.00 |
| Oct-20 | $ 25,643,178.00 | $ 23,593,448.00 | $ 2,049,730.00 |
| Nov-20 | $ 28,496,672.00 | $ 25,072,167.00 | $ 3,424,505.00 |
| Dec-20 | $ 28,434,671.00 | $ 25,623,869.00 | $ 2,810,802.00 |

---

[2] Between December 2013 and March 2020, the discrepancy between Mansour's account statements and his true balance fluctuated in amounts below approximately $500,000.

423. Indeed, as the COVID crisis deepened, the amount of missing money increased, until Merrill Lynch was forced to write down Plaintiff's NAV and blame the write-down on recent market movements.

424. Plaintiff was repeatedly provided account statements that inflated the balance he had within his control across his accounts at Merrill Lynch. As such, these account statements were false and misleading, including because they omitted information that could have alerted Plaintiff that his money may have been converted and secreted away by Merrill Lynch.

425. Merrill Lynch actively concealed that it had secreted away Plaintiff's funds and assets, where they could be used for money laundering, then returned and integrated into his accounts.

426. As explained in the next section, Merrill Lynch likely had possession of tens of millions of dollars that had been stolen from Plaintiff at Morgan Stanley and that had followed Plaintiff via shadow accounts outside of his reach when he moved to Deutsche Bank and then Merrill Lynch.

## X. MERRILL LYNCH AND THE SHADOW ACCOUNTS

427. A central part of the money laundering operations surrounding Plaintiff's accounts has been the movement of Plaintiff's funds outside of his view and control. This feature of the money laundering enterprise surrounding Plaintiff allowed the placement and layering phases of money laundering to occur without raising red flags.

428. The most direct means of moving money in and out of Plaintiff's accounts has been through trusts purportedly created and funded by Plaintiff, yet in truth unknown to him. The creation of trust accounts affiliated with Plaintiff allowed money launderers—and the Merrill Lynch bankers helping them—to move money to and from such accounts without sounding alarm

bells within the bank, which could result in suspicious activity reports ("SARs") filed with regulators.

429.     Lacy, who worked closely with Plaintiff's brother Jimmy Mansour, was an expert in the creation of such trust accounts, as well as other similar entities. Indeed, Lacy had created Plaintiff's own trust accounts in favor of his family and his children. Decades prior, both Jimmy Mansour and Lacy had also obtained a power of attorney on behalf of Plaintiff in favor of Plaintiff's other brother, Joe Mansour.

430.     This power of attorney had repeatedly been used to create entities and bank accounts affiliated with Plaintiff. At Merrill Lynch, the same had also occurred:



431.    As the document above, which was obtained during Mansour's 2021 and 2022 forensic investigation, revealed, Merrill Lynch had opened trust accounts associated with one of the trusts created by Lacy for Plaintiff's family—under the supposed authority of Mansour's brother Joe acting as Plaintiffs attorney-in-fact—including at least on September 10, 2007.

432.    Merrill Lynch had created accounts outside of Plaintiff's view and control, but nevertheless associated with him. This allowed funds to flow in and out of Plaintiff's accounts to these supposedly associated accounts without triggering Merrill Lynch's woefully ineffective anti-money-laundering systems (described *supra*, Facts § I).

433. The production of the MPR confirmed that since the inception of Plaintiff's relationship with Merrill Lynch, money and securities had been secretly flowing in and out of Plaintiff's accounts—and the account NAVs reported to him had been inflated to hide these movements of funds, particularly significant intramonth movements.

434. In February 2011, the MPR showed a $3,265,083.07 month-on-month outflow. Plaintiff's forensic analysis showed that $14,435,078.03 in cash moved into the account and $14,435,078.03 moved out.

435. In January 2012, the MPR showed a $2,557,324.29 month-on-month outflow. Plaintiff's forensic analysis showed $1,310,788.53 worth of securities had been taken out of the account.

436. In March 2012, the MPR showed a $2,557,324.23 month-on-month outflow. Plaintiff's forensic analysis showed that $2,571,139.76 worth of securities had been taken out of the account.

437. In August 2012, the MPR showed a $3,217,004.94 month-on-month outflow. Plaintiff's forensic analysis showed that $787,839 in cash moved into the account and $1,774,423.56 moved out. It also showed that $414,190.56 in securities had been received and $1,973,151.13 had been taken out of the account.

438. In March 2013, the MPR showed a $1,830,048.30 month-on-month outflow across Plaintiff's accounts. Plaintiff's forensic analysis showed that $1,901,533.43 of cash moved into Plaintiff's accounts and $1,899.577.84 moved out. In addition, $1,472.628.79 of securities had been received in Plaintiff's accounts.

439.   In July 2013, the MPR showed a $6,157,924.69 month-on-month inflow across Plaintiff's accounts. Plaintiff's forensic analysis showed that $8,247,178.31 of securities were received in Plaintiff's accounts and $3,722,634.02 were delivered out of them.

440.   In August 2013, the MPR showed a $2,084,308 month-on-month outflow across Mansour's accounts. Plaintiff's forensic analysis showed that $2,086,903.89 had moved into Plaintiff's accounts and $2,113,659.42 had moved out.

441.   In September 2013, the MPR showed a $2,073,892.18 month-on-month outflow across Plaintiff's accounts. The forensic analysis showed that $2,125,300.60 of cash had moved into Plaintiff's accounts and $2,128,389 had moved out.

442.   In February 2014, the MPR showed a month-on-month outflow of $2,272,265.87. Plaintiff's forensic analysis showed $1,154,004 of cash had moved into Plaintiff's accounts and $1,219,004.43 had moved out.

443.   In October 2014, $1,681,509.45 flowed out of Plaintiff's accounts month-on-month according to the MPR. Plaintiff's forensic analysis revealed that $2,022,975.91 in cash and $5,610,099.49 in securities had moved into Plaintiff's accounts, and $1,109,480.95 and $6,599,163.37 in securities had moved out.

444.   In November 2015 and December 2015, the MPR showed a month-on-month change of $4,578,956.52 and $19,767,589.58 across Plaintiff's accounts, respectively. The total across those two months, approximately $24.34 million, was significant. It was approximately the total amount of money exfiltrated from Plaintiff's accounts at Morgan Stanley, strongly indicative that the money had been siphoned away into an affiliated shadow account outside of Plaintiff's control. The MPR inadvertently disclosed that the money existed at Merrill Lynch—and vanished from Plaintiff's view as soon as it briefly appeared in his accounts. Plaintiff's forensic analysis

confirmed that approximately $24 million flowed in and out of Plaintiff's accounts in those two months. Specifically, $5,183,450.67 flowed into Plaintiff's accounts, and $5,683,450.67 flowed out, in November 2015, and in December 2015, $19,353,676,44 flowed into Plaintiff's accounts and $19,722,512.77 flowed out.

445.    In April 2016, the MPR showed that Plaintiff's accounts experienced a month-on-month outflow of $1,706,303.31. Plaintiff's forensic analysis revealed that $1,062,532.28 of cash flowed into his accounts, then $1,297,291.33 flowed out. That same month, $1,950,339.92 of securities flowed into Plaintiff's accounts, then $1,950,290.82 flowed out.

446.    In December 2016, the MPR showed a month-on-month outflow of $3,633,510.77. Plaintiff's forensic analysis showed a dramatic increase in securities received and delivered out of Plaintiff's accounts. Plaintiff's accounts had received $4,260,517.42 in securities had been taken out of the accounts, $4,260,471.41 worth of securities.

447.    In January 2017, the MPR showed a month-on-month outflow of $3,466,692.29 across Plaintiff's accounts. Plaintiff's forensic analysis showed a spike in securities received and delivered out of Plaintiff's accounts. Plaintiff's accounts had received $3,325.756.27 of securities, and $3,325,587 in securities had been taken out of Plaintiff's accounts.

448.    In November 2017, $2,681,128.17 moved into Plaintiff's accounts month-on-month according to the MPR. Again, Plaintiff's forensic analysis showed a spike in cash deposits and withdrawals across accounts—$5,063,439.14 in deposits and $5,178,42.71 in withdrawals. Overall, there appeared to be a $8,292,337.43 disparity between the reported NAVs in Plaintiff's account statements and the real assets within his control that month.

449. In May 2019, $6,827,653 moved out of the accounts Plaintiff's controlled month-on-month according to the MPR. Plaintiff's forensic analysis showed a spike in cash deposits and withdrawals, with $6,400,694.16 flowing into Plaintiff's accounts, and $6,448,694.16 flowing out.

450. None of these significant movements in cash and securities had been authorized by Plaintiff. Moreover, the significant movements were not reflected in the statements Plaintiff received at the time. The MPR's production raised red flags but did not explain how various inflows and outflows—none of which comported with the statements Plaintiff was given—actually occurred. Plaintiff's forensic analysis, however, showed that cash and securities were flowing in and out of his accounts. For that to have occurred without causing the creation of SARs or sounding alarms at Merrill Lynch, the source and target accounts involved in these significant movements of money were likely associated with Plaintiff, but were outside of his view and control.

451. Additional information produced by Merrill Lynch confirmed that the bank had many accounts associated with Plaintiff. Indeed, Merrill Lynch revealed that it had maintained at least 44 accounts associated with Plaintiff—and 29 of them had never previously been disclosed to Plaintiff. Moreover, 17 of the accounts had supposedly been purged by Merrill Lynch, 13 in 2020. As to one account ending in the numbers -328, which was supposedly purged on November 30, 2019, Merrill could not provide a full account number or even a general description for the account.

## XI. PLAINTIFF'S INVESTIGATION

452. In 2020, as the COVID pandemic had taken hold, Plaintiff instructed Merrill Lynch to put his holdings into cash and conservative bonds. But when Plaintiff received account statements from Merrill Lynch in late 2020 and early 2021, he noticed a significant drop in his NAV—from approximately $30 million to $24 million. Merrill Lynch advised Plaintiff that the decline in NAV was due to adverse market conditions attributable to the COVID pandemic. This

explanation did not align with Plaintiff's expectations, given his instructions to move his holdings to a low-risk cash and bond position—which should have resulted in minimal losses in his managed accounts at Merrill Lynch.

453. In December 2020, Plaintiff contacted a Merrill Lynch Vice President with questions about his account and a request for further contact information. In 2021, Plaintiff retained lawyers and consultants to assist him in an investigation of his accounts at Merrill Lynch. A mid-2021 analysis conducted by Plaintiffs' consultants revealed more than a billion dollars in trading activity in Plaintiff's Merrill accounts—a red flag—but Plaintiffs' attempts to investigate further the nature of this seemingly unauthorized trading activity were frustrated by a lack of complete records from Merrill.

454. In late 2021, Plaintiff continued pressing Merrill Lynch for documents and information about his accounts, and expanded his inquiry into Deutsche Bank, requesting his account statements from Deutsche Bank. In early 2022, Plaintiff employed a forensic accountant to investigate and evaluate the activity in his Merrill Lynch accounts. In mid and late 2022 and into 2023, this inquiry expanded to include the activities in Plaintiff's Deutsche Bank, Schwab, and Morgan Stanley accounts. Plaintiff's inquiry ultimately expanded to include lawyers, forensic accountants, and expert consultants with an extensive background in broker-dealer trading, investigating and evaluating documents from Plaintiff's accounts at Morgan Stanley, Deutsche Bank, Merrill Lynch, and Schwab.

455. In 2024, it became clear, through the efforts of Plaintiff's consulting experts, forensic accountants, and lawyers, that Plaintiff's investment accounts had been the target of a multiyear, coordinated scheme to facilitate money laundering and other financial malfeasance

across multiple investment banks, and that Plaintiff had lost tens of millions of dollars through the scheme, through conversion, foregone gains, and even outright theft.

456.     Plaintiff engaged litigation counsel and filed this lawsuit.

## REALLEGATION AND INCORPORATION BY REFERENCE

457.     Plaintiff realleges and incorporates by reference all the preceding paragraphs and allegations of this Complaint, as though fully set forth in each of the following Claims for Relief asserted on behalf of Plaintiff.

## CLAIMS FOR RELIEF

## I.     CLAIMS AGAINST DEFENDANT MORGAN STANLEY

### COUNT 1:
Violation of 18 U.S.C. § 1962(c), the Racketeering Influenced and Corrupt Organization Act, ("RICO")

458.     Defendant Morgan Stanley violated 18 U.S.C. § 1962(c) by engaging in prohibited predicate acts that were part of, and related to, a pattern of racketeering perpetrated by an association-of-fact. Plaintiff suffered injury to his business and/or property under 18 U.S.C. § 1964 by reason of Morgan Stanley's violation of Section 1962.

459.     ***The Money Laundering Enterprise.*** The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to collectively as the "Money Laundering Enterprise" or "MLE":

460.     <u>Jimmy Mansour</u>, who orchestrated and executed a scheme to use Plaintiff's money, bank accounts, identity, and reputation to launder money, including, by among other things, coordinating and/or engaging in (a) collusive transactions with a company with which he was affiliated as board member and major shareholder, Netpliance/TippingPoint; (b) the capture of fiduciaries that worked for Plaintiff, including Terri Lacy, Jim Moriarity, Boots Nowlan, John

Edrington, and Reed Smith, as well as the organizations these individuals worked for, namely, Morgan Stanley, Merrill Lynch, and Deutsche Bank; and (c) directly or indirectly causing the creation of trusts, entities, and bank accounts affiliated with Plaintiff, but outside of his control through which money laundering could occur.

461. <u>Terri Lacy</u>, who executed a scheme to use Plaintiff's money, bank accounts, identity, and reputation to launder money, by, among other things, (a) creating entities and trusts associated with Plaintiff through which money laundering could occur, and did occur; (b) engaging in transactions, valuations, and tax planning that facilitated the MLE; and (c) filing forms with the IRS that contained false and/or misleading statements. In addition to the predicate acts described below, Lacy also used her position of trust to further the MLE, and despite having a duty to speak fully and truthfully about the affairs she conducted on behalf of her client, did not disclose the whole truth about her fraudulent/unlawful conduct and also the severe conflicts of interests that existed when she rendered advice and conducted Plaintiff's affairs.

462. <u>Joe Mansour</u>, who, through a power of attorney granted to him, exceeded any conceivable authority he may have had as attorney-in-fact, to the extent he was given any authority at all. Indeed, Joe Mansour was not authorized to create trusts, entities, and bank accounts without Plaintiff's consent, knowledge, and approval. Moreover, even if appropriately acting as attorney-in-fact, Joe Mansour had a duty to tell Plaintiff the truth and to refrain from acting directly against his interests and/or in the interests of others, including those of Jimmy Mansour. Joe Mansour exceeded any authority vested in him as attorney-in-fact, to the extent any was vested in him at all, to further the goal of the MLE, including by creating conduits for the transmission of money in and out of Plaintiff's bank accounts.

463.     Netpliance/TippingPoint, which (a) collusively entered into transactions disguised as open-market transactions; (b) received and transmitted funds in connection with money laundering by the MLE; and (c) made false statements through its Vice President and General Counsel in connection with Terri Lacy's valuation, which was sent to the IRS.

464.     James Cahill, who, as Netpliance's Vice President and General Counsel facilitated the MLE and its money laundering by providing an interview to Lacy to be included in an implausible valuation of Netpliance, which Lacy used in an August 2001 filing with the IRS. Cahill knew that the valuation was implausible, false, and misleading, but provided a view consistent with the valuation to further the interests and goals of the MLE.

465.     Morgan Stanley, which agreed to manage Plaintiff's money and assets on his behalf, but instead (a) exfiltrated tens of millions of dollars of Intermedia stock belonging to Plaintiffs and actively concealed the destination of securities transferred out of Plaintiff's account without any consideration; (b) failed to implement anti-money-laundering protections, including as to suspicious transfers, trading, and the filing of SARs; and (c) engaged in coordinated money laundering through transactions and trades by its directors and employees through Plaintiff's accounts. Morgan Stanley abused its position of trust to actively conceal the injuries sustained by Plaintiff and to further the goals and interests of the MLE.

466.     Jim Moriarity, who agreed to manage Plaintiff's money and assets on his behalf and in his best interests, but instead (a) exfiltrated tens of millions of dollars of Intermedia stock belonging to Plaintiffs and actively concealed the destination of securities transferred out of Plaintiff's account without any consideration; (b) failed to implement anti-money-laundering protections, including as to suspicious transfers, trading, and the filing of SARs; and (c) engaged in coordinated money laundering through transactions and trades by its directors and employees

through Plaintiff's accounts. Moriarity abused his position of trust to actively conceal the injuries sustained by Plaintiff and to further the goals and interests of the MLE.

467. <u>Deutsche Bank</u>, which agreed to manage Plaintiff's money and assets on his behalf and in his best interests, but instead (a) created fraudulent loan documents and filed them with regulators; (b) made representations in financial statements to Plaintiffs that were materially false and misleading; (c) transferred funds from bank accounts outside of Plaintiff's view and control that were involved in, and used as part of, the MLE; (d) diverted, misappropriated and/or converted $6 million in loan proceeds from a fraudulent loan in Plaintiff's name; and (e) implemented unlawful, lax, reckless, and/or fraudulent anti-money-laundering systems. Deutsche Bank actively concealed that it had created a fraudulent loan of $6 million and also concealed the source of $3 million deposited in Plaintiff's account from a shadow account, likely associated with Plaintiff but outside of his view and control, as part of a subterfuge to further the goals and interests of the MLE. Indeed, Deutsche Bank made materially false and misleading statements in connection with Plaintiff's account statements in order to disguise the source of money that was transferred to Plaintiff's account, which was from sources associated with the MLE.

468. <u>Edwin "Boots" Nowlan</u>, who agreed to manage Plaintiff's money and assets on his behalf and in his best interests, but instead (a) created a fraudulent $6 million loan in Plaintiff's name; (b) failed to disclose the full truth about the loan; (c) failed to disclose the location of the $6 million unlawfully borrowed in Plaintiff's name; (d) failed to disgorge profits made from the fraudulent loan obtained on Plaintiff's behalf; and (e) abused his position of trust to conceal the existence of a fraudulent loan as well as the use and location of the loan proceeds. Nowlan actively concealed the existence of the fraudulent loan and $6 million in loan proceeds, including by

pretending to invest $6 million in Aletheia, Horizon, and Lateef. As explained above, nowhere close to $6 million had been invested in any of these funds—if any funds at all.

469. <u>John Edrington</u>, who agreed to manage Plaintiff's money and assets on his behalf and in his best interests, but instead (a) created a fraudulent $6 million loan in Plaintiff's name and signed loan documents, including a filing with the Federal Reserve, that contained a forgery of Plaintiff's signature; (b) failed to disclose the full truth about the loan; (c) failed to disclose the location of the $6 million unlawfully borrowed in Plaintiff's name and concealed the truth with a transfer of $3 million designed to disguise the true amount of the loan and the location of the loan proceeds; (d) failed to disgorge profits made from the fraudulent loan obtained on Plaintiff's behalf; and (e) abused his position of trust to conceal the existence of a fraudulent loan as well as the use and location of the loan proceeds. Nowlan actively concealed the existence of the fraudulent loan and $6 million in loan proceeds, including by pretending to invest $6 million in Aletheia, Horizon, and Lateef. As explained above, nowhere close to $6 million had been invested in any of these funds—if any funds at all.

470. <u>Merrill Lynch</u>, which agreed to manage Plaintiff's money and assets on his behalf and in his best interests, but instead (a) engaged in money laundering through Plaintiff's trading accounts, including by drowning out suspicious trading with hundreds of millions of dollars in transaction volumes and coordinating trades through Plaintiff's Schwab account; (b) failing to disclose accounts and funds associated with, but outside of the view and control of, Plaintiff; (c) failing to relinquish control over funds and bank accounts that rightfully belong to Plaintiff, including at least $24 million in cash located in shadow accounts; (d) creating fraudulent and/or unauthorized loans to third parties using funds from Plaintiff's accounts; (e) engaging in repeated transactions that lacked economic substance in order to relieve the bank of its regulatory reserve

requirements, allowing the bank to trade for its own account at Plaintiff's expense; (f) engaging in unauthorized/fraudulent transfers in and out of Plaintiff's accounts, likely into accounts associated with Plaintiff, but outside his view and control; (g) reporting false and/or misleading account statements that masked the workings of the MLE, including unauthorized/fraudulent transfers made in and out of Plaintiff's accounts; (h) failing to implement effective/sufficient internal controls, including anti-money-laundering systems; and (i) failing to account for $6 million of missing client funds, then actively concealing the missing funds through sham internal transfers from Plaintiff's own accounts. Merrill actively concealed its conduct, breached its fiduciary duty, and defrauded Plaintiff in service of the goals and interest of the MLE, and Merrill abused its position of trust to execute the MLE.

471.    Reed Smith, who, as an agent of Merrill Lynch, agreed to manage Plaintiff's money and assets on his behalf and in his best interests, but instead (a) engaged in money laundering through Plaintiff's trading accounts, including by drowning out suspicious trading with hundreds of millions of dollars in transaction volumes and coordinating trades through Plaintiff's Schwab account; (b) failed to disclose accounts and funds associated with, but outside of the view and control of, Plaintiff; (c) failed to relinquish control over funds and bank accounts that rightfully belong to Plaintiff, including at least $24 million in cash located in shadow accounts; (d) created fraudulent and/or unauthorized loans to third parties using funds from Plaintiff's accounts; (e) engaged in repeated transactions that lacked economic substance in order to relieve the bank of its regulatory reserve requirements, allowing the bank to trade for its own account at Plaintiff's expense; (f) engaged in unauthorized/fraudulent transfers in and out of Plaintiff's accounts, likely into accounts associated with Plaintiff, but outside his view and control; (g) reported false and/or misleading account statements that masked the workings of the MLE, including

unauthorized/fraudulent transfers made in and out of Plaintiff's accounts; (h) failed to implement and abide by effective/sufficient internal controls, including anti-money-laundering systems; and (i) failed to account for $6 million of missing client funds, then actively concealing the missing funds through sham internal transfers from Plaintiff's own accounts. Reed actively concealed his conduct, breached its fiduciary duty, and defrauded Plaintiff in service of the goals and interest of the MLE, and Reed abused his position of trust to execute the MLE.

472.    Charles Schwab, which (a) failed to disclose in communications and statements with Plaintiff that it had not implemented anti-money-laundering controls, that more than $1 billion in trades had suspiciously passed through his account, and someone other than Plaintiff had been engaging in more than $1 billion in suspicious trades in Plaintiff's account; and (b) failed to provide Plaintiff with trade confirmations in connection with more than $1 billion in collusive transactions used to facilitate money laundering.

473.    ***Pattern of Racketeering.*** Defendant Morgan Stanley's conduct was part of a pattern of racketeering spanning approximately 25 years, involving a group of entrepreneurs, businesses, bankers, fiduciaries, and financial services companies, who have utilized assets and accounts belonging to Plaintiff as part of a broader money laundering enterprise. Each member of the MLE committed predicate acts in violation of 1962(c) in furtherance of this overall conspiracy, and every predicate act served the same overall goal—to create and maintain a pot of money through which money and loans could be sent and received from with the true source concealed. Their conduct rhymes across the span of approximately 25 years, and if unabated, will continue at financial institutions with intentional and reckless lapses in anti-money-laundering controls. Indeed, at each step, members of the MLE directed Plaintiff and his assets to financial services institutions that

had been sanctioned and fined by regulators, including for criminal anti-money-laundering conduct (as described above).

474.    In addition to the facts pleaded above in this Complaint, the following are some of the related predicate acts performed by members of the MLE in service of the overall money-laundering objective:

- On April 30, 1998, Jimmy and Joe Mansour inserted a faxed affidavit in Intermedia's closing documents stating that 50 shares of NTF had never been in Joe's possession and had not been "endorsed, sold, assigned, transferred, hypothecated, pledged or otherwise disposed of." The affidavit was false and misleading and transferred over the mail/wires in furtherance of the overall scheme. The 50 shares had been issued, and as alleged above, had been exchanged for Intermedia stock and diverted after the merger to create the beginning of the funds used for money laundering activities under the MLE. This conduct constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343.

- On or about April 30, 1998, Jimmy Mansour caused his lawyers to state in the closing book for the Intermedia merger, which was transmitted to the Federal Trade Commission pursuant to the Hart-Scott-Rodino Act, a capital sheet for NTF, which stated that the same 50 shares had in fact "never issued." The statement was false, as the shares had issued in 1990 when the company had been founded. The false statement was made in connection with the exchange of the 50 shares for Intermedia stock and the diversion of the proceeds to create the beginning of the funds used for the MLE and its money laundering scheme. This conduct constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343. The diversion of the funds violated the federal money laundering statute, 18 U.S.C. § 1956.

- In or around April 2000, Jimmy and Lacy urged Plaintiff to take a BLIPS tax shelter strategy that was unnecessary given that Plaintiff had paid what was the full tax due on his share of the proceeds to the Intermedia merger. Jimmy and Lacy's statement that the BLIPS strategy was necessary to shelter his gains was false and misleading and designed to mask taxes paid for the diverted proceeds from the supposedly missing Intermedia shares. This conduct, particularly given Lacy's duty to speak fully and truthfully as Plaintiff's fiduciary, constituted an act of mail and/or wire fraud under 18 U.S.C. § 1341 & 1343.

- From June 1998 through June 1999, Morgan Stanley created manual journal entries stating that Plaintiff's Intermedia stock had been "DELIVER[ED]." The journal entries, described in detail above, were false and misleading, including because they omitted information about where the shares went and the purpose

of the transaction. Morgan Stanley deliberately concealed that it had transferred Intermedia stock out of Plaintiff's accounts without receiving any consideration. The purpose of the conduct was to continue to exfiltrate and segregate assets that could be used for money laundering activities by the MLE. The twelve false and misleading journal entries constituted acts of mail and/or wire fraud under 18 U.S.C. § 1341 & 1343. Morgan Stanley's transfer of Intermedia shares out of Plaintiff's account also violated the federal money laundering statute, 18 U.S.C. § 1956.

- In or around June 1999, Morgan Stanley, through Moriarity, falsely and misleadingly told Plaintiff that the loss in value in his accounts related to the decline of Intermedia stock, the failure of Morgan Stanley's hedge, and overall declines in the stock market. The statement was false and misleading, including because it omitted that the loss in value was in fact caused by the transfer of Intermedia stock out of Plaintiff's accounts without the receipt of any value or consideration. Moriarity made the false and misleading statement to conceal that $20.5 million in assets had been exfiltrated from Plaintiff's account, where they were being used for money laundering operations by the MLE. Moriarity's statements constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343.

- On January 21, 2000, Lacy prepared trust documents for Plaintiff and his family, which contained an exhibit stating that Plaintiff owned 214,000 shares in Netpliance stock and had contributed the asset to the partnership. The statement was false and misleading, as Plaintiff had not made such a contribution, and had not purchased Netpliance stock. Lacy's statement notably contained cost bases for all other assets, but did not include a cost basis for the Netpliance stock. As explained above, Lacy was Plaintiff's fiduciary and had a duty to speak fully and truthfully, but failed to disclose the true nature and purpose of the transaction, which was to create a $5 million margin of error in tax reporting for the MLE's then forthcoming money laundering conduct. Lacy's false statements and omissions, transmitted over the mail and wires, including recently in May of 2024 as purportedly a delivery of Plaintiff's true and correct files, were acts of mail and wire fraud. Lacy's conduct constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343. Lacy's conduct also violated the federal money laundering statute, 18 U.S.C. § 1956.

- On or around April 4, 2001, Netpliance, through its Vice President and General Counsel, James Cahill, provided Terri Lacy's valuation expert an interview in which he falsely and misleadingly stated that Netpliance was valued at $30 and that the valuation had been based on an arms-length transaction. The statement was false and misleading, as the $30 per share value provided by Cahill was implausible given the stock's penny-stock status at the time of the interview, and because the $30 pre-IPO sales were not in fact arms-length, but by company insiders. Cahill did not disclose Jimmy's interest in Netpliance as part of his interview, which he knew Lacy was using for a valuation to be sent to the IRS. Cahill's false statements were made in service of the MLE's overall objective—

to obtain funds necessary for money laundering activities. Cahill knew that Lacy intended to create a margin for error for the forthcoming money laundering activities. Cahill's conduct constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343.

- On August 9, 2001, Lacy transmitted, through the mail and/or wires, an IRS Form 709 based on a false, misleading, and fraudulent valuation of Netpliance, which valued the company at $24 per share while it was trading at approximately 40 cents per share. The filing with the IRS was false and misleading, including because it omitted the true nature of the transaction and because the transaction was not a non-taxable capital contribution but disallowed as a disguised sale of Netpliance stock, intentionally planted in Plaintiff's returns to create a potential retroactive taxable gain in the 2000 tax year. Lacy's filing also created a false, misleading, and fraudulent tax loss, which could be taken in any year Lacy chose. Lacy did not disclose to the IRS that the filing was designed to create an approximately $5 million margin of error in tax reporting and gain/loss in connection with money laundering activity by the MLE. Lacy's conduct constituted an act of mail and/or wire fraud under 18 U.S.C. § 1341 & 1343.

- From March 2000 through July 2004, Morgan Stanley, including through Moriarity, made false and misleading statements in account statements transmitted to Plaintiff, namely in journal entries describing transactions in Netpliance and TippingPoint stock. These journal entries were false and misleading because they did not disclose the true nature of the transactions and their relation to money laundering activity through Plaintiff's account. Indeed, the journal entries in the account statements did not disclose that some of the transactions had been collusive transfers of money disguised as securities transactions using coded order sizes and order-book signaling, nor did they disclose the true source or destination of the funds and securities collusively transferred. Morgan Stanley's false and misleading statements were made in service of the MLE's money-laundering conduct. Morgan Stanley and Moriarity's conduct constituted acts of mail and/or wire fraud under 18 U.S.C. § 1341 & 1343. The transfers themselves, including those occurring through secretly coded order sizes, violated the federal money laundering statute, 18 U.S.C. § 1956.

- On or around July 17, 2007, Deutsche Bank's Boots Nowlan and John Edrington falsely stated through the use of the wires that (a) Plaintiff would be taking a $3 million loan, and (b) the loan proceeds would be invested in a security referred to as CROCI. The statement was false, as Edrington had forged Plaintiff's signature on a $6 million loan and caused $3 million to be transferred from an account associated with Plaintiff, but outside of his view and control. Deutsche Bank, Nowlan, and Edrington used funds that had been exfiltrated and concealed from Plaintiff as part of the MLE's money laundering activities to conceal the fraudulent $6 million loan. Plaintiff did not in fact receive the

proceeds of any loan, let alone the $6 million loan Nowlan and Edrington fraudulently took in his name. Deutsche Bank, Nowlan, and Edrington made false and misleading statements through the wires. Their conduct constitutes mail and/or wire fraud under 18 U.S.C. § 1341 & 1343. The fraudulent $3 million transfer violated the federal money laundering statute, 18 U.S.C. § 1956.

- On July 6, 2007, John Edrington filed a Federal Reserve Form G-3, disclosing a $6 million loan to Mansour. The form was transmitted via fax over the wires. The form was false, as Plaintiff had not in fact taken a $6 million loan, nor had Plaintiff signed the document. In fact, the document contained a forged signature for John Mansour. Edrington filed the false form with the Federal Reserve in service of the MLE and its money laundering activities, including through Plaintiff's account. Edrington's conduct constitutes mail and/or wire fraud under 18 U.S.C. § 1341 & 1343. The diversion and concealment of $6 million from Plaintiff and his accounts violated the federal money laundering statute, 18 U.S.C. § 1956.

- Duetsche Bank's July statement included an entry for July 17, 2007, which stated that $3,000,000 had been transferred into one of the collateral accounts. The journal entry stated: "MANSOUR JOHN A 04547," with no additional information about the source or purpose of the funds. The journal entry was false and misleading, as it omitted the true source of the funds and had been wired to disguise that all of a fraudulent $6 million loan had been diverted from Plaintiff's account. The conduct directly relates to the money-laundering conduct of the MLE, including because it diverted additional funds to be used for money laundering conduct into accounts outside of Plaintiff's view and control.

- On August 6, 2007, Plaintiff e-mailed John Edrington asking him to liquidate the croci investment and "close out the 3M loan used for the ill timed purchase of oj croci in july." Edrington responded that he would "reduce the outstanding borrowing." Having spoken partially on the subject of the loan, Edrington had the duty to speak fully and truthfully. Edrington, however, did not disclose the existence of the fraudulent $6 million, nor did he tell Plaintiff that he had filed forged and fraudulent forms with the Federal Reserve. Edrington, acting on behalf of Deutsche Bank, made a false and misleading statement to Plaintiff through the wires. This false statement was made in service of the MLE, including the MLE's money laundering operations. His conduct constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343.

- In September 2007, Deutsche Bank received $6,000,000 into the Deutsche Bank Trust, but Plaintiff had only borrowed $4 million of his loan facility (and had been told falsely that he had already paid down an additional $3 million for the loan taken in relation to the CROCI investment). Plaintiff paid $2 million to Deutsche Bank Trust that he did not owe, and Deutsche Bank, having a duty

to speak fully and truthfully, including on bank statements disclosing the transfers to Deutsche Bank Trust, failed to tell Plaintiff the truth—that he had paid $2 million more than he ever borrowed. Deutsche Bank's statements concerning payments to the Deutsche Bank Trust constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343. The payments to Deutsche Bank violated the federal money laundering statute, 18 U.S.C. § 1956. The conduct related directly to the MLE's money laundering conduct, including because it concealed the diversion of $6 million in additional funds into accounts outside of Plaintiff's view and control.

- In addition, Deutsche Bank swept up collateral in the two collateral accounts at closing, creating an approximately $5-6 million shortfall in Plaintiff's account. The sweep of fraudulently obtained funds violated the federal money laundering statute, 18 U.S.C. § 1956.

- On or around September 13, 2007, Deutsche bank sent an e-mail containing a list of accounts and investments belonging to Plaintiff as part of the transition from Deutsche Bank to Merrill Lynch. The e-mail contained a spreadsheet that falsely stated that approximately $6 million, which had in fact been exfiltrated out of Plaintiff's account, had been invested in three hedge funds, Aletheia, Horizon, and Lateef. As explained above, the investments had never been made and the spreadsheet was false and misleading. The false statement was made in connection with the MLE and its money-laundering conduct, including to conceal that approximately $6 million had been diverted in service of the MLE's money laundering through Plaintiff's account.

- On or around September 13, 2007, Defendant Merrill Lynch, including through Reed Smith, falsely stated that it was transferring an existing relationship of $6 million in assets, which comprised of investments in Aletheia, Horizon, and Lateef, from Deutsche Bank. Merrill Lynch stated that it was depositing the investments in three accounts marked "FX" and sent Plaintiff subscription agreements to sign in connection with the suppoinvestments. As explained above, Merrill Lynch's statements were false and misleading, as they omitted that Merrill Lynch had not received custody of the $6 million in assets, nor was it investing $6 million in Aletheia, Horizon, or Lateef. The false and misleading statements were made in service of the MLE's money laundering conduct, including to conceal the money laundering and exfiltration that had occurred in connection with Plaintiff's account.

- On February 3, 2011, Defendant Merrill Lynch moved approximately $6 million of money from Plaintiff's own accounts and transferred them into accounts earmarked for Aletheia, Horizon, and Lateef. The transfers were made to conceal that Merrill Lynch had not made investments in these funds as represented to Plaintiff in September 2007. The transfer violated the federal money laundering statute, 18 U.S.C. § 1956. Moreover, Merrill Lynch and Reed Smith had a duty to speak fully and truthfully, but failed to disclose that no

investment had been made in Aletheia, Horizon, or Lateef, and that the February 3, 2011 transfers were made to cover up the fact that approximately $6 million of Plaintiff's assets had been diverted by the MLE for money laundering purposes. Merrill Lynch's omissions in its account statements and communications to Plaintiff in the face of a duty to speak constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343.

- From February 2009 through December 2009, Merrill Lynch traded hundreds of millions of dollars of securities through Plaintiff's account. Merrill Lynch and the manager of Plaintiff's account, Reed Smith, transmitted account statements to Plaintiff reflecting securities transactions made on his behalf. The statements, including journal entries associated with hundreds of millions of dollars of trades were false and misleading, as they failed to disclose that the trades were made in coordination with trades through Plaintiff's Schwab account. Merrill Lynch's omissions in its account statements and communications to Plaintiff, particularly in the face of a duty to speak fully and truthfully, constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343.

- From September 2007 through March 2021, Merrill Lynch transmitted account statements to Plaintiff that falsely stated the NAVs across his accounts. The statements were false and misleading, as they omitted that Merrill Lynch had secretly transferred funds in and out of Plaintiff's account, reducing the true account NAVs in Plaintiff's view and control. The false statements facilitated and concealed the MLE's money laundering conduct through Plaintiff's assets and accounts and constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343. The transfers of securities and cash in and out of Plaintiff's account constituted violations of the federal money laundering statute, 18 U.S.C. § 1956, in addition to violations of state-law predicates, including embezzlement.

- From September 2007 through March 2021, Defendant Merrill Lynch sent account statements to Plaintiff and responses to requests for account information, which are described above. Merrill Lynch omitted the existence of 29 accounts associated with Plaintiff but that were outside of his view and control, and did so in service of the MLE and the money laundering activity conducted by the MLE, including through Plaintiff's accounts.

475. The predicate acts bulleted above are non-exhaustive. Additional acts are described above in detail throughout the complaint. These predicate acts, however, evince a common enterprise by the MLE and a pattern of racketeering activity. Indeed, each of the predicate acts above were undertaken in service of the MLE's money laundering conduct, including because they, among other things, (a) diverted, and concealed funds diverted, from Plaintiff's accounts, (b)

transferred funds to and from third-parties involved in the MLE and its money laundering operations, and (c) concealed the existence of accounts associated with Plaintiff but outside his view and control.

476.     The predicate acts undertaken by the MLE resulted in injury to many victims in addition to Plaintiffs. Indeed, the predicate acts above have injured, among others, trust accounts in favor of Plaintiff's family; investors and shareholders of Netpliance and TippingPoint; the United States government, including through the evasion of taxes and the false filing of federal forms; and investors who purchases securities on public exchanges while more than $1 billion in collusive and coordinated trades occurred through Plaintiff's Merrill Lynch and Schwab accounts. The conduct had a broad impact and involved a long-term pattern of related conduct.

477.     In addition, the conduct above has re-occurred and rhymed over the course of 25 years through relationships at several financial institutions. Indeed, the MLE's money laundering followed similar patterns over the 25-year period, including the trading of hundreds of millions of dollars of securities to obfuscate the MLE's money laundering activities, the collusive transfers of funds and securities, and the use of undisclosed and concealed accounts to store laundered and exfiltrated assets. Moreover, the MLE has consistently targeted financial institutions with unlawful, reckless, or negligently implemented anti-money-laundering systems and internal controls. Indeed, as explained above, members of the MLE ensured that Plaintiff's funds flowed through some of the worst violators of anti-money-laundering regulations and laws in the United States, if not the world.

478.     This conduct, if unabated, creates a threat of continuing racketeering activity. Indeed, Merrill Lynch continues to maintain an account with at least $24 million in funds

exfiltrated from Plaintiff's accounts as part of the MLE's 25-year conduct—and these funds will be used for money laundering in the future absent abatement, deterrent liability, and judicial relief.

479. Even if evaluated as a closed-ended pattern of racketeering, the conduct above is highly interrelated and in service of a common unlawful purpose—money laundering. Moreover, the conspiracy described above involved actors across several financial institutions, injured several individuals and institutions, and included varied but related conduct that furthered the money laundering goals of the MLE and the concealment of the pattern of racketeering for more than two decades.

480. ***Morgan Stanley's Predicate Acts.*** In addition to the predicate acts described throughout the Complaint above, Morgan Stanley engaged in at least the following predicate acts:

- From June 1998 through June 1999, Morgan Stanley created manual journal entries stating that Plaintiff's Intermedia stock had been "DELIVER[ED]." The journal entries, described in detail above, were false and misleading, including because they omitted information about where the shares went and the purpose of the transaction. Morgan Stanley deliberately concealed that it had transferred Intermedia stock out of Plaintiff's accounts without receiving any consideration. The purpose of the conduct was to continue to exfiltrate and segregate assets that could be used for money laundering activities by the MLE. The twelve false and misleading journal entries constituted acts of mail and/or wire fraud under 18 U.S.C. § 1341 & 1343. Morgan Stanley's transfer of Intermedia shares out of Plaintiff's account also violated the federal money laundering statute, 18 U.S.C. § 1956.

- In or around June 1999, Morgan Stanley, through Moriarity, falsely and misleadingly told Plaintiff that the loss in value in his accounts related to the decline of Intermedia stock, the failure of Morgan Stanley's hedge, and overall declines in the stock market. The statement was false and misleading, including because it omitted that the loss in value was caused by the transfer of Intermedia stock out of Plaintiff's accounts without the receipt of any value or consideration. Moriarity made the statement to conceal that $20.5 million in assets had been exfiltrated from Plaintiff's account, where they were being used for money laundering operations by the MLE. Moriarity's statements constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343.

- From March 2000 through July 2004, Morgan Stanley, including through Moriarity, made false and misleading statements in account statements

transmitted to Plaintiff, namely in journal entries describing transactions in Netpliance and TippingPoint stock. These journal entries were false and misleading because they did not disclose the true nature of the transactions and their relation to money laundering activity through Plaintiff's account. Indeed, the journal entries in the account statements did not disclose that some of the transactions had been collusive transfers of money disguised as securities transactions using coded order sizes and order-book signaling, nor did they disclose the true source or destination of the funds and securities collusively transferred. Morgan Stanley's false and misleading statements were made in service of the MLE's money-laundering conduct. Morgan Stanley and Moriarity's conduct constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343. The transfers themselves, including those occurring through secretly coded order sizes, violated the federal money laundering statute, 18 U.S.C. § 1956.

481. As explained above, this conduct was in furtherance of the MLE's racketeering conduct, including the laundering of money through Plaintiff's account.

482. **_Injury to Business or Property._** Plaintiff was injured in his business or property, as he (a) lost the use, control, and enjoyment of his assets and money as a result of the pattern of racketeering; and (b) lost tens of millions of dollars that were exfiltrated from his accounts, including $20.5 million of Intermedia stock and $6 million in funds lost and/or stolen as a result of Defendants' fraudulent conduct.

483. **_Proximate Cause/Directness._** Plaintiff's injury to business or property is caused by reason of the Defendants' unlawful conduct and pattern of racketeering. Indeed, with respect to predicate acts of mail and wire fraud, Plaintiff directly relied on Defendants' statements, including Morgan Stanley's false and misleading statements, and his injuries were caused as a direct result of the conduct. There is no intermediary between Plaintiff and Morgan Stanley, and no other party has experienced a loss duplicative of Plaintiff's as a result of Morgan Stanley's conduct.

484. **_Tolling and Statute of Limitations._** _Fraudulent Concealment and Tolling._ The statute of limitations is tolled as to Morgan Stanley's breaches of fiduciary duty.

485.     As to the transfers of Plaintiff's Intermedia stock out of his accounts, that conduct was concealed, facilitated, and perpetrated through Morgan Stanley's false and misleading account information, including its false and misleading journal entries. Plaintiff did not know that Morgan Stanley's journal entries in his account statements were false and misleading, including because they omitted highly material information, until a detailed forensic analysis spanning through May 2024 ultimately showed that he did not receive any value for the supposed sale of his stock, and that representations made to him by Morgan Stanley and banker Jim Moriarity on or about June 1999 were false and misleading. Accordingly, Plaintiff could not have known, and did not know, that his stock had been converted, not sold.

486.     Indeed, Morgan Stanley and Plaintiff's banker in charge of his account falsely and misleadingly stated, on or after June 1999, that the losses in NAV Plaintiff experienced were caused by a downturn in the stock market and in the value of Intermedia stock. The statements, which were plausible at the time in 1999 given market movements and the price of Intermedia stock, fraudulently concealed Plaintiff's cause of action, including the discovery of facts necessary to plead the elements of his claim.

487.     Morgan Stanley's false and misleading statements could not have been revealed to be false without a forensic analysis, by experts, of the value of Plaintiff's assets across several accounts, as well as of the subsequent value of those accounts after they were transferred out of Morgan Stanley. Plaintiff could not have reasonably discovered the falsity of Morgan Stanley's statements given the asymmetry of information and expertise. Moreover, the complexity of the transactions at issue also prevented Plaintiff from discovering the fraud or his injury, including as a result of fraud and money laundering. Indeed, the complexity of the transactions is precisely why

Plaintiff reasonably relied on Morgan Stanley to sell his restricted stock and to hedge its value as the sale occurred.

488.    In addition, Morgan Stanley, Moriarity, and the Morgan Stanley options desk employed a supposed derivatives-based hedging strategy, which created a smoke screen to hide the fraud. The hedging strategy added significant complexity to the account statements, not only because the statements were riddled with put and call options, but also exotic forms of options, such as European options, which can only be exercised on as specific date. Those options further created the illusion that Plaintiff's Intermedia stock was still within his possession—namely, in the options account created for him by Morgan Stanley.

489.    Plaintiff could not—and did not—reasonably discover that an accumulating short position was being created in his main account as a result of repeated transfers of his stock, without consideration, to unknown accounts, as the NAV would not have reflected anything other than an ultimate sale of all of Plaintiff's Intermedia stock when the values of Intermedia stock in the options account and the short position in the main account were netted against each other.

490.    Moreover, because the stock was restricted, the accumulating short position created in Plaintiff's main account did not result in the transfer of the Intermedia shares in his options account, creating the illusion that his stock remained in his account subject to hedging. It was not until after the one-year restriction period had lapsed that the quantity and value of Intermedia stock in the options account could be netted against the accumulating short position, resulting in his stock no longer appearing in his account—a fact that would have been consistent with the sale of his Intermedia stock as per Morgan Stanley's instructions and objective at the time. There was no reason to believe—and no way to know—that Morgan Stanley had transferred his funds to other accounts.

491. Plaintiff also did not know that Morgan Stanley had created accounts that he could neither see nor control, but that were nonetheless affiliated with him. He did not learn of the existence of those accounts until years later, after Morgan Stanley began producing account information to him in 2022. Indeed, Morgan Stanley was still producing new account information up to the very date of this Complaint. Even after receiving the account statement, Plaintiff could not discover the truth or his injury without a costly and multi-year forensic analysis, which did not conclude until weeks prior to the filing of this Complaint. Indeed, a person of ordinary skill and intelligence could not have gleaned the truth from the account statements and other information Morgan Stanley provided, as Plaintiff hired experts in investment banking and forensic accounting to perform the painstaking analysis.

492. Moreover, Morgan Stanley and Moriarity knew of, and evaded, Morgan Stanley's lax, inadequate, and unlawful anti-money-laundering standards. They did so, in part, by transferring funds into accounts associated with Plaintiff, but outside his visibility and control. To date, Morgan Stanley has not fully disclosed the assets and accounts associated with Plaintiff during his tenure at Morgan Stanley.

493. As to Morgan Stanley's fraudulent transfers associated with Netpliance/TippingPoint, Plaintiff did not know—and could not have reasonably known—about Morgan Stanley's conduct and the resulting injury.

494. Plaintiff did not know that Morgan Stanley's journal entries in his account statements were false and misleading, including because they omitted highly material information, until a detailed forensic analysis spanning through May 2024 ultimately showed, among other things, a pattern of suspicious trading activity (*e.g.*, order-book signaling and collusion through coded messages and identification), and the suspicious timing of suspicious and unlawful conduct

by his fiduciary and lawyer, Terri Lacy. Indeed, Plaintiff could not connect the timing of Lacy's filings with the IRS and trust transactions with the Netpliance/TippingPoint transactions without a full forensic review of his Morgan Stanley financial statements in tandem with his taxes and documents produced by Lacy as late as May 2024. Given the complexity of the transactions, the expertise required to determine the effect of the tax laws, the sprawling factual record, and the asymmetry of information and expertise between Morgan Stanley and Plaintiff, Plaintiff could not have reasonably discovered that Morgan Stanley had injured his business or property by reason of a pattern of racketeering and lacked facts necessary to assert a RICO cause of action.

495. In addition, because Netpliance and TippingPoint stock is no longer listed on a public exchange and has not been for some time, the historical data required to perform a detailed analysis of the transactions is not readily available. To date, information about the order books as they existed at the time of the transactions is unavailable, further obfuscating any order-book signaling or collusion that may have incurred, including as to other stocks. Order-book data, as well as data concerning transactions undertaken by Morgan Stanley for other clients, is not publicly available and exclusively in the hands of Morgan Stanley. Further discovery is required to further investigate the hundreds of millions of dollars of transactions that Morgan Stanley and Moriarity ran through Plaintiff's account. Indeed, additional, complex statistical analysis is necessary to detect broader indicia of collusive transactions across the hundreds of millions of dollars of securities transactions that Morgan Stanley purportedly made through Plaintiff's account.

496. Moreover, Morgan Stanley fraudulently concealed facts necessary for Plaintiff to have asserted a fraud cause of action, including as to the elements of falsity and injury. To begin with, Plaintiff relied on account statements, including NAVs, to monitor the performance of his investments. Morgan Stanley engaged in hundreds of millions of dollars of securities transactions

through Plaintiff's managed account, which resulted in a high volume of account journal entries that obfuscated the collusive transactions related to Netpliance and TippingPoint. Neither Plaintiff nor any reasonable person could have discovered the sophisticated fraud perpetrated by Morgan Stanley, including through coded order-book signaling and collusion with company insiders, among the large volume of other transactions. In addition, given that Plaintiff had multiple accounts are Morgan Stanley, transfers in and out of accounts were not uncommon and would not have by themselves been regarded as suspicious. Absent a detailed analysis of such transfers in conjunction with the fraudulent transactions and the timing of collusive tax transactions by Lacy, Plaintiff could not have learned, or even have been spurred to investigate, the truth.

497. In addition, the tax consequences of the fraud could not have been detected given the collusively timing and fraudulent concealment of the transactions by Lacy. Indeed, as explained below, Lacy had created the option for a retroactive taxable gain from Netpliance as well as the immediate option to take a large tax loss just prior to the beginning of the fraudulent transactions in April 2000 and August 2001. She did not trigger the gain or loss for Plaintiff—that is until Morgan Stanley had completed its fraud in 2004, immediately writing down $5.1 million of Netpliance stock and passing through a tax loss to Plaintiff that masked the gain realized from transfers into Plaintiff's account made for the purpose of money laundering. Morgan Stanley fraudulently concealed its conduct and Plaintiff's injury by collusively timing these transactions with Lacy, who worked closely with Jimmy Mansour and Netpliance/TippingPoint executives and officers.

498. Finally, the use of coded order-book signaling obfuscated the true nature of the fraudulent transfers in and out of Plaintiff's account. Plaintiff could not have reasonably discovered a sophisticated system of encrypted messages embedded in the order sizes of his accounts without

heroic efforts, which he had no reason to undertake until other indicia of fraud and money laundering had appeared in connection with Netpliance/TippingPoint, Lacy, and Netpliance/TippingPoint management in 2024. Moreover, a reasonable person of ordinary skill could not have detected the sophisticated encryption and communication scheme used by Morgan Stanley. Detection of the numerical patterns required expertise in collusive trading and statistical analysis.

499.    Given Plaintiff's lack of knowledge of injury and facts necessary to have asserted a RICO cause of action until approximately the date of this Complaint, his claims did not accrue outside the statute of limitations, and even if they did, Morgan Stanley, Moriarity, and/or members of the Morgan Stanley options desk fraudulently concealed facts necessary to assert his cause of action until a time within the applicable statute of limitations period—*i.e.*, April or May of 2024. Plaintiff's claim is therefore timely.

**COUNT 2:**
Violation of 18 U.S.C. § 1962(d), RICO

500.    Defendant Morgan Stanley violated 18 U.S.C. § 1962(d) by engaging in prohibited predicate acts that were part of, and related to, a pattern of racketeering perpetrated by an association-of-fact. Plaintiff suffered injury to his business and/or property under 18 U.S.C. § 1964 by reason of Defendants' violation of Section 1962 and Morgan Stanley's overt acts in furtherance of the conspiracy.

501.    The persons listed in Count 1, *supra*, are members of the MLE enterprise and have engaged in a pattern of racketeering in violation of 18 U.S.C. § 1962(c). Moreover, Defendants and other co-conspirators have engaged in a pattern of racketeering as described, *supra*, Count 1.

502. Morgan Stanley engaged in overt acts in furtherance of the conspiracy, including the predicate acts described in Count 1, *supra*. In addition, Morgan Stanley engaged in overt acts in furtherance of the predicate acts performed by members of the conspiracy, as described above.

503. Plaintiff is injured in his business or property as a direct and proximate result of Defendants' conspiracy, including multiple overt acts by Defendant Morgan Stanley and its employees and agents, including Moriarity.

504. Plaintiff's claim is timely and subject to fraudulent concealment and/or equitable tolling for the reasons set forth in Count 1, *supra*, and based on the facts alleged throughout the Complaint.

## COUNT 3:
## Fraud
(as to the Exfiltration of Intermedia Restricted Stock)

505. Defendant Morgan Stanley committed fraud by making false and/or misleading statements, as well as by omitting material facts in the face of a duty to speak fully and truthfully.

506. Morgan Stanley made false statements and omissions in account statements sent to Plaintiff from June 1998 through June 1999 by stating that securities belonging to Plaintiff had been "DELIVER[ED]," meaning transferred out of the account. The journal entries were false and/or misleading, as they failed to provide full information about the destination of the securities transferred after having spoken partially on the subject. The journal entries were also false and misleading because they omitted information about the purpose of the transaction. Indeed, the terse entries lack even the most basic information required in accounting and banking journal entries. In addition, the entries contrast with other entries on Plaintiff's statements that contain significantly more detail (*e.g.*, the destination account of a transfer or description of a transaction), indicating that the fraudulent and misleading entries were deliberately terse and lacking in necessary information.

507. These false and/or misleading statements occurred on June 30, 1998, August 11, 1998, August 31, 1998, September 24, 1998, October 22, 1998, February 28, 1999, March 22, 1999, April 6, 1999, April 22, 1999, May 3, 1999, and June 1, 1999.

508. In addition, Defendant Morgan Stanley stood in a position of trust with respect to Plaintiff, as the Bank had provided Plaintiff investment advice and executed an investment strategy on Plaintiff's behalf. Plaintiff relied on Morgan Stanley to his detriment, as Morgan Stanley was acting against Plaintiff's interests. This position of trust created a duty for Morgan Stanley to have spoken fully and completely. If it had done so, it would have disclosed, among other things, (a) the full destination of the transfer of Intermedia stock out of Plaintiff's account; and (b) the true effect (or ineffectiveness) of the supposed hedge it created of Intermedia restricted stock. These facts would have been material, and Plaintiff would not have engaged Morgan Stanley, Moriarity, or any other Morgan Stanley personnel in connection with his Intermedia stock if he knew the truth about Morgan Stanley planned to do and ultimately did with his stock.

509. Morgan Stanley induced Plaintiff's reliance by proposing the hedging strategy to him and purporting to follow his instructions to sell his restricted stock as restrictions were lifted over the course of a year—approximately, 1/12th of the stock in his possession, per month. Morgan Stanley further induced reliance by creating the appearance that it was, and had, followed Plaintiff's instructions.

510. Plaintiff reasonably relied on the financial statements containing the false and/or misleading journal entries. Indeed, account statements are the primary means by which an account-holder can monitor his agent and fiduciary—here, Morgan Stanley. That is why Morgan Stanley deliberately omitted information from account statements as part of its fraud, as that is the primary

source of information that Plaintiff could use to examine a transaction and reconstruct the state of an account—or series of accounts—with specificity.

511. Moreover, Plaintiff relied on Morgan Stanley to execute the hedging and sale of his Intermedia restricted stock. Indeed, Plaintiff engaged Morgan Stanley because he lacked the expertise to properly hedge his Intermedia stock or to sell restricted Intermedia stock as restrictions lifted. Given the complexity of the necessary transactions, Plaintiff reasonably relied on Morgan Stanley—which collected fees for the service and had superior skills, information, and tools—to hedge and sell his restricted Intermedia stock. Plaintiff was also forced to rely on Morgan Stanley's expertise because of the asymmetry of information. For example, data concerning derivatives, such as options and futures, were generally unavailable to Plaintiff in 1998 and 1999, and even if procured through costly means (*e.g.*, by engaging a separate prime brokerage), the data would be unintelligible to Plaintiff, who lacked the expertise to interpret, forecast, and synthesize the information necessary to execute the trading strategy Morgan Stanley had proposed.

512. Finally, Plaintiff reasonably relied on Morgan Stanley's false statements by paying taxes in the amount required given the purported sales on tax forms sent to him and his tax advisors from Morgan Stanley. Plaintiff would not have paid taxes on stock gains if he knew that his stock had not in fact been sold, but transferred out of his account for no consideration.

513. Plaintiff has been injured by Morgan Stanley's fraud because Morgan Stanley (a) took without authorization/converted/embezzled approximately $20.5 million of Intermedia stock while under a duty to act on Plaintiff's behalf and in his interests; (b) deprived Plaintiff of the use and control of his Intermedia stock. Plaintiff is accordingly entitled to compensatory damages, as well as an appropriate measure of interest—the quantity of both be determined at trial, including based on expert testimony.

514. In addition, Plaintiff is entitled to punitive damages for Morgan Stanley's fraud. Morgan Stanley's conduct is aimed at the public generally, is gross, and involves high moral culpability. Morgan Stanley's theft/embezzlement/conversion of $20.5 million of Intermedia shares targeted the public, as its conduct corrupts the public's confidence in banks and broker dealers. The taking of the Intermedia shares was deliberate and premeditated, and Morgan Stanley used an ineffective "hedging strategy" as a smokescreen for the taking of Plaintiff's Intermedia stock and the transfer of his stock out of his account.

515. Finally, Morgan Stanley's false and misleading journal entries in its account statements is directed at the public, as it undermines confidence in banks and financial institutions to include deliberately opaque, incomplete, and inconsistent journal entries, particularly to conceal the theft or embezzlement. The deliberate and premeditated nature of Morgan Stanley's fraud cries out of deterrence, and punitive damages in Plaintiff's favor would be a just, appropriate, and effective relief in service of deterrence. Indeed, punitive damages would prevent Morgan Stanley from repeating this sort of fraudulent conduct in millions of other accounts it holds on behalf of other customers and as to the approximately $6.6 trillion in customer assets it oversees.

516. To the extent Plaintiff is entitled to a recessionary measure of damages, Plaintiff is entitled to be put in the place he was before agreeing to engage Morgan Stanley to sell his restricted shares and hedge his investment. This measure of damages may include, for example, the value of Intermedia restricted shares as of, or before, June 1998; any taxes paid as a direct result of Morgan Stanley's fraudulent conduct; and any relevant measure of interest appropriately awarded in relation to such measures of damages. The appropriate measure of damages depends on factual issues to be tried by a factfinder, and may include other or different measures or relief, including whatever other relief the Court deems just, reasonable, and appropriate.

517.    *Statute of Limitations and Tolling*. Plaintiff did not know that Morgan Stanley's journal entries in his account statements were false and misleading, including because they omitted highly material information, until a detailed forensic analysis spanning through May 2024 ultimately showed that he did not receive any value for the supposed sale of his stock, and that representations made to him by Morgan Stanley and banker Jim Moriarity on or about June 1999 were false and misleading.

518.    Specifically, Morgan Stanley and Plaintiff's banker in charge of his account falsely and misleadingly stated, on or after June 1999, that the losses in NAV Plaintiff experienced were caused by a downturn in the stock market and in the value of Intermedia stock. The statements, which were plausible at the time in 1999 given market movements and the price of Intermedia stock, fraudulently concealed Plaintiff's cause of action, including the discovery of facts necessary to plead the elements of a fraud claim. The elements concealed include, among other things, falsity and injury.

519.    Indeed, Morgan Stanley and Moriarty's statements could not have been revealed to be false without a forensic analysis, by experts, of the value of Plaintiff's assets across several accounts, as well as the subsequent value of those accounts after they were transferred out of Morgan Stanley. Plaintiff could not have reasonably discovered the falsity of Morgan Stanley's statements given the asymmetry of information and expertise. Moreover, the complexity of the transactions at issue also prevented Plaintiff from discovering the fraud or his injury. Indeed, the complexity of the transactions is precisely why Plaintiff reasonably relied on Morgan Stanley to sell his restricted stock and to hedge its value as the sale occurred.

520.    In addition, Morgan Stanley, Moriarity, and the Morgan Stanley options desk employed a supposed derivatives-based hedging strategy, which created a smoke screen to hide

the fraud. The hedging strategy added significant complexity to the account statements, not only because the statements were riddled with put and call options, but also exotic forms of options, such as European options, which can only be exercised on as specific date. Those options, particularly when mixed with American options that could be called away at any time, further created the illusion that Plaintiff's Intermedia stock was still within his possession—namely, in the options account created for him by Morgan Stanley.

521. Plaintiff could not—and did not—reasonably discover that an accumulating short position was being created in his main account as a result of repeated transfers of his stock, without consideration, to unknown accounts, as the NAV would not have reflected anything other than an a supposed sale of Plaintiff's Intermedia stock when the value of Intermedia stock in the options account and the short position value were netted against each other. Moreover, because the stock was restricted, the accumulating short position created in Plaintiff's main account did not result in the transfer of the Intermedia shares in his options account, creating the illusion that his stock remained in his account subject to hedging. It was not until after the one-year restriction period had lapsed that the quantity of Intermedia stock in the options account could be netted against the accumulating short position, resulting in his stock no longer appearing in his account—a fact that would have been consistent with the sale of his Intermedia stock as per Morgan Stanley's instructions and objective at the time. There was no reason to believe—and no way to know—that Morgan Stanley had transferred his funds to other accounts.

522. Plaintiff also did not know that Morgan Stanley had created accounts that he could neither see nor control, but that were nonetheless associated with him. He did not learn of the existence of those accounts until years later, after Morgan Stanley began producing account information to him in 2022. Indeed, Morgan Stanley was still producing new account information

up to the very date of this complaint. Even after receiving the account statement, Plaintiff could not discover the truth or his injury without a costly and multi-year forensic analysis, which did not conclude here until weeks prior to the filing of this Complaint. Indeed, a person of ordinary skill and intelligence could not have gleaned the truth from the account statements and other information Morgan Stanley provided, as Plaintiff hired experts in investment banking and forensic accounting to perform the painstaking analysis.

523.    Moreover, Morgan Stanley and Moriarity knew of, and evaded, Morgan Stanley's lax, inadequate, and unlawful anti-money-laundering standards. They did so, in part, by transferring funds into accounts associated with Plaintiff, but outside his visibility and control. To date, Morgan Stanley has not fully disclosed the assets and accounts associated with Plaintiff during his tenure at Morgan Stanley.

524.    Given Plaintiff's lack of knowledge of fraudulent injury and facts necessary to have asserted a cause of action for fraud until approximately the date of this Complaint, his claims did not accrue outside the statute of limitations, and even if they did, Morgan Stanley, Moriarity, and members of the Morgan Stanley options desk fraudulently concealed facts necessary to assert his cause of action until a time within the applicable statute of limitations period—*i.e.*, April or May of 2024. Plaintiff's claim is therefore timely.

## COUNT 4:
### Fraud as to the Netpliance and TippingPoint Transactions

525.    Defendant Morgan Stanley fraudulently transferred funds to related counterparties through collusive transactions disguised as securities trades of Netpliance and TippingPoint securities, as well as through wire transfers, and the journaled movement of Netpliance and TippingPoint securities in and out of Plaintiff's accounts. The details of these transactions are set forth above.

526.     Morgan Stanley and Moriarity made false and misleading statements in connection with these fraudulent transfers in and out of Plaintiff's account. To begin with, Morgan Stanley's statements reflected arms-length transactions of Netpliance stock, then later TippingPoint stock. The transactions, however, were not purchase or sales of these securities, but direct transfers of funds to colluding counterparties for the purpose of laundering money through Plaintiff's accounts. Indeed, Morgan Stanley, Moriarity, and other personnel working for them, engaged in trades with order sizes that contained identifying and coordinating information through the use of repeated codes (*e.g.*, odd lot orders ending in sequences of "1s," small orders only in prime number quantities). The effect of this collusion was that a direct transfer of value was cloaked as a securities transaction, but not transactions had in fact taken place. The identifying order sizes ensured that the value transferred would be to and from Plaintiff's account.

527.     Morgan Stanley made a series of false and misleading statements concerning these fraudulent transactions. To begin with, as set forth in detail above, from May 2000 through approximately July 2004, Morgan Stanley entered false journal entries on Plaintiff's account statements. These journal entries disclosed purchases or sales of Netpliance/TippingPoint securities, the price of the transactions, and their dates. They did not, however, disclose that the transactions were not in fact purchases or sales of securities, but direct transferers to and from colluding third-parties, including affiliates of Netpliance/TippingPoint, such as Plaintiff's brother Jimmy or the officers and directors of the company, including General Counsel and VP James Cahill. Moreover, Morgan Stanley and Moriarity did not disclose that they were facilitating money laundering through Plaintiff's account.

528.     In addition, Plaintiff's account statements reflected wire transfers to Netpliance and TippingPoint, which lacked any reasonable description that would allow Plaintiff to determine the

purpose of the transactions or whether they involved any consideration in return. Specifically, Plaintiff's account statements reflected journal entries stating that wire transfers were made to Netpliance on August 31, 1999 and September 23, 1999 for amounts totaling $1,091,094. The journal entries were false and misleading. To begin with, they lacked information about who had authorized the transfers. They also lacked full information about the purpose of the transfers and the destination account numbers. The journal entries also did not disclose that Morgan Stanley and Moriarity were working with insiders at Netpliance and leveraging his accounts to collude with them. Morgan Stanley had a bird's eye view of where these wire transfers were going, but omitted material information in Plaintiff's account statements.

529.    Plaintiff's account statements from Morgan Stanley and Moriarity contained journal entries reflecting a single-day transfer of TippingPoint stock in and out of Plaintiff's account on July 27, 2004. The journal entries failed to disclose the purpose of the transactions or the source or destination of the transfers of the TippingPoint stock that flowed in and out of his account. The failure to at least provide source or destination information renders the journal entries false and misleading, including because the omitted information hid the identity of the counterparty with which Morgan Stanley and Moriarity were colluding.

530.    Moreover, Morgan Stanley, and Moriarity in particular, occupied a position of trust with respect to Plaintiff, as they had agreed to invest his money on his behalf and in his best interest, including by executing transactions in his accounts. They routinely reported information about his accounts, assets, and financial strategies to Plaintiff, and acted as though they were under a duty to provide him with the whole truth about his affairs. For example, Moriarity directly contacted Plaintiff about his accounts and investments and routinely dispensed advise and investment proposals. Moriarity held himself out as a manager of Plaintiff's money, with discretion

over his funds, including through his actions. Moriarity and Morgan Stanley therefore acted in a fiduciary capacity on behalf of Plaintiff and owed him fiduciary duties, including duties of loyalty, candor, and care. By omitting the existence of, and participation in, collusive Netpliance/TippingPoint transactions, Morgan Stanley and Moriarity breached those duties to Plaintiff.

531. The omitted information was highly material to Plaintiff—and would have been to any reasonable person. Indeed, Moriarity and Morgan Stanley had likely traded with insiders, colluded to create the appearance of open-market transactions, and actively facilitated (if not participated in) money laundering through his accounts. Plaintiff would not have maintained any business relationship, let alone one of such trust and confidence, if the truth were disclosed.

532. Plaintiff relied on Morgan Stanley and Moriarity, as well as their statements to him about his transactions and financial affairs. When Morgan Stanley presented false and misleading account statements, including journal entries, Plaintiff relied on those statements to assess the value of his assets and the performance of those investments. Indeed, due to the information asymmetry inherent in the relationship, the volume of transactions, and the complexity of the transactions on his account statements, Plaintiff had no choice but to rely on Morgan Stanley and Moriarity for full and truthful information. Plaintiff reasonably relied on their false and misleading statements, and Morgan Stanley defrauded him as a result.

533. Morgan Stanley induced Plaintiff's reliance, including through the communications of its agent and employee, Moriarity. Specifically, Morgan Stanley and Moriarity provided Plaintiff with account statements, performance reports, investment proposals, and other information to induce him to enter into transactions with Morgan Stanley or to allow Morgan Stanley to continue investing his assets through them. Morgan Stanley and Moriarity reasonably expected that their

conduct would induce Plaintiff to continue his relationship with them and to vest them with broad discretion over his accounts and assets. In fact, their conduct and statements did so for many years, including during the period in which Morgan Stanley and Moriarity engaged in fraudulent transactions concerning Netpliance and TippingPoint.

534.    Notably, Morgan Stanley had run hundreds of millions of dollars of transactions through Plaintiff's accounts, and additional discovery is required to determine whether similar conduct occurred with respect to other stocks, companies, or transactions.

535.    Plaintiff was injured by Morgan Stanley's conduct, including through Moriarity in at least the following ways: (a) Plaintiff lost the use and control over the assets in his account, including the funds used to engage in sham Netpliance and TippingPoint transactions; and (b) and he lost the value of any money or securities lost to counterparties colluding with Morgan Stanley in connection with the transactions, including as a result of sham transactions, wire transfers, and journaled transfers of securities. Plaintiff is entitled to compensatory damages, as well as an appropriate measure of interest—the quantity of both be determined at trial, including based on expert testimony.

536.    In addition, Plaintiff is entitled to punitive damages for Morgan Stanley's fraud. Morgan Stanley's conduct is aimed at the public generally, is gross, and involves high moral culpability. Specifically, by channeling money laundering activity and transfers through public securities markets, Morgan Stanley's conduct is aimed at the public generally. The conduct is unmistakably premeditated, as Morgan Stanley and its bankers used order sizes in trades of Intermedia, and potentially other stock, to collude with counterparties involved in the money laundering. The conduct is gross and involves high moral culpability because it is an overt attempt

to conceal the source and destination of funds that were unlawfully obtained from Plaintiff's accounts.

537. The appropriate measure of damages depends on factual issues to be tried by a factfinder, and may include other or different measures or relief, including whatever other relief the Court deems just, reasonable, and appropriate.

538. *Statute of Limitations and Tolling.* Plaintiff did not know that Morgan Stanley's journal entries in his account statements were false and misleading, including because they omitted highly material information, until a detailed forensic analysis continuing through May 2024 ultimately showed, among other things, a pattern of suspicious trading activity (*e.g.*, order-book signaling and collusion through coded messages and identification), and the suspicious timing of suspicious and unlawful conduct by his fiduciary and lawyer, Terri Lacy. Indeed, Plaintiff could not connect the timing of Lacy's filings with the IRS and trust transactions with the Netpliance/TippingPoint transactions without a full forensic review of his Morgan Stanley financial statements in tandem with his taxes and documents produced by Lacy as late as May 2024. Given the complexity of the transactions, the expertise required to determine the effect of the tax laws, the sprawling factual record, and the asymmetry of information and expertise between Morgan Stanley and Plaintiff, Plaintiff could not have reasonably discovered that Morgan Stanley had committed fraud or the facts required to assert a fraud cause of action against Morgan Stanley.

539. In addition, because Netpliance and TippingPoint stock is no longer listed on a public exchange and has not been for some time, the historical data required to perform a detailed analysis of the transactions is not readily available. To date, information about the order book as it existed at the time of this transaction is unavailable, further obfuscating any order-book signaling or collusion that may have incurred, including as to other stocks. Order-book data, as well as data

concerning transactions undertaken by Morgan Stanley for other clients, is not publicly available and exclusively in the hands of Morgan Stanley. Further discovery is required to further investigate the hundreds of millions of dollars of transactions that Morgan Stanley and Moriarity ran through Plaintiff's account. Indeed, additional, complex statistical analysis is necessary to detect broader indicia of collusive transactions across the hundreds of millions of dollars of securities transactions that Morgan Stanley purportedly made through Plaintiff's account.

540.    Moreover, Morgan Stanley fraudulently concealed facts necessary for Plaintiff to have asserted a fraud cause of action, including as to the elements of falsity and injury. To begin with, Plaintiff relied on account statements, including NAVs, to monitor the performance of his investments. Morgan Stanley engaged in hundreds of millions of dollars of securities transactions through Plaintiff's managed account, which resulted in a high volume of account journal entries that obfuscated the collusive transactions related to Netpliance and TippingPoint. Neither Plaintiff nor any reasonable person could have discovered the sophisticated fraud perpetrated by Morgan Stanley, including through coded order-book signaling and collusion with company insiders, among the large volume of other transactions. In addition, given that Plaintiff had multiple accounts are Morgan Stanley, transfers in and out of accounts were not uncommon and would not have by themselves been regarded as suspicious. Absent a detailed analysis of such transfers in conjunction with the fraudulent transactions and the timing of collusive tax transactions by Lacy, Plaintiff could not have learned, or even have been spurred to investigate, the truth.

541.    In addition, the tax consequences of the fraud could not have been detected given the collusively time, fraudulent concealment of the transactions by Lacy. Indeed, as explained below, Lacy had created the option for a retroactive taxable gain from Netpliance as well as the immediate option to take a large tax loss just prior to the beginning of the fraudulent transactions

in April 2000 and August 2001. She did not trigger the gain or loss for Plaintiff—that is until Morgan Stanley had completed its fraud in 2004, immediately writing down $5.1 million of Netpliance stock and passing through a tax loss to Plaintiff that masked the gain realized from transfers into Plaintiff's account for the purpose of money laundering placement and integration under the guise of sham stock purchases. Morgan Stanley fraudulently concealed its fraud by collusively timing these transactions with Lacy, who worked closely with Jimmy Mansour and Netpliance/TippingPoint executives and officers.

542. Finally, the use of coded order-book signaling obfuscated the true nature of the fraudulent transfers in and out of Plaintiff's account. Plaintiff could not have reasonably discovered a sophisticated system of encrypted messages embedded in the order sizes of his accounts without heroic efforts, which he had no reason to undertake until other indicia of fraud had appeared in connection with Netpliance/TippingPoint, Lacy, and Netpliance/TippingPoint management in 2024. Moreover, a reasonable person of ordinary skill could not have detected the sophisticated encryption and communication scheme used by Morgan Stanley. Detection of the numerical patterns required expertise in collusive trading and statistical analysis.

543. Plaintiff's fraud claim therefore did not accrue until 2024, the earliest, and if it had accrued earlier, Morgan Stanley fraudulently concealed the facts necessary to have maintained a cause of action against Morgan Stanley, which hid the truth until 2024, the earliest.

## COUNT 5:
### Breach of Fiduciary Duty

544. Defendant Morgan Stanley breached its fiduciary duty to Plaintiff, including through Moriarity and its other agents. Morgan Stanley owed a fiduciary duty to Plaintiff because of its relationship of trust and confidence with Plaintiff. Specifically, Morgan Stanley and

Moriarity directly advised Plaintiff on his investments and assets, most of which was held in Morgan Stanley accounts and managed by Morgan Stanley and Moriarity.

545. Morgan Stanley holds out its wealth management advisers, such as Moriarity, out as providing holistic investment and asset management services. Moriarity actively managed Plaintiff's investments. Indeed, Plaintiff did not have an online portal account for all, if not most, of the time his accounts were with Morgan Stanley and Moriarity. When Plaintiff sought to execute a transaction, including money transfers, wires, or stock purchases, he did so by calling Morgan Stanley or Moriarity. He did not, and could not have, engaged in the hundreds of millions of dollars of transactions made through his accounts, nor did Plaintiff have the expertise to engage in the complex investment strategies Morgan Stanley executed on his behalf through his accounts. Due to material asymmetries in information and expertise, Plaintiff entrusted Morgan Stanley and Moriarity with his financial affairs, and Morgan Stanley and Moriarity acted accordingly at all times.

546. Plaintiff relied on Morgan Stanley and Moriarity to provide him all necessary information about his accounts, investments, and assets. Indeed, when a significant loss of value occurred after the supposed sale of his intermedia stock in June 1999, Plaintiff relied on Moriarity and Morgan Stanley for the reasons why. He was given false reasons, which obfuscated the fraudulent transfers of Intermedia stock out of his accounts without any consideration in return. Plaintiff accepted those reasons precisely because he regarded Morgan Stanley and Moriarity as his fiduciaries.

547. The substance of the transactions Morgan Stanley, Moriarity, and Morgan Stanley's options desk executed for Plaintiff necessarily required a relationship of trust and confidence. Plaintiff had no access to relevant financial data, including as to complex derivatives. Plaintiff did

not have a legal understanding of the custodial constraints relevant to the restrictions placed on his Intermedia stock. Plaintiff had no experience executing hedging strategies or even forecasting price risks from volatility. Indeed, Plaintiff relied on Morgan Stanley, Moriarity, and the Morgan Stanley options desk because the stock market was in a period of unprecedented volatility in 1998 and 1999, requiring specialized expertise and experience to successfully mitigate losses. Morgan Stanley, Moriarity, and the Morgan Stanley options desk held themselves out as having that expertise and experience in and around June 1998, when they began selling and hedging Intermedia restricted stock on Plaintiff's behalf. Morgan Stanley therefore had undertaken fiduciary duties to Plaintiff.

548. Morgan Stanley breached its fiduciary duties to Plaintiff, including its duties of care, candor, and loyalty, by (a) engaging in fraudulent transfers of his Intermedia stock, likely into accounts associated with Plaintiff but outside of his view and control; (b) engaging in money laundering through his account, including through collusive Netpliance/TippingPoint transfers masked to look like securities transactions; (c) wire transfers in and out of his account with false and misleading journal entries on account statements; (d) failing to disclose the full truth about Morgan Stanley and Jim Moriarity's conflicts of interest and conflicting duties, including as to Plaintiff's brother Jimmy and Joe; and (e) intentionally and/or recklessly failing to implement and/or enforce anti-money-laundering systems, including filing SARs and reporting suspicious trading and account activity to regulators.

549. Plaintiff has been injured and damaged by the breach. Specifically, Plaintiff has (a) lost the value and use of the assets and money in his Morgan Stanley account at the time of the fraudulent Netpliance/TippingPoint transactions, including as a result of the more than $600 million trades through his account to obfuscate money laundering facilitated and executed by

Morgan Stanley and more than $1 million in fraudulent wire transfers; (b) lost the reasonable returns that would have been associated with Plaintiff's assets absent the fraud; (c) lost the value of taxes paid as a result of Morgan Stanley's fraudulent conduct; and (d) lost the value of his Intermedia restricted stock, worth at least $20.5 million as of June 1999, as well as the reasonable returns that would have accrued on this funds. Plaintiff is entitled to compensatory damages and/or restitution as a result of Morgan Stanley's breaches of fiduciary duty, as well as the value of any applicable rate of interest to be applied to his damages. The amount of damages is to be proven at trial, including through expert testimony. Plaintiff is also entitled to punitive damages, including because its breach of duty cries out for deterrence and punishment, given the gross, collusive, and premeditated nature of the conduct. Plaintiff also seeks any other remedies that the Court and/or factfinder deems just, proper, and appropriate.

550. *Fraudulent Concealment and Tolling*. The statute of limitations is tolled as to Morgan Stanley's breaches of fiduciary duty.

551. As to the fraudulent transfers of Plaintiff's Intermedia stock out of his accounts, that breach of fiduciary duty was concealed, facilitated, and perpetrated through Morgan Stanley's false and misleading account information, including its false and misleading journal entries. Plaintiff did not know that Morgan Stanley's journal entries in his account statements were false and misleading, including because they omitted highly material information, until a detailed forensic analysis spanning through May 2024 ultimately showed that he did not receive any value for the supposed sale of his stock, and that representations made to him by Morgan Stanley and banker Jim Moriarity on or about June 1999 were false and misleading. Accordingly, Plaintiff could not have known, and did not know, that his stock had been converted, not sold.

552.     Indeed, Morgan Stanley and Plaintiff's banker in charge of his account falsely and misleadingly stated, on or after June 1999, that the losses in NAV Plaintiff experienced were caused by a downturn in the stock market and in the value of Intermedia stock. The statements, which were plausible at the time in 1999 given market movements and the price of Intermedia stock, fraudulently concealed Plaintiff's cause of action, including the discovery of facts necessary to plead the elements of a conversion claim.

553.     Morgan Stanley and could not have been revealed to be false without a forensic analysis, by experts, of the value of Plaintiff's assets across several accounts, as well as the subsequent value of those accounts after they were transferred out of Morgan Stanley. Plaintiff could not have reasonably discovered the falsity of Morgan Stanley's statements given the asymmetry of information and expertise. Moreover, the complexity of the transactions at issue also prevented Plaintiff from discovering the fraud or his injury. Indeed, the complexity of the transactions is precisely why Plaintiff reasonably relied on Morgan Stanley to sell his restricted stock and to hedge its value as the sale occurred.

554.     In addition, Morgan Stanley, Moriarity, and the Morgan Stanley options desk employed a supposed derivatives-based hedging strategy, which created a smoke screen to hide the fraud. The hedging strategy added significant complexity to the account statements, not only because the statements were riddled with put and call options, but also exotic forms of options, such as European options, which can only be exercised on as specific date. Those options, particularly when mixed with American options that could be called away at any time, further created the illusion that Plaintiff's Intermedia stock was still within his possession—namely, in the options account created for him by Morgan Stanley.

555. Plaintiff could not—and did not—reasonably discover that an accumulating short position was being created in his main account as a result of repeated transfers of his stock, without consideration, to unknown accounts, as the NAV would not have reflected anything other than an incremental sale when the value of Intermedia stock in the options account and the short position value were netted against each other. Moreover, because the stock was restricted, the accumulating short position created in Plaintiff's main account did not result in the transfer of the Intermedia shares in his options account, creating the illusion that his stock remained in his account subject to hedging. It was not until after the one-year restriction period had lapsed that the quantity of Intermedia stock in the options account could be netted against the accumulating short position, resulting in his stock no longer appearing in his account—a fact that would have been consistent with the sale of his Intermedia stock as per Morgan Stanley's instructions and objective at the time. There was no reason to believe—and no way to know—that Morgan Stanley had transferred his funds to other accounts.

556. Plaintiff also did not know that Morgan Stanley had created accounts that he could neither see nor control, but that were nonetheless affiliated with him. He did not learn of the existence of those accounts until years later, after Morgan Stanley began producing account information to him in 2022. Indeed, Morgan Stanley was still producing new account information up to the very date of this complaint. Even after receiving the account statement, Plaintiff could not discover the truth or his injury without a costly and multi-year forensic analysis, which did not conclude here until weeks prior to the filing of this Complaint. Indeed, a person of ordinary skill and intelligence could not have gleaned the truth from the account statements and other information Morgan Stanley provided, as Plaintiff hired experts in investment banking and forensic accounting to perform the painstaking analysis.

557.    Moreover, Morgan Stanley and Moriarity knew of, and evaded, Morgan Stanley's lax, inadequate, and unlawful anti-money-laundering standards. They did so, in part, by transferring funds into accounts associated with Plaintiff, but outside his visibility and control. To date, Morgan Stanley has not fully disclosed the assets and accounts associated with Plaintiff during his tenure at Morgan Stanley.

558.    As to breaches of fiduciary duty arising from Morgan Stanley's fraudulent transfers associated with Netpliance/TippingPoint, Plaintiff did not know—and could not have reasonably known—about Morgan Stanley's breaches of fiduciary duty.

559.    Plaintiff did not know that Morgan Stanley's journal entries in his account statements were false and misleading, including because they omitted highly material information, until a detailed forensic analysis spanning through May 2024 ultimately showed, among other things, a pattern of suspicious trading activity (*e.g.*, order-book signaling and collusion through coded messages and identification), and the suspicious timing of suspicious and unlawful conduct by his fiduciary and lawyer, Terri Lacy. Indeed, Plaintiff could not connect the timing of Lacy's filings with the IRS and trust transactions with the Netpliance/TippingPoint transactions without a full forensic review of his Morgan Stanley financial statements in tandem with his taxes and documents produced by Lacy as late as May 2024. Given the complexity of the transactions, the expertise required to determine the effect of the tax laws, the sprawling factual record, and the asymmetry of information and expertise between Morgan Stanley and Plaintiff, Plaintiff could not have reasonably discovered that Morgan Stanley had committed fraud or the facts required to assert a fraud cause of action against Morgan Stanley.

560.    In addition, because Netpliance and TippingPoint stock is no longer listed on a public exchange and has not been for some time, the historical data required to perform a detailed

analysis of the transactions is not readily available. To date, information about the order book as it existed at the time of this transaction is unavailable, further obfuscating any order-book signaling or collusion that may have incurred, including as to other stocks. Order-book data, as well as data concerning transactions undertaken by Morgan Stanley for other clients, is not publicly available and exclusively in the hands of Morgan Stanley. Further discovery is required to further investigate the hundreds of millions of dollars of transactions that Morgan Stanley and Moriarity ran through Plaintiff's account. Indeed, additional, complex statistical analysis is necessary to detect broader indicia of collusive transactions across the hundreds of millions of dollars of securities transactions that Morgan Stanley purportedly made through Plaintiff's account.

561. Moreover, Morgan Stanley fraudulently concealed facts necessary for Plaintiff to have asserted a fraud cause of action, including as to the elements of falsity and injury. To begin with, Plaintiff relied on account statements, including NAVs, to monitor the performance of his investments. Morgan Stanley engaged in hundreds of millions of dollars of securities transactions through Plaintiff's managed account, which resulted in a high volume of account journal entries that obfuscated the collusive transactions related to Netpliance and TippingPoint. Neither Plaintiff nor any reasonable person could have discovered the sophisticated fraud perpetrated by Morgan Stanley, including through coded order-book signaling and collusion with company insiders, among the large volume of other transactions. In addition, given that Plaintiff had multiple accounts are Morgan Stanley, transfers in and out of accounts were not uncommon and would not have by themselves been regarded as suspicious. Absent a detailed analysis of such transfers in conjunction with the fraudulent transactions and the timing of collusive tax transactions by Lacy, Plaintiff could not have learned, or even have been spurred to investigate, the truth.

562.     In addition, the tax consequences of the fraud could not have been detected given the collusively time, fraudulent concealment of the transactions by Lacy. Indeed, as explained below, Lacy had created the option for a retroactive taxable gain from Netpliance as well as the immediate option to take a large tax loss just prior to the beginning of the fraudulent transactions in April 2000 and August 2001. She did not trigger the gain or loss for Plaintiff—that is until Morgan Stanley had completed its fraud in 2004, immediately writing down $5.1 million of Netpliance stock and passing through a tax loss to Plaintiff that masked the gain realized from transfers into Plaintiff's account for the purpose of money laundering placement and integration under the guise of sham stock purchases. Morgan Stanley fraudulently concealed its fraud by collusively timing these transactions with Lacy, who worked closely with Jimmy Mansour and Netpliance/TippingPoint executives and officers.

563.     Finally, the use of coded order-book signaling obfuscated the true nature of the fraudulent transfers in and out of Plaintiff's account. Plaintiff could not have reasonably discovered a sophisticated system of encrypted messages embedded in the order sizes of his accounts without heroic efforts, which he had no reason to undertake until other indicia of fraud had appeared in connection with Netpliance/TippingPoint, Lacy, and Netpliance/TippingPoint management in 2024. Moreover, a reasonable person of ordinary skill could not have detected the sophisticated encryption and communication scheme used by Morgan Stanley. Detection of the numerical patterns required expertise in collusive trading and statistical analysis.

564.     Given Plaintiff's lack of knowledge of injury and facts necessary to have asserted a cause of action for breaches of fiduciary duty until approximately the date of this Complaint, his claims did not accrue outside the statute of limitations, and even if they did, Morgan Stanley, Moriarity, and/or members of the Morgan Stanley options desk fraudulently concealed facts

necessary to assert his cause of action until a time within the applicable statute of limitations period—*i.e.*, April or May of 2024. Plaintiff's claim is therefore timely.

**COUNT 6:**
Conversion

565. Defendant Morgan Stanley is liable for conversion because it intentionally and without authority, assumed and/or exercised control over Plaintiff's property, interfering with his right of possession.

566. Plaintiff had a possessory right and interest in (a) the restricted Intermedia Shares he placed with Morgan Stanley for hedging and sale, and (b) the funds and assets held in his managed accounts, including tens of millions of dollars in cash and securities.

567. Defendant exercised dominion over, and interfered with, Plaintiff's property, in derogation of his rights. Specifically, Morgan Stanley, including through Moriarity and its other agents, (a) moved funds and assets in and out of Plaintiff's accounts in connection with its money laundering, depriving Plaintiff of control over its assets; (b) engaged in more than $600 million of securities transactions to facilitate and conceal its money laundering conduct, depriving Plaintiff of the value and availability of those funds, including as collateral for other investments; and (c) moved Plaintiff's Intermedia stock out of his accounts through manually journaled transactions without his permission and authority and for no consideration.

568. Plaintiff has been injured and damaged by Morgan Stanley's conversion of his assets. Defendant is liable for compensatory damages, as well as the reasonable rate of return Plaintiff would have earned absent the conversion. Plaintiff is also entitled to punitive damages, including because its conversion cries out for deterrence and punishment, given the gross, collusive, and premeditated nature of the conduct. Plaintiff also seeks any other remedies that the Court and/or factfinder deems just, proper, and appropriate.

569.    *Fraudulent Concealment and Tolling.* The statute of limitations is tolled as to Morgan Stanley's conversion.

570.    As to the transfers of Plaintiff's Intermedia stock out of his accounts, that conversion was concealed, facilitated, and perpetrated through Morgan Stanley's false and misleading account information, including its false and misleading journal entries. Plaintiff did not know that Morgan Stanley's journal entries in his account statements were false and misleading, including because they omitted highly material information, until a detailed forensic analysis spanning through May 2024 ultimately showed that he did not receive any value for the supposed sale of his stock, and that representations made to him by Morgan Stanley and banker Jim Moriarity on or about June 1999 were false and misleading. Accordingly, Plaintiff could not have known, and did not know, that his stock had been converted, not sold.

571.    Indeed, Morgan Stanley and Plaintiff's banker in charge of his account falsely and misleadingly stated, on or after June 1999, that the losses in NAV Plaintiff experienced were caused by a downturn in the stock market and in the value of Intermedia stock. The statements, which were plausible at the time in 1999 given market movements and the price of Intermedia stock, fraudulently concealed Plaintiff's cause of action, including the discovery of facts necessary to plead the elements of a conversion claim.

572.    Morgan Stanley and Moriarty's statements could not have been revealed to be false without a forensic analysis, by experts, of the value of Plaintiff's assets across several accounts, as well as the subsequent value of those accounts after they were transferred out of Morgan Stanley. Plaintiff could not have reasonably discovered the falsity of Morgan Stanley's statements given the asymmetry of information and expertise. Moreover, the complexity of the transactions at issue also prevented Plaintiff from discovering the fraud or his injury. Indeed, the complexity of the

transactions is precisely why Plaintiff reasonably relied on Morgan Stanley to sell his restricted stock and to hedge its value as the sale occurred.

573. In addition, Morgan Stanley, Moriarity, and the Morgan Stanley options desk employed a supposed derivatives-based hedging strategy, which created a smoke screen to hide the conversion. The hedging strategy added significant complexity to the account statements, not only because the statements were riddled with put and call options, but also exotic forms of options, such as European options, which can only be exercised on as specific date. Those options further created the illusion that Plaintiff's Intermedia stock was still within his possession—namely, in the options account created for him by Morgan Stanley.

574. Plaintiff could not—and did not—reasonably discover that an accumulating short position was being created in his main account as a result of repeated transfers of his stock, without consideration, to unknown accounts, as the NAV would not have reflected anything other than an incremental sale when the value of Intermedia stock in the options account and the short position value were netted against each other. Moreover, because the stock was restricted, the accumulating short position created in Plaintiff's main account did not result in the transfer of the Intermedia shares in his options account, creating the illusion that his stock remained in his account subject to hedging. It was not until after the one-year restriction period had lapsed that the quantity and value of the Intermedia stock in the options account could be netted against the accumulating short position, resulting in his stock no longer appearing in his account—a fact that would have been consistent with the sale of his Intermedia stock as per Morgan Stanley's instructions and objective at the time. There was no reason to believe—and no way to know—that Morgan Stanley had transferred his Intermedia stock to other accounts outside his view and control.

575. Plaintiff also did not know that Morgan Stanley had created accounts that he could neither see nor control, but that were nonetheless affiliated with him. He did not learn of the existence of those accounts until years later, after Morgan Stanley began producing account information to him in 2021 and 2022. Indeed, Morgan Stanley was still producing new account information up to the very date of this complaint. Even after receiving the account statements, Plaintiff could not discover the truth or his injury without a costly and multi-year forensic analysis, which did not conclude here until weeks prior to the filing of this Complaint. Indeed, a person of ordinary skill and intelligence could not have gleaned the truth from the partial account statements and other information Morgan Stanley provided, as Plaintiff hired experts in investment banking and forensic accounting to perform the painstaking analysis.

576. Moreover, Morgan Stanley and Moriarity knew of, and evaded, Morgan Stanley's lax, inadequate, and unlawful anti-money-laundering standards. They did so, in part, by transferring funds into accounts associated with Plaintiff, but outside his visibility and control. To date, Morgan Stanley has not fully disclosed the assets and accounts associated with Plaintiff during his tenure at Morgan Stanley.

577. As to the conversion arising from Morgan Stanley's transfers associated with Netpliance/TippingPoint, Plaintiff did not know—and could not have reasonably known—about Morgan Stanley's conversion.

578. Plaintiff did not know that Morgan Stanley's journal entries in his account statements were false and misleading, including because they omitted highly material information, until a detailed forensic analysis spanning through May 2024 ultimately showed, among other things, a pattern of suspicious trading activity (*e.g.*, order-book signaling and collusion through coded messages and identification), and the suspicious timing of suspicious and unlawful conduct

by his fiduciary and lawyer, Terri Lacy. Indeed, Plaintiff could not connect the timing of Lacy's filings with the IRS and trust transactions with the Netpliance/TippingPoint transactions without a full forensic review of his Morgan Stanley financial statements in tandem with his taxes and documents produced by Lacy as late as May 2024. Given the complexity of the transactions, the expertise required to determine the effect of the tax laws, the sprawling factual record, and the asymmetry of information and expertise between Morgan Stanley and Plaintiff, Plaintiff could not have reasonably discovered that Morgan Stanley had committed conversion or the facts required to assert a conversion cause of action against Morgan Stanley.

579. In addition, because Netpliance and TippingPoint stock is no longer listed on a public exchange and has not been for some time, the historical data required to perform a detailed analysis of the transactions is not readily available. To date, information about the order books as they existed at the time of this transaction is unavailable, further obfuscating any order-book signaling or collusion that may have incurred, including as to other stocks. Order-book data, as well as data concerning transactions undertaken by Morgan Stanley for other clients, is not publicly available and exclusively in the hands of Morgan Stanley. Further discovery is required to further investigate the hundreds of millions of dollars of transactions that Morgan Stanley and Moriarity ran through Plaintiff's account. Indeed, additional, complex statistical analysis is necessary to detect broader indicia of collusive transactions across the hundreds of millions of dollars of securities transactions that Morgan Stanley purportedly made through Plaintiff's account.

580. Moreover, Morgan Stanley fraudulently concealed facts necessary for Plaintiff to have asserted a conversion cause of action, including as to the elements of falsity and injury. To begin with, Plaintiff relied on account statements, including NAVs, to monitor the performance of his investments. Morgan Stanley engaged in hundreds of millions of dollars of securities

transactions through Plaintiff's managed account, which resulted in a high volume of account journal entries that obfuscated the collusive transactions related to Netpliance and TippingPoint. Neither Plaintiff nor any reasonable person could have discovered the sophisticated fraud and conversion perpetrated by Morgan Stanley, including through coded order-book signaling and collusion with company insiders, among the large volume of other transactions. In addition, given that Plaintiff had multiple accounts are Morgan Stanley, transfers in and out of accounts were not uncommon and would not have by themselves been regarded as suspicious. Absent a detailed analysis of such transfers in conjunction with the fraudulent transactions and the timing of collusive tax transactions by Lacy, Plaintiff could not have learned, or even have been spurred to investigate, the truth.

581.    In addition, the tax consequences of the fraud could not have been detected given the collusively time, fraudulent concealment of the transactions by Lacy. Indeed, as explained below, Lacy had created the option for a retroactive taxable gain from Netpliance as well as the immediate option to take a large tax loss just prior to the beginning of the fraudulent transactions in April 2000 and August 2001. She did not trigger the gain or loss for Plaintiff—that is until Morgan Stanley had completed its fraud in 2004, immediately writing down $5.1 million of Netpliance stock and passing through a tax loss to Plaintiff that masked the gain realized from transfers into Plaintiff's account for the purpose of money laundering. Morgan Stanley fraudulently concealed its fraud by collusively timing these transactions with Lacy, who worked closely with Jimmy Mansour and Netpliance / TippingPoint executives and officers.

582.    Finally, the use of coded order-book signaling obfuscated the true nature of the transfers in and out of Plaintiff's account. Plaintiff could not have reasonably discovered a sophisticated system of encrypted messages embedded in the order sizes of his accounts without

heroic efforts, which he had no reason to undertake until other indicia of impropriety and fraud had appeared in connection with Netpliance/TippingPoint, Lacy, and Netpliance/TippingPoint management in 2024. Moreover, a reasonable person of ordinary skill could not have detected the sophisticated encryption and communication scheme used by Morgan Stanley. Detection of the numerical patterns required expertise in collusive trading and statistical analysis.

583.    Given Plaintiff's lack of knowledge of injury and facts necessary to have asserted a cause of action for conversion duty until approximately the date of this Complaint, his claims did not accrue outside the statute of limitations, and even if they did, Morgan Stanley, Moriarity, and/or members of the Morgan Stanley options desk fraudulently concealed facts necessary to assert his cause of action until a time within the applicable statute of limitations period—*i.e.*, April or May of 2024. Plaintiff's claim is therefore timely.

**COUNT 7:**
Unjust Enrichment

584.    Defendant Morgan Stanley is liable for unjust enrichment because it was enriched at Plaintiff's expense, and it is against equity and good conscience to permit Morgan Stanley to retain what it has taken from Plaintiff.

585.    Morgan Stanley was unjust enriched with (a) Plaintiff's Intermedia stock, which Morgan Stanley transferred out of his account without receiving or providing consideration; (b) commissions and fees as a result of $600 million in trades through his accounts, which were used to conceal money laundering, including through Netpliance/TippingPoint related stock; and (c) the use and benefit Morgan Stanley obtained from Plaintiff's assets, which Morgan Stanley moved out of his accounts into other unidentified accounts outside Plaintiff's view or control. Each benefit came at Plaintiff's expense and to exclusion of his rights to his own assets.

586.    It would be against equity and good conscience for Morgan Stanley to keep what it has received at Plaintiff's expense. Morgan Stanley's transfer of Intermedia stock outside of Plaintiff's account was unlawful and unauthorized. Morgan Stanley breached its duties to Plaintiff as part of its transfer of Intermedia stock out of his accounts. Moreover, Plaintiff's use of Netpliance/Intermedia transfers, including sham securities transactions, to facilitate and execute money laundering, *i.e.*, to conceal the source of transfers of funds to and from Plaintiff's account, was unlawful and unjust. In addition, Morgan Stanley's generation and receipt of fees and commissions in connection with more than $600 million in securities transactions improperly and unnecessarily run through his accounts was unlawful and unjust, and connected to unlawful and unjust conduct—*i.e.*, money laundering. Morgan Stanley also received the benefits conferred upon it as a result of its unreasonably lax, inadequate, and unlawful anti-money-laundering systems. It would be inequitable for Morgan Stanley to keep any of these benefits, which it obtained through unjust, unlawful, reckless and/or negligent means.

587.    *Fraudulent Concealment and Tolling*. Plaintiff's claim had not accrued until 2024, and in any event, the statute of limitations is tolled as to Morgan Stanley's unjust enrichment for the reasons stated in counts 1-7, *supra*. Plaintiff's claim is therefore timely.

## II.    CLAIMS AGAINST DEFENDANT DEUTSCHE BANK

### COUNT 8:
Violation of 18 U.S.C. § 1962(c), RICO

588.    Defendant Deutsche Bank violated 18 U.S.C. § 1962(c) by engaging in prohibited predicate acts that were part of, and related to, a pattern of racketeering perpetrated by an association-of-fact. Plaintiff suffered injury to his business and/or property under 18 U.S.C. § 1964 by reason of Defendants' and Deutsche Bank's violation of Section 1962.

589.     ***The Money Laundering Enterprise.*** The members of the MLE set forth in Count 1, *supra*, who and others presently unknown, have been members of and constitute an "associate-in-fact enterprise" within the meaning of RICO.

590.     ***Pattern of Racketeering.*** Defendant Deutsche Bank's conduct was part of a pattern of racketeering spanning approximately 25 years, involving a group of entrepreneurs, businesses, bankers, fiduciaries, and financial services companies, who have utilized assets and accounts belonging to Plaintiff as part of a broader money laundering enterprise. Each member of the MLE committed predicate acts in violation of 1962(c) in furtherance of this overall conspiracy, and every predicate served the same overall goal—to create and maintain a pot of money through which money and loans could be sent and received with the true source concealed. Their conduct rhymes across the span of approximately 25 years, and if unabated, will continue at financial institutions with intentional and reckless lapses in anti-money-laundering controls. Indeed, at each step, members of the MLE directed Plaintiff and his assets to financial services institutions that had been sanctioned and fined by regulators, including for criminal anti-money-laundering conduct. In addition to the facts pleaded above in this Complaint, the several predicate acts performed by members of the MLE are listed above in Count 1, *supra*.

591.     ***Deutsche Bank's Predicate Acts.*** In addition to the predicate acts described throughout the Complaint above, Deutsche Bank engaged in at least the following predicate acts:

- On or around July 17, 2007, Deutsche Bank's Boots Nowlan and John Edrington falsely stated through the use of the wires that (a) Plaintiff would be taking a $3 million loan, and (b) the loan proceeds would be invested in a security referred to as CROCI. The statement was false, as Edrington had forged Plaintiff's signature on a $6 million loan and caused $3 million to be transferred from an account associated with Plaintiff, but outside of his view and control. Deutsche Bank, Nowlan, and Edrington used funds that had been exfiltrated and concealed from Plaintiff as part of the MLE's money laundering activities to hide the fraudulent $6 million loan. Plaintiff did not in fact receive the proceeds of any loan, let alone the $6 million loan Nowlan and Edrington fraudulently took in his name. Deutsche Bank, Nowlan, and Edrington made false and

misleading statements through the wires. Their conduct constitutes mail and/or wire fraud under 18 U.S.C. § 1341 & 1343. The fraudulent $3 million transfer violated the federal money laundering statute, 18 U.S.C. § 1956.

- On July 6, 2007, John Edrington filed a Federal Reserve Form G-3, disclosing a $6 million loan to Mansour. The form was transmitted via fax over the wires. The form was false, as Plaintiff had not in fact taken a $6 million loan, nor had Plaintiff signed the document. In fact, the document contained a forged signature for John Mansour. Edrington filed the false form with the Federal Reserve in service of the MLE and its money laundering activities, including through Plaintiff's account. Edrington's conduct constitutes mail and/or wire fraud under 18 U.S.C. § 1341 & 1343. The diversion and concealment of $6 million from Plaintiff and his accounts violated the federal money laundering statute, 18 U.S.C. § 1956.

- Duetsche Bank's July statement included an entry for July 17, 2007, which stated that $3,000,000 had been transferred into one of the control accounts. The journal entry stated: "MANSOUR JOHN A 04547," with no additional information about the source or purpose of the funds. The journal entry was false and misleading, as it omitted the true source of the funds and had been wired to disguise that all of a fraudulent $6 million loan had been diverted from Plaintiff's account. The conduct directly relates to the money-laundering conduct of the MLE, including because it diverted additional funds to be used for money laundering conduct into accounts outside of Plaintiff's view and control.

- On August 6, 2007, Plaintiff e-mailed John Edrington asking him to liquidate the croci investment and "close out the 3M loan used for the ill timed purchase of oj croci in july." Edrington responded that he would "reduce the outstanding borrowing." Having spoken partially on the subject of the loan, Edrington had the duty to speak fully and truthfully. Edrington, however, did not disclose the existence of the fraudulent $6 million, nor did he tell Plaintiff that he had filed forged and fraudulent forms with the Federal Reserve. Edrington, acting on behalf of Deutsche Bank, made a false and misleading statement to Plaintiff through the wires. This false statement was made in service of the MLE, including the MLE's money laundering operations.

- In September 2007, Deutsche Bank received $6,000,000 into the Deutsche Bank trust, but Plaintiff had only borrowed $4 million of his loan facility (and had been told falsely that he had already paid down $3 million for the loan taken in relation to the CROCI investment). Plaintiff paid $2 million to Deutsche Bank Trust that he did not owe, and Deutsche Bank, having a duty to speak fully and truthfully, including on bank statements disclosing the transfers to Deutsche Bank Trust, failed to tell Plaintiff the truth—that he had paid $2 million more than he ever borrowed. Deutsche Bank's statements concerning payments to the Deutsche Bank Trust constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343. The payments to Deutsche Bank violated the federal money laundering statute, 18 U.S.C. § 1956. The conduct related directly to the MLE's money laundering conduct, including because it concealed the diversion of $6 million in additional funds into accounts outside of Plaintiff's view and control.

- In addition, Deutsche Bank swept up collateral in the two collateral accounts at closing, creating an approximately $5-6 million shortfall in Plaintiff's account. The sweep of fraudulently obtained funds violated the federal money laundering statute, 18 U.S.C. § 1956.

- On or around September 13, 2007, Deutsche bank sent an e-mail containing a list of accounts and investments belonging to Plaintiff as part of the transition from Deutsche Bank to Merrill Lynch. The e-mail contained a spreadsheet that falsely stated that approximately $6 million, which had in fact been exfiltrated out of Plaintiff's account, had been invested in three hedge funds, Aletheia, Horizon, and Lateef. As explained above, the investments had never been made and the spreadsheet was false and misleading. The false statement was made in connection with the MLE and its money-laundering conduct, including to conceal that approximately $6 million had been diverted in service of the MLE's money laundering through Plaintiff's account.

592. As explained above, this conduct was in furtherance of the MLE's racketeering conduct, including the laundering of money through Plaintiff's account.

593. ***Injury to Business or Property.*** Plaintiff was injured in his business or property, as he (a) lost the use, control, and enjoyment of his assets and money as a result of the pattern of racketeering; and (b) lost at least six millions of dollars that were exfiltrated from his accounts by Deutsche Bank, as well as tens of millions of dollars as a result Defendants' pattern of racketeering.

594. ***Proximate Cause/Directness.*** Plaintiff's injury to business or property is caused by reason of the Defendants' unlawful conduct and pattern of racketeering. Indeed, with respect to predicate acts of mail and wire fraud, Plaintiff directly relied on Deutsche Bank's false and misleading statements, and his injuries were caused as a direct result of Defendants' and Deutsche Bank's conduct. There is no intermediary between Plaintiff and Deutsche Bank, and no other party has experienced a loss duplicative of Plaintiff's as a result of Defendants' or Deutsche Bank's conduct.

595. ***Tolling and Statute of Limitations.*** Plaintiff's claim did not accrue outside of the statute of limitations because he did not know—and could not have reasonably known—that he

was injured by reason of Defendants' pattern of racketeering, including Deutsche Bank's predicate acts.

596.     Specifically, the following facts fraudulently concealed and/or prevented discovery of Plaintiff's injury and cause of action: (a) Deutsche Bank filed forged and false documents with the federal reserve that were not disclosed to Plaintiff until Deutsche Bank produced the false documents for the first time in 2022; (b) Deutsche Bank's revelation of account numbers associated with Plaintiff but outside his control or view had not been disclosed until 2022 and Plaintiff did not know about them, nor had any reason to know about them prior to that date; (c) absent the revelation of associated accounts outside his view and control, Plaintiff could not have known—and did not know—that the $3 million deposited in his collateral account was from an account that he neither controlled nor could see. For the same reason, Plaintiff could not tell that Edrington's false and misleading statements / omissions in connection with a supposed $3 million loan were false and misleading when made. Finally, because Deutsche Bank lied about its investments in Aleitheia, Horizon, and Lateef, Plaintiff could not detect the $5-6 million shortfall resulting from the collateral sweep that occurred at account closing. Moreover, Plaintiff could not tell that he overpaid for loans, as Deutsche Bank had deceptively purchased structured loans in his account using his own money.

597.     Because Plaintiff did not know—and could not have reasonably known—that he was injured by reason of Deutsche Bank's conduct, and because the facts necessary to assert his cause of action were fraudulently concealed from him, Plaintiff's claim is timely.

### COUNT 9:
Violation of 18 U.S.C. § 1962(d), RICO

598.     Defendant Deutsche Bank violated 18 U.S.C. § 1962(d) by engaging in prohibited predicate acts that were part of, and related to, a pattern of racketeering perpetrated by an

association-of-fact, as described above. Plaintiff suffered injury to his business and/or property under 18 U.S.C. § 1964 by reason of Deutsche Bank's violation of Section 1962.

599.    The persons listed in Count 1, *supra*, are members of the MLE enterprise and have engaged in a pattern of racketeering in violation of 18 U.S.C. § 1962(c). Moreover, Defendants and other co-conspirators have engaged in a pattern of racketeering as described, *supra*, Count 1.

600.    Deutsche Bank engaged in overt acts in furtherance of the conspiracy, including the predicate acts described in Count 1, *supra*. In addition, Defendant Deutsche Bank engaged in overt acts in furtherance of the predicate acts performed by members of the conspiracy, as described above.

601.    Plaintiff is injured in his business or property as a direct and proximate result of Defendants' conspiracy, including as a result of multiple overt acts by Defendant Deutsche Bank and its employees and agents, including Nowlan and Edrington.

602.    Plaintiff's claim is timely and subject to fraudulent concealment and/or equitable tolling for the reasons set forth in Count 8, *supra*, and based on the facts alleged throughout the Complaint.

## COUNT 10:
Fraud
(under New York law)

603.    Plaintiff asserts a cause of action for fraud against Defendant Deutsche Bank.

604.    Deutsche Bank made false and misleading statements and/or omissions, as described above. These statements include, but are not limited to, statements that (a) Plaintiff had taken a $3 million dollar loan and had received the proceeds, when in fact he had not received any loan proceeds at all; and (b) false and/or misleading statements in Plaintiff's account statements that Plaintiff had paid back loans rather than his own funds.

605.     Deutsche Bank sought to induce Plaintiff's reliance by soliciting his investment in CROCI and making false statements about paying down a loan amount half of what Deutsche Bank had secretly borrowed on his behalf.

606.     Plaintiff relied on Deutsche Bank's false statements, including as to the fraudulent loan and diverted loan proceeds. Plaintiff also relied on false statements in account statements sent to him by Deutsche bank.

607.     Plaintiff was injured and damaged by approximately $6 million as a result of Deutsche Bank's false and misleading statements and/or omissions. Plaintiff is entitled to compensatory damages, restitution, or other measures of damages that the Court finds just and improper.

608.     In addition, Plaintiff is entitled to punitive damages in light of Deutsche Bank's gross and egregious conduct, which was directed at the public through false and forged documents sent to the Federal Reserve.

609.     *Tolling and Fraudulent Concealment*. Plaintiff's claim did not accrue outside of the statute of limitations because he did not know—and could not have reasonably known—that he was defrauded or injured by Deutsche Bank or its employees and agents, including Edrington and Nowlan.

610.     Specifically, the following facts fraudulently concealed and/or prevented discovery of Plaintiff's injury and cause of action: (a) Deutsche Bank filed forged and false documents with the federal reserve that were not disclosed to Plaintiff until Deutsche Bank produced the false documents for the first time in 2022; (b) Deutsche Bank's revelation of account numbers associated with Plaintiff but outside his control or view had not been disclosed until 2022 and Plaintiff did not know about them, nor had any reason to know about them prior to that date; (c) absent the

revelation of associated accounts outside his view and control, Plaintiff could not have known—and did not know—that the $3 million deposited in his collateral account was from an account that he neither controlled nor could see. For the same reason, Plaintiff could not tell that Edrington's false and misleading statements/omissions in connection with a supposed $3 million loan were in fact false and misleading. Finally, because Deutsche Bank lied about its investments in Aleitheia, Horizon, and Lateef, Plaintiff could not detect the $5-6 million shortfall resulting from the collateral sweep that occurred at account closing. Moreover, Plaintiff could not tell that he overpaid outstanding loan amounts, as Deutsche Bank had deceptively purchased structured loans in his account using his own money.

611.    Because Plaintiff did not know—and could not have reasonably known—that he was injured by reason of Deutsche Bank's conduct, and because the facts necessary to assert his cause of action were fraudulently concealed from him, Plaintiff's claim is timely.

## COUNT 11:
### Breach of Fiduciary Duty

612.    Defendant Deutsche Bank breached its fiduciary duty to Plaintiff, including through Nowlan, Edrington and its other agents. Deutsche Bank owed a fiduciary duty to Plaintiff because of its relationship of trust and confidence with Plaintiff. Specifically, Deutsche Bank, Nowlan, and Edrington directly advised Plaintiff on his investments and assets, most of which was held in Deutsche Bank accounts and managed by Deutsche Bank, Nowlan, and Edrington.

613.    Deutsche Bank holds out its wealth management advisers, such as Nowlan and Edrington, out as providing holistic investment and asset management services. Nowlan and Edrington actively managed Plaintiff's investments. When Plaintiff sought to execute a transaction, including money transfers, wires, or stock purchases, he did so by calling or e-mailing Deutsche Bank's Nowlan or Edrington. Due to material asymmetries in information and expertise,

Plaintiff entrusted Deutsche Bank, Nowlan, and Edrington with his financial affairs, and Deutsche Bank, Nowlan, and Edrington acted accordingly at all times.

614.     Deutsche Bank breached its fiduciary duty by, as described above, making false statements about a fraudulent loan taken out under Plaintiff's name; filing forged and false documents with regulators; and concealing that Plaintiff had overpaid outstanding loan amounts.

615.     Plaintiff has been injured and damaged by the breach. The amount of damages is to be proven at trial, including through expert testimony. Plaintiff is also entitled to punitive damages, including because its breach of duty cries out for deterrence and punishment, given the gross, collusive, and premeditated nature of the conduct. Plaintiff also seeks any other remedies that the Court and/or factfinder deems just, proper, and appropriate.

## COUNT 12:
Unjust Enrichment

616.     Deutsche Bank was unjustly enriched by the $6 million of proceeds of a loan taken out in Plaintiff's name without his authorization. Moreover, Deutsche Bank received the additional benefit of loan repayments beyond what it was owed, including through a collateral sweep at account closing.

617.     It would be unjust for Deutsche Bank to keep the benefits it obtained from Plaintiff. Plaintiff is entitled to damages and/or restitution in the amount of loan proceeds diverted from him as well as the amount of loan repayment that Deutsche Bank received from Plaintiff, but Plaintiff did not owe. Plaintiff is also entitled to punitive damages, including because its breach of duty cries out for deterrence and punishment, given the gross, collusive, and premeditated nature of the conduct. Plaintiff also seeks any other remedies that the Court and/or factfinder deems just, proper, and appropriate.

### III. CLAIMS AGAINST DEFENDANT SCHWAB

### COUNT 13:
Violation of 18 U.S.C. § 1962(d), RICO

618.    Defendant Schwab violated 18 U.S.C. § 1962(d) by engaging in prohibited predicate acts that were part of, and related to, a pattern of racketeering perpetrated by an association-of-fact. Plaintiff suffered injury to his business and/or property under 18 U.S.C. § 1964 by reason of Defendants' and Schwab's violation of Section 1962.

619.    The persons listed in Count 1, *supra*, are members of the MLE enterprise and have engaged in a pattern of racketeering in violation of 18 U.S.C. § 1962(c). Moreover, Defendants and other co-conspirators have engaged in a pattern of racketeering as described, *supra*, Count 1.

620.    Schwab engaged in overt acts in furtherance of the conspiracy, including:

- The willful and/or reckless decision to implement grossly inadequate anti-money-laundering policies, systems, and internal controls in furtherance of the MLE and its money laundering operations. Indeed, Schwab knew, or had reason to know, that more than a billion dollars of trades were flowing through Plaintiff's Schwab account, but did nothing to prevent, flag, or abate the suspicious activity.

- Schwab disabled and/or diverted trade confirmations in order to conceal and further the MLE and its money laundering operations.

- Despite having a duty to speak fully and truthfully, Schwab failed to disclose in its account statements that someone other than Plaintiff had access to his trading account and was trading more than a $1 billion in securities within a short amount of time (*i.e.*, a span of months). Indeed, the trading volume in Plaintiff's account was indicative of control over the account by a third-party or an algorithmic source. Schwab knew through its monitoring systems this was the case, but did not disclose in its communications with Plaintiff, including in account statements, the existence of any third-party access to his account.

621.    Plaintiff is injured in his business or property as a direct and proximate result of Defendants' conspiracy, including multiple overt acts by Defendant Schwab.

622.    Plaintiff's claim is timely and subject to fraudulent concealment and/or equitable tolling for the reasons set forth above, including:

- Schwab's active concealment of billions of dollars of trades in the span of months through his accounts by diverting or failing to generate real-time trade confirmations. Indeed, Schwab had a duty to generate trade confirmations under FINRA and SEC rules and regulations applicable to broker-dealer.

- Schwab's reckless and willful lapses in anti-money-laundering systems, which allowed the MLE's money laundering conduct through Plaintiff's account to go unabated and undetected by Plaintiff.

623. Because of Schwab's fraudulent concealment, including its willful failure to generate trade confirmations, to disclose third-party access to his accounts, or to flag suspicious trading activity, Plaintiff was prevented from discovering the money laundering activity in his account. Moreover, Plaintiff could not determine that the activity in his account was related to, and controlled by, Merrill Lynch and its employees that managed his assets. Plaintiff could not have—and did not—discovery his injury to business or property until it obtained account information from Merrill Lynch and conducted (and completed) an extensive forensic analysis, which is described above.

## COUNT 14:
### California Unfair Competition Law, § 17200

624. Schwab has violated the Section 17200 of the California Unfair Competition law because its conduct was unlawful, as set forth above. Specifically, Schwab's conduct (a) was tortious, (b) violated the RICO statute, and (c) Schwab failed to comply with FINRA and SEC regulations requiring the generation and transmission of trade confirmations.

625. Plaintiff is entitled to restitution in an amount to be determined at trial.

## COUNT 15:
### Restitution/Quasi-Contract (under California Law)

626. Schwab received the benefit of trade commissions as a result of its negligent, reckless, and/or intentional failure to implement, maintain, and abide by anti-money laundering

controls. Indeed, because of Schwab's conduct, it generated commissions on more than $1 billion in transactions over several months in 2009.

627.    It would be unjust and inequitable for Schwab to retain the unjustly received benefit it obtained as a result of its negligent, reckless, or intentional failure to implement, maintain, and abide by anti-money laundering controls or to follow rules and regulations as to trade confirmations.

## IV.    CLAIMS AGAINST DEFENDANT MERRILL LYNCH

### COUNT 16:
Violation of 18 U.S.C. § 1962(c), RICO

628.    Defendant Merrill Lynch violated 18 U.S.C. § 1962(c) by engaging in prohibited predicate acts that were part of, and related to, a pattern of racketeering perpetrated by an association-of-fact. Plaintiff suffered injury to his business and/or property under 18 U.S.C. § 1964 by reason of Defendants' and Merrill Lynch's violation(s) of Section 1962.

629.    ***The Money Laundering Enterprise.*** The members of the MLE set forth in Count 1, *supra*, who and others presently unknown, have been members of and constitute an "associate-in-fact enterprise" within the meaning of RICO.

630.    ***Pattern of Racketeering.*** Defendant Merrill Lynch's conduct was part of a pattern of racketeering spanning approximately 25 years, involving a group of entrepreneurs, businesses, bankers, fiduciaries, and financial services companies, who have utilized assets and accounts belonging to Plaintiff as part of a broader money laundering enterprise. Each member of the MLE committed predicate acts in violation of 1962(c) in furtherance of this overall conspiracy, and every predicate served the same overall goal—to create and maintain a pot of money through which money and loans could be sent and received with the true source concealed. Their conduct rhymes across the span of approximately 25 years, and if unabated, will continue at financial institutions

with intentional and reckless lapses in anti-money-laundering controls. Indeed, at each step, members of the MLE directed Plaintiff and his assets to financial services institutions that had been sanctioned and fined by regulators, including for criminal anti-money-laundering conduct. In addition to the facts pleaded above in this Complaint, the several predicate acts performed by members of the MLE are listed above in Count 1, *supra*.

631. ***Merrill Lynch's Predicate Acts.*** In addition to the predicate acts described throughout the Complaint above, Merrill Lynch engaged in at least the following predicate acts:

- On February 3, 2011, Defendant Merrill Lynch moved approximately $6 million of money from Plaintiff's own accounts and transferred them into accounts earmarked for Aletheia, Horizon, and Lateef. The transfers were made to conceal that Merrill Lynch had not made investments in these funds as represented to Plaintiff in September 2007. The transfer violated the federal money laundering statute, 18 U.S.C. § 1956. Moreover, Merrill Lynch and Reed Smith had a duty to speak fully and truthfully, but failed to disclose that no investment had been made in Aletheia, Horizon, or Lateef, and that the February 3, 2011 transfers were made to cover up the fact that approximately $6 million of Plaintiff's assets had been diverted by the MLE for money laundering purposes. Merrill Lynch's omissions in its account statements and communications to Plaintiff in the face of a duty to speak constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343.

- From February 2009 through December 2009, Merrill Lynch traded hundreds of millions of dollars of securities through Plaintiff's account. Merrill Lynch and the manager of Plaintiff's account, Reed Smith, transmitted account statements to Plaintiff reflecting securities transactions made on his behalf. The statements, including journal entries associated with hundreds of millions of dollars of trades were false and misleading, as they failed to disclose that the trades were made in coordination with trades through Plaintiff's Schwab account. Merrill Lynch's omissions in its account statements and communications to Plaintiff, particularly in the face of a duty to speak fully and truthfully, constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343.

- From September 2007 through March 2021, Merrill Lynch transmitted account statements to Plaintiff that falsely stated the NAVs across his accounts. The statements were false and misleading, as they omitted that Merrill Lynch had secretly transferred funds in and out of Plaintiff's account, reducing the true account NAVs in Plaintiff's view and control. The false statements facilitated and concealed the MLE's money laundering conduct through Plaintiff's assets and accounts and constituted mail and/or wire fraud under 18 U.S.C. § 1341 & 1343. The transfers of securities and cash in and out of Plaintiff's account constituted violations of the federal money laundering statute, 18 U.S.C. § 1956, in addition to violations of state-law predicates, including embezzlement.

- From September 2007 through March 2021, Defendant Merrill Lynch sent account statements to Plaintiff and responses to requests for account information, which are described above. Merrill Lynch omitted the existence of 29 accounts associated with Plaintiff but that were outside of his view and control, and did so in service of the MLE and the money laundering activity conducted by the MLE, including through Plaintiff's accounts.

632.    As explained above, this conduct was in furtherance of the MLE's racketeering conduct, including the laundering of money through Plaintiff's account.

633.    ***Injury to Business or Property.*** Plaintiff was injured in his business or property, as he (a) lost the use, control, and enjoyment of his assets and money as a result of the pattern of racketeering; and (b) lost tens of millions of dollars that were exfiltrated from his accounts as a result of Merrill Lynch and Defendants' pattern of racketeering.

634.    ***Proximate Cause/Directness.*** Plaintiff's injury to business or property is caused by reason of the Defendants' unlawful conduct and pattern of racketeering. Indeed, with respect to predicate acts of mail and wire fraud, Plaintiff directly relied on Merrill Lynch's false and misleading statements, and his injuries were caused as a direct result of Defendants' and Merrill Lynch's conduct. There is no intermediary between Plaintiff and Merrill Lynch, and no other party has experienced a loss duplicative of Plaintiff's as a result of Defendants' or Merrill Lynch's conduct.

635.    ***Tolling and Statute of Limitations.*** Plaintiff's claim did not accrue outside of the statute of limitations because he did not know—and could not have reasonably known—that he was injured by reason of Defendants' pattern of racketeering, including Merrill Lynch's predicate acts.

636.    Specifically, the following facts fraudulently concealed and/or prevented discovery of Plaintiff's injury and cause of action: (a) Merrill Lynch lied about its failure to obtain the assets related to Lateef, Horizon, and Aletheia, then covered it up with sham internal transactions; (b)

Merrill Lynch lied about Plaintiff's true NAVs to prevent him from discovering the truth—that his assets were being transferred in and out of his account, including for the purpose of money laundering; (c) that Merrill Lynch was collusively trading in both his managed Merrill Lynch account and directly or indirectly through his Schwab account; and (d) failed to disclose the existence of accounts associated with him, but outside of his view and control.

637.    Because Plaintiff did not know—and could not have reasonably known—that he was injured by reason of Merrill Lynch's conduct, and because the facts necessary to assert his cause of action were fraudulently concealed from him, Plaintiff's claim is timely.

**COUNT 17:**
Violation of 18 U.S.C. § 1962(d), RICO

638.    Defendant Merrill Lynch violated 18 U.S.C. § 1962(d) by engaging in prohibited predicate acts that were part of, and related to, a pattern of racketeering perpetrated by an association-of-fact, as described above. Plaintiff suffered injury to his business and/or property under 18 U.S.C. § 1964 by reason of Merrill Lynch and Defendants' violations of Section 1962.

639.    The persons listed in Count 1, *supra*, are members of the MLE enterprise and have engaged in a pattern of racketeering in violation of 18 U.S.C. § 1962(c). Moreover, Defendants and other co-conspirators have engaged in a pattern of racketeering as described, *supra*, Count 1.

640.    Merrill Lynch engaged in overt acts in furtherance of the conspiracy, including the predicate acts described in Count 1, *supra*. In addition, Defendant Merrill Lynch engaged in overt acts in furtherance of the predicate acts performed by members of the conspiracy, as described above.

641.    Plaintiff is injured in his business or property as a direct and proximate result of Defendants' conspiracy, including as a result of multiple overt acts by Defendant Merrill Lynch and its employees and agents, including Reed Smith.

642. Plaintiff's claim is timely and subject to fraudulent concealment and/or equitable tolling for the reasons set forth in Count 16, *supra*, and based on the facts alleged throughout the Complaint.

## COUNT 18:
Fraud

643. Defendant Merrill Lynch made false and misleading statements to Plaintiff, including the statements set forth in Count 16, *supra*, and throughout the complaint.

644. Plaintiff relied on Merrill Lynch's statements, including on account statements, journal entries, statements by Reed Smith. Indeed Plaintiff had no choice but to rely on these false and misleading statements given the asymmetry of information and expertise.

645. Moreover, Merrill Lynch induced Plaintiff's reliance, including by soliciting Plaintiff to make investments, providing investment advice to Plaintiff, executing an investment strategy for Plaintiff, and providing Plaintiff information about his investments and assets in the ordinary course of the relationship.

646. Plaintiff has been injured by Merrill Lynch's fraudulent conduct and is entitled to compensatory damages to be proven at trial. Plaintiff is also entitled to punitive damages, including because its breach of duty cries out for deterrence and punishment, given the gross, collusive, and premeditated nature of the conduct. Plaintiff also seeks any other remedies that the Court and/or factfinder deems just, proper, and appropriate.

## COUNT 19:
Breach of Fiduciary Duty

647. As alleged above, Defendant Merrill Lynch owed Plaintiff a fiduciary duty arising from the relationship of confidence and trust between it and Plaintiff. Specifically, Merrill Lynch and Reed Smith solicited Plaintiff to make investments, provided investment advice to Plaintiff,

executed an investment strategy for Plaintiff, and provided Plaintiff information about his investments and assets in the ordinary course of the relationship.

648.    Plaintiff relied on Merrill Lynch and Reed Smith's expertise to select and implement investment strategies on his behalf, and Merrill Lynch and Reed Smith knew it. In addition Merrill Lynch routinely provided information to Plaintiff about his investments and assets. The communication between Merrill Lynch, including from Smith, was continuous and substantive over the course of the relationship. Plaintiff thus reasonably expected that Merrill Lynch was acting in his interests and keeping his confidences. Merrill Lynch and Reed Smith acted in accord with that understanding.

649.    Merrill Lynch breached its fiduciary duties, including its duties of candor, care, and loyalty by, among other things, (a) fraudulently burying the fact that $6 million in assets were never in Merrill Lynch's possession and were not invested in Aletheia, Horizon, or Lateef, contrary to Merrill Lynch's representations; (b) concealing transfers of cash and securities to and from Plaintiff's accounts as part of a money laundering scheme; (c) falsely stating Plaintiff's NAVs, while maintaining a second set of books with true NAVs; and (d) failing to disclose the existence of accounts and assets associated with Plaintiff, but outside his view and control.

650.    Plaintiff is injured by this breach of fiduciary duty and is entitled to compensatory and consequential damages. Plaintiff is also entitled to punitive damages, including because its breach of duty cries out for deterrence and punishment, given the gross, collusive, and premeditated nature of the conduct. Plaintiff also seeks any other remedies that the Court and/or factfinder deems just, proper, and appropriate.

## COUNT 20:
### Conversion

651.    Defendant Merrill Lynch unlawfully converted Plaintiff's assets.

652.     Specifically, Merrill Lynch intentionally and knowingly converted approximately $6 million of Plaintiff's assets by falsely creating the impression that money had been invested in Aletheia, Horizon, and Lateef. Moreover, Merrill Lynch had transferred millions in and out of Plaintiff's accounts, while providing Plaintiff false NAV information. Merrill Lynch had also engaged in collusive and coordinated trades in tandem with Plaintiff's Schwab account—without Schwab's authorization or permission. The trades deprived Plaintiff of the use and enjoyment of his funds, including by tying up money that could have been productively and legitimately invested by Plaintiff. Merrill Lynch has, and continues to, convert tens of millions of dollars of assets in undisclosed accounts associated with Plaintiff but outside of his view and control.

653.     Plaintiff has been injured by Merrill Lynch's conversion and is entitled to compensatory and consequential damages. Plaintiff is also entitled to punitive damages, including because its conversion cries out for deterrence and punishment, given the gross, collusive, and premeditated nature of the conduct. Plaintiff also seeks any other remedies that the Court and/or factfinder deems just, proper, and appropriate.

## COUNT 21:
### Unjust Enrichment

654.     Defendant Merrill Lynch has been unjustly enriched.

655.     Plaintiff has conferred numerous benefits on Defendant Merrill Lynch, including (a) approximately $6 million that Merrill Lynch failed to safeguard in transition from Deutsche Bank and the absence of which Merrill Lynch hid from Plaintiff; (b) approximately $24 million in assets placed beyond Plaintiff's view and control, including in undisclosed accounts associated with Plaintiff; (c) the value of commissions and fees generated by the hundreds of millions of dollars of trades Merrill Lynch ran through Plaintiff's account; and (d) the millions of dollars it

transferred in and out of Plaintiff's account without his knowledge or permission, while hiding the transfers with inflated NAVs.

656. Plaintiff has been injured by Merrill Lynch's unjust enrichment and is entitled to restitution. Plaintiff is also entitled to punitive damages, including because its unjust enrichment cries out for deterrence and punishment, given the gross, collusive, and premeditated nature of the conduct. Plaintiff also seeks any other remedies that the Court and/or factfinder deems just, proper, and appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A. Enter a judgment declaring that Defendants have committed the violations of law alleged in this case;

B. Award actual, compensatory, statutory, consequential damages;

C. Award punitive and trebled damages;

D. Award plaintiffs disgorgement, including under RICO;

E. Award equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and the imposition of a constructive trust upon, or otherwise restricting the proceeds of Defendants' ill-gotten gains, to ensure an effective remedy;

F. Award Plaintiffs the cost of this action, including reasonable attorneys' fees and expenses and expert fees;

G. Award declaratory relief;

H. Issue an injunction restoring Mansour's ownership and access to all bank accounts and interests unlawfully taken from him;

I. Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

J.      Grant such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable as a matter of right.


Dated:  May 17, 2024                              Respectfully submitted,

                                                  **BATHAEE DUNNE LLP**

*/s/  Brian J. Dunne*                              */s/ Yavar Bathaee*
Brian J. Dunne (CA 275689)*                       Yavar Bathaee (NY 4703443)*
bdunne@bathaeedunne.com                           (Lead Counsel)
Edward M. Grauman (TX 24081931)*                  yavar@bathaeedunne.com
egrauman@bathaeedunne.com                         Andrew Wolinsky (NY 4892196)*
901 South MoPac Expressway                        awolinsky@bathaeedunne.com
Barton Oaks Plaza I, Suite 300                    445 Park Avenue, 9th Floor
Austin, TX 78746                                  New York, NY 10022
Tel.: (213) 462-2772                              Tel: (332) 322-8835


                                                  *Attorneys for Plaintiff John A. Mansour*


* Admitted in the Eastern District of Texas