UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————— x

JOHN A. MANSOUR,

                Plaintiff,

      -against-

MORGAN STANLEY; MORGAN
STANLEY & CO. LLC; AND MORGAN
STANLEY SMITH BARNEY LLC,

                Defendants.

———————————————————————————— x

25-cv-7633 (CM)

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

McMahon, J.:

Plaintiff John A. Mansour alleges that, beginning in the late 1990s, several individuals and financial institutions, including Merrill Lynch, Deutsche Bank, and Charles Schwab, engaged in a long-running scheme to misappropriate and launder funds through his brokerage accounts. The claims against Merrill Lynch, Deutsche Bank, and Charles Schwab are presently stayed pending arbitration. Only Plaintiff's claims against Morgan Stanley, Morgan Stanley & Co. LLC, and Morgan Stanley Smith Barney LLC (collectively, the "Morgan Stanley Defendants") are presently pending before this Court.

Against the Morgan Stanley Defendants, Plaintiff asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), alleging violations of 18 U.S.C. § 1962(c) and § 1962(d), as well as state-law claims for fraud, breach of fiduciary duty, conversion, and unjust enrichment.

The Morgan Stanley Defendants move to dismiss the complaint pursuant to Rule 12(b)(6). The motion is GRANTED. Plaintiff's claims fail for two independent reasons. First, the Private

Securities Litigation Reform Act of 1995 ("PSLRA"), which amended 18 U.S.C. § 1964(c), bars the civil RICO claims.  Second, Plaintiff's remaining state-law claims are barred by the applicable New York statutes of limitations.

## I.    BACKGROUND

### A.  Factual Background

Plaintiff is a retired entrepreneur who, in 1998, received substantial cash and restricted stock in connection with the sale of his telecommunications business, National Telecommunications of Florida ("NTF"), to Intermedia Communications, Inc. ("Intermedia"). Dkt. No. 1, Compl., ¶¶ 98–100.  At his brother's recommendation, Plaintiff retained Morgan Stanley banker Jim Moriarity to manage his Intermedia holdings.  *Id.*, ¶¶ 125–28.

Plaintiff alleges that Morgan Stanley proposed a complex hedging strategy designed to protect his restricted stock position.  *Id.*, ¶¶ 125–28.  According to the complaint, that strategy was never meaningfully implemented.  Instead, Plaintiff alleges that, between late 1998 and 1999, more than $20 million worth of Intermedia shares were surreptitiously removed from his account and marked as "DELIVER[ED]" in journal entries appearing on his Morgan Stanley account statements.  *Id.*, ¶¶ 147–149, 153–175, 179–180.  The complaint includes a series of specific journal entries reflecting large blocks of Intermedia shares transferred out of Plaintiff's account and coded as "DELIVER," with aggregate stated values exceeding $20 million.  *Id.*, ¶¶ 153–175. Plaintiff alleges that these transfers were not authorized, were made without consideration, and were directed to undisclosed accounts.  *Id.*, ¶¶ 147–149, 179–180.

In June 1999, when Plaintiff inquired about the declines in his net asset value ("NAV"), Morgan Stanley allegedly attributed the losses to unfavorable market conditions and to broader volatility in technology stocks after the dot-com bubble.  *Id.*, ¶¶ 143–46, 474.  Plaintiff alleges that

he reasonably relied on these explanations at the time and did not suspect wrongdoing. *Id.*, ¶¶ 144–146.

The complaint further alleges that, beginning in or about 1999 and continuing through 2004, Morgan Stanley engaged in a series of transactions involving Netpliance (later known as TippingPoint), a company affiliated with Plaintiff's brother, Jimmy Mansour. *Id.*, ¶¶ 190, 193. Plaintiff alleges that his Morgan Stanley accounts were used as a vehicle for coordinated open-market transactions in Netpliance/TippingPoint securities and related instruments. *Id.*, ¶¶ 245–281. According to the complaint, these transactions generated approximately $2.2 billion in total trading volume and were structured as "sham" trades designed to conceal and launder the value of the earlier Intermedia share transfers. *Id.*, ¶¶ 245–281.

The complaint asserts that the trades were deliberately timed to obfuscate the flow of funds, to embed transfers within legitimate market volume, and to prevent detection through ordinary review of account statements. *Id.*, ¶¶ 268–278, 540. For example, Plaintiff alleges that Morgan Stanley used coded order sizes in open-market transactions – what he describes as "order-book signaling" – to communicate with counterparties and coordinate trades through his account. *Id.*, ¶¶ 268–278. Specifically, Plaintiff alleges that, "Repeated numeric sequences ending in 1s, for example, wrapped large order blocks, likely signifying acknowledgements or delimiters for transactions." *Id.*, ¶ 277, *see also id.*, ¶ 269. He further alleges that, "Prime numbered order sizes or other repeated order sizes provided means of identifying to Morgan Stanley's traders that it was buying from the right counterparty on the exchange." *Id.*, ¶ 277. According to Plaintiff, these numeric patterns served as encrypted identifiers, allowing Morgan Stanley and alleged co-conspirators to signal when to commence or conclude blocks of trades and to confirm counterparty identity without overt communication. *Id.*, ¶¶ 277, 279–281. Plaintiff alleges that by embedding

these allegedly coordinated trades within extremely high overall trading volume – totaling billions of dollars – Defendants were able to redirect Intermedia-derived value to Netpliance insiders while disguising the transactions as ordinary brokerage activity. *Id.*, ¶¶ 245–281, 540.

Plaintiff maintains that he could not have discovered the facts necessary to assert his claims – and could not reasonably have uncovered the alleged misconduct, which he contends began on or about June 1999 – until 2021, when he retained forensic accountants and investment professionals to review his accounts. *Id.*, ¶¶ 5–6. Significantly, the complaint alleges no facts explaining why Plaintiff was unable to retain such professionals earlier. The forensic analysis continued through May 2024 and allegedly revealed that he had not received consideration for certain transfers of Intermedia shares and that various journal entries in his account statements were false or misleading. *Id.*, ¶¶ 517–518.

Plaintiff further asserts that, absent expert analysis, he could not reasonably have discovered that Morgan Stanley and his banker falsely and misleadingly represented – on or after June 1999 – that the declines in his NAV were attributable to general market downturns and fluctuations in the value of Intermedia's stock price. *Id.*, ¶¶ 518–22, 524, 557–564.

### B. Procedural History

Plaintiff commenced this action on May 17, 2024, in the United States District Court for the Eastern District of Texas. *Mansour v. Morgan Stanley*, 2025 WL 2380456, at *1 (E.D. Tex. Aug. 15, 2025) (Mazzant, J.). In his complaint, Plaintiff named the following defendants: (1) Morgan Stanley; (2) Morgan Stanley & Co. LLC; (3) Morgan Stanley Smith Barney LLC; (4) Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"); (5) Deutsche Bank Securities Inc. ("Deutsche Bank"); (6) Charles Schwab & Co., Inc. ("Charles Schwab"); and (7) twenty John Doe defendants. Dkt. No. 1, at 2–3.

Beginning in July 2024, the defendants filed a series of motions challenging the forum and arbitrability of Plaintiff's claims.  Merrill Lynch moved to compel arbitration and to stay proceedings pending arbitration.  Deutsche Bank and Charles Schwab likewise moved to compel arbitration.  Morgan Stanley moved, in the alternative, to compel arbitration or to sever and transfer the claims against it to the Southern District of New York pursuant to a mandatory forum-selection clause.  On August 15, 2025, Judge Amos L. Mazzant issued a comprehensive opinion and order resolving these motions.

First, the court denied Plaintiff's motion for leave to amend his complaint to assert a nationwide class action challenging Financial Industry Regulatory Authority ("FINRA") arbitration.  *Mansour*, 2025 WL 2380456, at *1.  The court concluded that the proposed amendment constituted a tactical effort to avoid arbitration and was futile.  *Id.* at *9–11.

Second, the court granted the motions to compel arbitration filed by Merrill Lynch, Deutsche Bank, and Charles Schwab.  *Id.* at *11–16.  The court held that Plaintiff had entered into valid and enforceable arbitration agreements with those defendants.  *Id.*  As to Merrill Lynch and Deutsche Bank, the court compelled arbitration of Plaintiff's claims pursuant to the governing customer agreements.  *Id.* at *11–15.  As to Charles Schwab, the court held, consistent with *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010), that the parties' delegation clause required the arbitrator to determine issues of arbitrability, including the applicability of FINRA's six-year eligibility rule.  *Id.* at *15–17.

Third – and most pertinent here – the Texas court addressed Morgan Stanley's motion to compel arbitration.  Unlike the other defendants, Morgan Stanley's governing agreements permitted Plaintiff to elect between arbitration or litigation.  *Id.* at *23–27.  Judge Mazzant determined that Plaintiff, through his litigation conduct and repeated resistance to arbitration, had

elected litigation. *Id.* at \*27. The court further held that the 1994 Customer Agreement and 1997 Sweep Service Agreement between Plaintiff and Morgan Stanley contained a mandatory forum-selection clause, requiring that any litigation "must be instituted in the United States District Court for the Southern District of New York." *Id.* at \*25.

Applying *Atlantic Marine Construction Co. v. United States District Court for the Western District of Texas*, 571 U.S. 49 (2013), the court concluded that the forum-selection clause was mandatory, valid, and enforceable. *Id.* at \*28–30. It rejected Plaintiff's argument that the civil RICO venue provision, *see* 18 U.S.C. § 1965, displaced the contractual clause and found that the public-interest factors did not present the "extraordinary circumstances" necessary to override the parties' contractual choice of forum. *Id.* at \*31–33. Accordingly, Judge Mazzant granted Morgan Stanley's motion to sever and transfer. *Id.* at \*34. The court severed Plaintiff's claims against Morgan Stanley, Morgan Stanley & Co. LLC, and Morgan Stanley Smith Barney LLC and transferred those claims to the United States District Court for the Southern District of New York. *Id.* The court simultaneously stayed all remaining proceedings in the Eastern District of Texas pending arbitration of Plaintiff's claims against Merrill Lynch, Deutsche Bank, and Charles Schwab. *Id.*

The only claims presently before the Court are the severed claims against the Morgan Stanley Defendants.

## II.    LEGAL STANDARDS

### A.  Rule 12(b)(6) Standard

To survive dismissal, a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference

6

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted). At this stage, the Court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Twombly*, 550 U.S. at 555–56. If the allegations do not nudge the claims "across the line from conceivable to plausible," dismissal is required. *Id.* at 570.

## III.    DISCUSSION

### A.  The PSLRA Bars Plaintiff From Pursuing His Civil RICO Claims

Plaintiff asserts claims under 18 U.S.C. §§ 1962(c) and (d), alleging that the Morgan Stanley Defendants conducted and conspired to conduct an enterprise through a pattern of racketeering activity. The alleged predicate acts include wire fraud, mail fraud, and money laundering, all of which are premised on the alleged misappropriation and coordinated trading of securities held in Plaintiff's brokerage accounts. These claims are barred by Section 107 of the Private Securities Litigation Reform Act of 1995 ("PSLRA").

Section 107 of the PSLRA amended 18 U.S.C. § 1964(c) to provide:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor . . . except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

18 U.S.C. § 1964(c). This statutory language is broad. It bars reliance on "any conduct" that "would have been actionable as fraud in the purchase or sale of securities." It does not require that the plaintiff himself possess a viable securities claim against the defendant. Nor does it depend on the label attached to the asserted predicate acts. The inquiry is conduct-based. *See MLSMK Inv. Co. v. JPMorgan Chase & Co.*, 651 F.3d 268, 273–79 (2d Cir. 2011).

The legislative history confirms the breadth of the amendment. The Conference Committee Report explains that Congress intended "to eliminate securities fraud as a predicate offense in a civil RICO action," and to bar plaintiffs from "plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." H.R. Conf. Rep. No. 104–369, at 47 (1995).

Floor debates reflect the same concern. Representative Christopher Cox, the amendment's sponsor, explained that plaintiffs had been using RICO "to evade the requirements that Congress has established in the Federal securities laws," and warned that without the amendment, lawyers could perform an "end run around all of the reform by simply using the RICO statute." 141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995). The amendment sought to prevent precisely Plaintiff's current maneuver – relabeling securities fraud as mail fraud, wire fraud, or other racketeering predicates in order to obtain treble damages. As the SEC's General Counsel testified (and as quoted during the debate):

> The commission is concerned that the civil liability provisions of RICO can, in many cases, convert private securities law fraud claims into RICO claims. Successful plaintiffs in such cases are entitled to treble damages, despite the express limitations on recovery under the securities laws to actual damages. Private plaintiffs may be able to bypass the carefully crafted liability provisions of the securities laws and thereby recover damages in cases in which Congress or the courts have determined that no recovery should be available.

*Id.* Congress responded by eliminating the use of such conduct as civil RICO predicates. *See* 18 U.S.C. § 1964(c). The focus of § 1964(c), both in text and history, is on the nature of the conduct – not on pleading labels.

The Second Circuit's precedents establish a straightforward rule. If the conduct alleged as RICO predicates would have been actionable as securities fraud, the civil RICO claim cannot proceed – regardless of the labels attached to the predicate acts. *See MLSMK*, 651 F.3d at 273–79. The Court's task is thus to examine the conduct alleged and determine whether it arises from,

or is inseparable from, securities transactions. If so, the PSLRA forecloses reliance on that conduct to establish a RICO violation.

Applying that rule here, the conduct alleged as RICO predicates concerns the transfer, trading, and reporting of securities transactions executed through Plaintiff's Morgan Stanley brokerage accounts. Because those allegations describe conduct that would have been actionable – if at all – as securities fraud, the PSLRA bars Plaintiff from repackaging that conduct as mail fraud, wire fraud, or money laundering to support a civil RICO claim.

Plaintiff's RICO theory against Morgan Stanley rests on the following predicate acts:

1. From June 1998 through June 1999, Morgan Stanley created false and misleading journal entries regarding Intermedia stock transfers, thus engaging in mail/wire fraud and money laundering.

2. In or around June 1999, Morgan Stanley made false and misleading oral statements regarding the decline in value of his accounts, thus engaging in mail/wire fraud.

3. From March 2000 through July 2004, Morgan Stanley sent false and misleading account statements, thus engaging in mail/wire fraud and money laundering.

Dkt. No. 1, Compl., ¶ 480. Each of these allegations concerns conduct undertaken in connection with the purchase, sale, transfer, or disposition of securities and alleged misrepresentations or omissions about those transactions. The Securities Exchange Act of 1934 defines "security" to include "stock" and other instruments commonly known as securities. 15 U.S.C. § 78c(a)(10); *see also* 15 U.S.C. § 77b(a)(1) (Securities Act of 1933). Shares of stock fall squarely within this definition. *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985). Plaintiff's allegations stem from the shares of Intermedia and Netpliance/TippingPoint stock, which he alleges were traded through his Morgan Stanley brokerage accounts. Such shares plainly constitute "securities" within the meaning of the federal securities laws.

Nor is there any serious question that the alleged conduct occurred "in connection with" the purchase or sale of those securities. *See* 15 U.S.C. § 78j(b). The Exchange Act defines "purchase" and "sale" broadly to include any contract to acquire or dispose of a security. 15 U.S.C. §§ 78c(a)(13)–(14). Courts construe the "in connection with" requirement flexibly, and it is satisfied where the securities transaction and the deceptive scheme coincide – even if the fraud concerns the disposition of customer securities or the diversion of sale proceeds rather than a misstatement about a particular security's value.

The Supreme Court's decisions in *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6 (1971) and *SEC v. Zandford*, 535 U.S. 813 (2002) make that clear. In *Superintendent of Insurance*, the Supreme Court held that § 10(b) reached a scheme in which the seller was "injured as an investor through a deceptive device which deprived it of any compensation for the sale of its valuable block of securities," and it emphasized that it was "irrelevant" that the seller's proceeds were later misappropriated. 404 U.S. at 10–13. And in *Zandford*, the Supreme Court held that a broker's unauthorized sales of a customer's securities, coupled with misappropriation of the proceeds, satisfied the "in connection with" requirement because the "securities sales and [the broker's] fraudulent practices were not independent events" – each sale furthered the fraudulent securities-based scheme. 535 U.S. at 819–22.

The same reasoning applies here. Plaintiff alleges that Morgan Stanley caused Intermedia shares to be transferred out of his brokerage account and executed coordinated Netpliance/TippingPoint trades through that account. Those alleged acts were carried out through securities transfers and trades reflected in brokerage records. On these allegations, and consistent with *Superintendent of Insurance* and *Zandford*, the challenged conduct – if fraudulent – would have been actionable as fraud "in connection with" the purchase or sale of securities, and thus

constitutes conduct that "would have been actionable as fraud in the purchase or sale of securities" for purposes of the PSLRA bar. *See* 18 U.S.C. § 1964(c).

Plaintiff attempts to avoid the PSLRA bar by characterizing the predicates as "money laundering" and "wire fraud." That effort fails as a matter of law. As the Second Circuit explained in *MLSMK*, courts must look to the substance of the conduct alleged. "Congress did not say that it was removing 'any claim that would have been actionable.' Its focus was on the *behavior* alleged to satisfy RICO's predicate-act requirement." *MLSMK*, 651 F.3d at 279 (emphasis added). Here, the alleged wire communications, journal entries, and transfers are inseparable from the alleged fraudulent securities transactions.

The complaint repeatedly ties the alleged racketeering activity to securities transfers and trading activity reflected in Plaintiff's brokerage accounts. For example, Plaintiff alleges that Morgan Stanley created "false and misleading journal entries regarding Intermedia Stock Transfers." Dkt. No. 1, Compl. ¶ 480. The Intermedia shares at issue were "publicly-traded" stock that Plaintiff held in his Morgan Stanley brokerage accounts following the sale of his telecommunications company. *See id.*, ¶ 2. The complaint likewise alleges that Morgan Stanley made "false and misleading oral statements regarding the decline in value of [Plaintiff's] accounts." *Id.*, ¶ 480. Those accounts, according to the complaint, consisted of securities positions managed by Morgan Stanley, including shares of Intermedia and later trading activity involving Netpliance and TippingPoint securities. *See, e.g.*, *id.*, ¶¶ 125–80. These allegations confirm that the purported racketeering conduct centers on the transfer, valuation, and trading of securities held in Plaintiff's brokerage accounts.

Even Plaintiff concedes that Morgan Stanley sent false and misleading brokerage account statements reflecting securities transactions. Specifically, the complaint alleges that, "From March

11

2000 through July 2004, Morgan Stanley . . . made false and misleading statements in account statements transmitted to Plaintiff, namely in journal entries describing transactions in Netpliance and TippingPoint stock." Dkt. No. 1, Compl., ¶ 480.  According to the complaint, these statements were misleading because they allegedly failed to disclose "the true nature of the transactions" and their purported relation to money laundering activity.  *Id.*  The complaint states that journal entries described transactions that allegedly involved "collusive transfers of money disguised as *securities transactions* using coded order sizes and order-book signaling."  *Id.* (emphasis added).

Plaintiff's own allegations likewise confirm that the alleged "exfiltration" occurred through an extraordinary volume of securities transactions executed through his account.  The complaint alleges that Morgan Stanley executed "hundreds of millions of dollars of securities" trades annually and "billions of dollars" in trading activity through a single account between 2001 and 2004.  Dkt. No. 1, Compl., ¶¶ 285–87.  Plaintiff further asserts that the sheer number of transactions flowing through the account made it "virtually impossible for a reasonable account holder" to detect irregularities.  *Id.*, ¶ 287.  According to the complaint, the alleged exfiltration occurred entirely through securities transactions.  Repackaging the same conduct and styling it as "money laundering" does not remove it from the ambit of § 1964(c).

Section 1964(c)'s legislative history anticipated precisely this pleading tactic.  The Conference Report states that plaintiffs may not plead "mail or wire fraud . . . as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud."  H.R. Conf. Rep. No. 104–369, at 47.  That is what Plaintiff attempts here.  Plaintiff's allegations of "money laundering," "wire fraud," and coded trading activity all derive from securities transactions.  Because the conduct alleged as RICO predicates consists of securities transfers, securities trades, and account statements describing those securities transactions, it is

12

conduct that "would have been actionable as fraud in the purchase or sale of securities." 18 U.S.C. § 1964(c). Plaintiff therefore may not rely on that conduct to undergird a civil RICO claim. *See MLSMK*, 651 F.3d at 279; *see also Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999) ("[A] plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud.").

As the Second Circuit has made clear, a plaintiff may not evade the PSLRA bar by recasting conduct undertaken to sustain a securities fraud scheme as independent racketeering activity. *See MLSMK*, 651 F.3d at 277 n.1 ("Conduct undertaken to keep a securities fraud Ponzi scheme alive is [necessarily] conduct undertaken in connection with the purchase and sale of securities."). Plaintiff's civil RICO claims against the Morgan Stanley Defendants cannot proceed. Counts I and II are therefore dismissed with prejudice.

## B. Plaintiff's Remaining State Law Claims Are Time-Barred

Before turning to Plaintiff's state-law claims, the Court addresses its jurisdiction over them. The Court has original jurisdiction over Plaintiff's federal RICO claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c), and supplemental jurisdiction over the related state-law claims under 28 U.S.C. § 1367(a). Although dismissal of the federal claims would permit the Court to decline supplemental jurisdiction, *see* 28 U.S.C. § 1367(c)(3), the relevant considerations – judicial economy, convenience, fairness, and comity – favor retaining jurisdiction. *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56–57 (2d Cir. 2004). The issues are fully briefed, and the governing state law is straightforward. Resolving the remaining claims now therefore promotes efficiency and avoids unnecessary duplication of judicial and party resources.

The Court also notes that diversity jurisdiction is not available as an independent basis for jurisdiction over the remaining claims.  Although the complaint alleges damages exceeding the $75,000 amount-in-controversy requirement, it does not adequately plead complete diversity of citizenship.  Diversity of citizenship must "be distinctly and positively averred in the pleadings." *Wolfe v. Hartford Life & Annuity Ins. Co.*, 148 U.S. 389, 389 (1893).  Plaintiff alleges only that he "resides" in Texas, which is insufficient to establish citizenship for purposes of 28 U.S.C. § 1332. *See, e.g.*, *Leveraged Leasing Admin. Corp. v. PacifiCorp Cap., Inc.*, 87 F.3d 44, 47 (2d Cir. 1996). In addition, two of the Morgan Stanley Defendants – Morgan Stanley & Co. LLC and Morgan Stanley Smith Barney LLC – are limited liability companies, whose citizenship depends on the citizenship of each of their members.  *See Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51–52 (2d Cir. 2000).  The complaint does not plead the citizenship of those members. Accordingly, the Court does not rely on diversity jurisdiction.

All of Plaintiff's state-law claims arise from alleged conduct that occurred between 1998 and 2004 – more than two decades before he filed this action in May 2024.  By Plaintiff's own pleading, the alleged misconduct was reflected (at least in part) in contemporaneous account statements and journal entries that he received, and in the extraordinary trading activity he alleges was executed through his managed accounts.  Even accepting Plaintiff's premise that the alleged scheme was sophisticated and that he delegated day-to-day oversight to Morgan Stanley, for statute of limitations purposes, the relevant inquiry is whether he possessed "knowledge of facts from which fraud could reasonably be inferred."  *Vilsack v. Meyer*, 946 N.Y.S.2d 595, 597 (2012) (citation omitted).  The allegations in the complaint establish that he did.

### 1.    Fraud (Counts 3 & 4)

Fraud claims are governed by CPLR 213(8), which requires commencement within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." Plaintiff cannot satisfy either prong.

First, the six-year period expired long ago. The fraud theories Plaintiff pleads are tied to alleged misstatements and omissions in journal entries and brokerage account statements concerning Intermedia "deliveries" and Netpliance/TippingPoint transactions, and to alleged oral explanations given during and shortly after the downturn resulting from the dot-com bubble. Those alleged events all occurred, at the latest, by July 2004. Any fraud claim accruing in that period is untimely under the six-year accrual rule.

Second, Plaintiff cannot avail himself of CPLR 213(8)'s two-year discovery rule. That rule required Plaintiff to file suit within two years of the date he discovered the alleged fraud, or could with reasonable diligence have discovered it. Because Plaintiff filed this action on May 17, 2024, he must plausibly allege that the fraud was not, and could not reasonably have been, discovered before May 17, 2022. He does not do so.

Plaintiff's own timeline confirms that the relevant information was available to him at the time the transactions occurred. Plaintiff alleges that he received account statements containing the challenged journal entries during the period from 1998 through 2004 and that those statements described anomalous transactions in Intermedia, Netpliance, and TippingPoint stock. Dkt. No. 1, Compl., ¶ 480. Although Plaintiff alleges that the "false and misleading" nature of the entries lay in what they did not disclose – namely, the "true nature" and purported purpose of the transactions – CPLR 213(8) does not require that a plaintiff already know the "true nature" of the

scheme. The question is whether the plaintiff had enough information that, with reasonable diligence, would have led him to discover that a fraud was being perpetrated against him. Here, Plaintiff pleads precisely the sort of "storm warnings" that trigger inquiry notice – including journal entries reflecting "DELIVER[ED]" Intermedia shares (i.e., transfers out of the account), alleged unexplained transfers in and out of managed accounts, and (by Plaintiff's own account) an extraordinary volume of securities trading flowing through the accounts over several years.

Plaintiff's own allegations about the Intermedia "DELIVER" entries illustrate the point. Plaintiff pleads that, "From June 30, 1998, through June 30, 1999, Morgan Stanley purportedly sold all of Plaintiff's restricted Intermedia stock," and that by the time Morgan Stanley supposedly sold the shares, "Plaintiff's account had lost $21 million in value." Dkt. No. 1, Compl., ¶ 142. He further pleads that Morgan Stanley's personnel told him the losses were "bad luck" and that the "hedging strategy had failed to mitigate most of the loss," which he alleges was "plausible to Plaintiff." *Id.*, ¶ 143. But Plaintiff simultaneously alleges that his account records from that same period contained opaque "DELIVER" journal entries reflecting large transfers of Intermedia stock out of his account without destination information – precisely the type of account-record anomaly that places a reasonably diligent investor on notice that further inquiry is required.

In Plaintiff's words, certain entries "appeared to have been manually generated and lacking the minimal information required to determine the state of the general ledger before and after certain transactions." *Id.*, ¶ 152. Plaintiff alleges that one such entry identified "-150,000 shares of restricted Intermedia stock, signifying that the stock exited Plaintiff's account," yet the entry contained "no account number, name, or reason," and provided "no indication of where the stock went or why it went there." *Id.*, ¶¶ 156–57. Plaintiff further alleges that, from June 1998 to June 1999, his account records "include many 'DELIVER' journal entries associated with Plaintiff's

16

Intermedia stock with no information about where the stock was transferred." *Id.*, ¶ 161.  And Plaintiff pleads that these undisclosed "DELIVER" entries reflected transfers of substantial value – *e.g.*, "34,000 and 57,200 shares of Intermedia stock, valued at $845,750 and $1,422,850," an "adjustment" of 122,400 shares "valued at $3,044,700," and an entry marking "150,000 of Intermedia shares" as "DELIVER" and removing them from his account "worth $3,909,375." *Id.*, ¶¶ 164–69.  In total, Plaintiff alleges that these opaque "manual journal entries resulted in $20,499,677 of money transferred out of Plaintiff's Morgan Stanley accounts to an unknown destination," and that "[e]ach journal entry omitted necessary information about the transaction— most critically, the destination account where the Intermedia shares were delivered." *Id.*, ¶¶ 172– 73.

But these are not allegations of a fully hidden loss discoverable only by a  forensic review that did not begin until 2021 or conclude until 2024.  They are allegations that the account documentation available to Plaintiff in 1999 reflected repeated high-dollar "DELIVER" entries removing securities from Plaintiff's account to the tune of millions of dollars without the most basic identifying information.  These allegations describe the sort of "storm warnings" that would have prompted a reasonable investor to inquire further.  Plaintiff could have – and should have – retained forensic accountants two decades before he actually did so.

On Plaintiff's own allegations, the managed and fiduciary nature of the relationship does not eliminate the duty of inquiry.  *Farr v. Shearson Lehman Hutton, Inc.*, 755 F. Supp. 1219, 1227 (S.D.N.Y. 1991) ("[T]he existence of a fiduciary relationship does not relieve a plaintiff of his obligation to make an inquiry where there is reason to suspect the probability of wrongdoing.").  Plaintiff's fiduciary relationship with Morgan Stanley underscores why omissions in the account records mattered and why a reasonably diligent customer would have sought clarification once

17

confronted with repeated, high-dollar entries that lacked an "account number, name, or reason." *Id.*, ¶ 157. Delegation may explain why Plaintiff did not monitor day-to-day trading minutiae, but it does not excuse ignoring numerous journal entries reflecting the removal of hundreds of thousands of shares and tens of millions of dollars in value with no basic identifying information at all. These were the sort of "knowledge of facts from which [the fraud] could be reasonably inferred" that triggered Plaintiff's obligation to investigate long before 2024. *See Vilsack*, 946 N.Y.S.2d at 597.

Plaintiff's assertion that the entries were "sprinkled inconspicuously" among technical terms, *id.*, ¶ 174, or that a "supposed hedge strategy" created an "illusion," *id.*, ¶¶ 176, 180, and so prevented discovery, does not eliminate the duty of inquiry. A plaintiff need not "have notice of the entire fraud being perpetrated to be on inquiry notice." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008). Instead, the question is whether, under the totality-of-the-circumstances, the available facts were sufficient such that, with reasonable diligence, discovery would have followed. *See id.*; *cf. Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993) ("A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud."), *cert. denied*, 511 U.S. 1019 (1994). The doctrine of inquiry notice exists precisely to prevent the "leisurely discovery of the full details of the alleged scheme" once warning signs of the kind alleged here appear. *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir. 1970).

Under Second Circuit law, once "storm warnings" trigger a duty to investigate, knowledge of the fraud is imputed if the plaintiff fails to pursue a reasonably diligent inquiry. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361–62 (2d Cir. 2013); *Koch v. Christie's Int'l PLC*, 699 F.3d 141,

18

153, 155 (2d Cir. 2012). When a plaintiff "makes no inquiry once the duty to inquire arises, knowledge will be imputed as of the date the duty arose." *Cohen*, 711 F.3d at 361–62 (citation modified). Conversely, "if some inquiry is made, the court will impute knowledge of what a plaintiff in the exercise of reasonable diligence should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud." *Id.* at 362 (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir. 2005)).

Applied here, Plaintiff's own pleadings establish inquiry notice – and thus a duty to investigate – several years before Plaintiff undertook that investigation. Plaintiff alleges that, beginning no later than 1999, he received account records reflecting repeated "DELIVER" journal entries removing substantial quantities of Intermedia stock from his account while omitting, in his words, "no account number, name, or reason," and providing "no indication of where the stock went or why it went there." Dkt. No. 1, Compl., ¶¶ 156–57; *see also id.*, ¶¶ 161–73. These are the sort of concrete anomalies in account documentation that "suggest to a person of ordinary intelligence the probability that he has been defrauded," thereby triggering a duty of inquiry. *See Gutkin v. Siegal*, 926 N.Y.S.2d 485, 486 (2011). Once that duty arose, Plaintiff was required to pursue a reasonably diligent investigation. *Cohen*, 711 F.3d at 362. Instead, he alleges that he retained forensic accountants and investigators only in 2021 – more than two decades after the account records he identifies as suspicious were first made available to him. Under *Cohen*, a plaintiff cannot avoid the timeliness consequences of inquiry notice by alleging that no such investigation was undertaken.

Therefore, knowledge of the alleged fraud is imputed to Plaintiff as of 1999, when the duty to inquire arose.

Plaintiff's Netpliance/TippingPoint allegations reinforce the same conclusion. Plaintiff pleads that, from May 2000 through July 2004, Morgan Stanley entered journal entries on his account statements reflecting purported purchases and sales of Netpliance and later TippingPoint securities. Dkt. No. 1, Compl., ¶ 527. According to Plaintiff, however, these entries were misleading because the transactions were not genuine securities trades but "direct transfers of funds to colluding counterparties." *Id.*, ¶ 526. Yet the account statements themselves allegedly reflected the very transactions Plaintiff now challenges, including wire transfers and securities movements that, by Plaintiff's own description, lacked basic identifying information.

For example, Plaintiff alleges that his statements reflected wire transfers to Netpliance totaling $1,091,094 but that the corresponding journal entries "lacked information about who had authorized the transfers," omitted "the purpose of the transfers," and did not include "destination account numbers." *Id.*, ¶ 528. Plaintiff likewise alleges that his statements recorded a same-day transfer of TippingPoint stock into and out of his account on July 27, 2004, yet the entries "failed to disclose the purpose of the transactions or the source or destination of the transfers." *Id.*, ¶ 529. In Plaintiff's own telling, the account documentation he received contained suspicious transaction entries involving substantial sums that allegedly omitted the most basic information about authorization, purpose, or destination.

These alleged omissions are the sort of "storm warnings" that trigger a duty of inquiry. CPLR 213(8) does not require a plaintiff to have already uncovered the "true nature" of an alleged scheme; it asks whether the information available would have prompted a reasonably diligent person to investigate. *See Staehr*, 547 F.3d at 427. By Plaintiff's own allegations, the account statements he received reflected wire transfers exceeding $1 million and same-day securities movements lacking authorization, purpose, or destination information. A reasonably diligent

investor confronted with these anomalies would have sought clarification and investigated long before 2021. Had Plaintiff undertaken a reasonably diligent inquiry at the time – by, for example, demanding clarification about the destination, authorization, and purpose of the "DELIVER" entries and the later wire transfers and same-day securities movements – he would have been positioned to discover "what [a plaintiff] in the exercise of reasonable diligence should have discovered concerning the fraud." *See Cohen*, 711 F.3d at 362.

Pointing to the alleged sophistication of "order-book signaling" and coded trade sizes does not alter this conclusion. Even accepting Plaintiff's theory that Morgan Stanley embedded signals in order sizes, the supposed scheme still manifested in the account statements themselves through the very transactions Plaintiff now describes – wire transfers and securities movements lacking basic identifying information. The discovery rule does not permit a plaintiff to delay suit until every alleged mechanism of concealment has been decoded. Once such warning signs appear, the duty of inquiry arises. *See Klein*, 421 F.2d at 343.

In sum, Plaintiff's own allegations concerning both the Intermedia "DELIVER" entries underlying Count 3 and the Netpliance/TippingPoint transactions underlying Count 4 establish inquiry notice no later than 1999 as to Count 3 and no later than 2004 as to Count 4, both well before this action was filed in 2024. Accordingly, Plaintiff cannot plausibly invoke CPLR 213(8)'s two-year discovery rule to resuscitate fraud claims filed long after the challenged statements and transactions occurred. *See Koch*, 699 F.3d at 155–56 (holding that dismissal under CPLR 213(8)'s two-year discovery rule is proper "when the alleged facts do establish that a duty of inquiry existed and that an inquiry was not pursued.").

Plaintiff's fraud claims are therefore barred by CPLR 213(8), and Counts 3 and 4 are dismissed with prejudice as time-barred.

### 2.    Breach of Fiduciary Duty (Count 5)

Where (as here) the fiduciary-duty claim is pleaded as fraud-based and seeks fraud-type relief, Plaintiff invokes CPLR 213(8) and its discovery rule.

New York law "does not provide any single limitations period for breach of fiduciary duty claims;" the applicable period depends on the substantive relief sought. *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 164 (1st Dep't 2003).  When the relief sought is equitable in nature, a six-year limitations period applies.  *Id.*  Where, however, a plaintiff seeks only money damages – as is the case here – courts treat the claim as one for "injury to property," and apply a three-year statute of limitations.  *Id.*; *Universitas Educ., LLC v. T.D. Bank*, 2015 WL 9304551, at 3 (S.D.N.Y. Dec. 21, 2015).

Under either limitations period – three years or six years – Plaintiff's claim is untimely for the same reasons previously discussed.  The alleged breaches track the same account transfers, securities transactions, and allegedly misleading account statements that underpin Counts 3 and 4, and Plaintiff pleads that these were reflected in the account documentation and trading activity from 1998 to 2004.  Thus, even assuming the longer six-year period, the latest alleged breaches occurred by 2004 – nearly twenty years before Plaintiff commenced this action in May 2024.  And if the three-year period applies (as it generally does where only money damages are sought), the claim is even more plainly time-barred.

In short, Plaintiff cannot extend timeliness by re-labeling the same nucleus of alleged conduct as "breach of fiduciary duty."  If the underlying facts were sufficient to trigger inquiry as to the fraud-based misconduct, they were likewise sufficient to trigger inquiry as to the alleged fiduciary breaches Plaintiff pleads.

Accordingly, Count 5 is dismissed as time-barred.

### 3.    Conversion (Count 6)

Conversion is governed by CPLR 214(3), which requires that an action for the "taking or detaining" property be "commenced within three years."

It is well established that the discovery rule applicable to fraud claims does not apply to conversion claims. Therefore, the statute of limitations runs from the date of the actual conversion "and not from discovery or the exercise of diligence to discover" the alleged fraud. *Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso, Tex.*, 87 N.Y.2d 36, 44 (1995). On Plaintiff's own theory, the converted property consisted of Intermedia shares and funds allegedly moved via Netpliance/TippingPoint transactions, and the operative acts occurred from 1998 to 2004. Because this suit was not commenced until 2024, the three-year limitations period bars Plaintiff's conversion claim, rendering it untimely by roughly two decades.

Accordingly, Count 6 is dismissed as time-barred.

### 4.    Unjust Enrichment (Count 7)

Plaintiff pleads unjust enrichment as a backstop for the same alleged misconduct. New York courts apply either a three-year or six-year limitations period to unjust enrichment depending on the substantive "gravamen" of the claim. *See City of Almaty v. Sater*, 503 F. Supp. 3d 51, 64–66 (S.D.N.Y. 2020) (applying a three-year limitation where the gravamen of the unjust enrichment claim arose from the alleged conversion). But even assuming, as Plaintiff would urge, that the longer six-year limitations period applies, the claim is untimely. The claim accrued when the alleged enrichment occurred – *i.e.*, when Plaintiff alleges his property was wrongfully transferred, traded, or diverted through the managed accounts from 1998 to 2004. On that theory, an unjust enrichment claim filed in 2024 is likewise untimely.

### 5.    Equitable Tolling Does Not Apply

Plaintiff attempts to avoid the statute of limitations by invoking equitable tolling or equitable estoppel based on alleged fraudulent concealment.  That argument fails.

Equitable estoppel is an "extraordinary remedy," *MRE Tech. Sols. LLC v. Smiths Detection, Inc.*, 187 N.Y.S.3d 633, 635 (2023), that is to be "invoked sparingly and only under exceptional circumstances," *Gross v. N.Y.C. Health & Hosps. Corp.*, 505 N.Y.S.2d 678, 679 (2d Dep't 1986). Under New York law, equitable tolling applies only when a plaintiff was "induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Doe v. Holy See (State of Vatican City)*, 793 N.Y.S.2d 565 (3d Dep't 2005) (internal quotation marks omitted).  However, "Due diligence on the part of the plaintiff in bringing [an] action is an essential element" of such relief, and the plaintiff bears the burden of demonstrating that the action was commenced within a reasonable time after the circumstances giving rise to the estoppel ceased to operate. *Id.* at 569.

Plaintiff's own pleadings foreclose any such showing.  As explained above, Plaintiff alleges that the account records he received beginning in 1998 and 1999 contained repeated "DELIVER" journal entries removing substantial quantities of Intermedia stock from his account without destination information, resulting in transfers of tens of millions of dollars in value.  These irregularities triggered inquiry notice and a duty to investigate.  When the facts already available to a plaintiff are sufficient to trigger inquiry notice, a defendant's alleged omissions cannot constitute the type of "concealment" required for equitable tolling. *See Tenamee v. Schmukler*, 438 F. Supp. 2d 438, 445 (S.D.N.Y. 2006); *see also Jordan v. Ford Motor Co.*, 426 N.Y.S.2d 359, 361 (1980).

Nor does Plaintiff plausibly allege diligence.  Plaintiff identifies no steps taken to investigate the anomalies reflected in his account records when they occurred, and instead alleges

that he waited roughly two decades – until a forensic review undertaken in 2021– to pursue the claims asserted here.  Plaintiff, for his part, offers no explanation for what prompted him to begin investigating the matter in 2021 or why such an inquiry could not have been undertaken years earlier.  Under New York law, that lack of diligence independently defeats reliance on equitable tolling or equitable estoppel.  *See Holy See*, 793 N.Y.S.2d at 569.

Plaintiff's theory of concealment fails for an additional reason.  Under New York law, the same alleged nondisclosure cannot serve both as the basis for the underlying claim and as the act of concealment supporting equitable estoppel.  *See Kaufman v. Cohen*, 760 N.Y.S.2d 157, 167 (1st Dep't 2003) ("[E]quitable estoppel does not apply where the misrepresentation or act of concealment underlying the estoppel claim is the same act which forms the basis of plaintiff's underlying cause of action.")  Rather, equitable estoppel applies only where a defendant engages in subsequent conduct that conceals an earlier wrong and thereby prevents the plaintiff from bringing suit.  *See Smith v. Smith*, 830 F.2d 11, 13 (2d Cir. 1987).  Here, the supposed "concealment" consists of the same alleged omissions and misleading account entries that form the basis of Plaintiff's substantive claims.  Those allegations therefore cannot simultaneously support equitable estoppel as a matter of New York law.  *See Tenamee*, 438 F. Supp. at 445.  Because Plaintiff alleges no subsequent acts of concealment that prevented him from timely bringing suit – and because his own pleadings establish inquiry notice decades before this action was filed – equitable tolling or equitable estoppel does not apply.

Because Plaintiff cannot rely on equitable tolling or equitable estoppel to revive claims that were already stale decades before this action was filed, his state-law claims for breach of fiduciary duty, conversion, and unjust enrichment – like his fraud claims – are time-barred.

### C.  Leave to Amend is Denied

A "bare request to amend a pleading contained in a brief, which does not also attach the proposed amended pleading, is improper under Rule 15." *Oden v. Boston Sci. Corp.*, 330 F. Supp. 3d 877, 904 n.4 (E.D.N.Y. 2018).  Courts in this Circuit routinely deny leave to amend where a plaintiff requests it only in a cursory sentence in an opposition brief without explaining how amendment would cure the complaint's deficiencies.  *See, e.g., City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014).

Plaintiff does exactly that here.  He requests leave to amend in a single sentence at the end of his opposition brief, stating that if the Court grants Defendants' motion, he "respectfully requests leave to amend, including because discovery may reveal additional facts that would cure any defect."  Dkt. No. 191, at 31.  Plaintiff does not explain what facts discovery could uncover that would salvage claims premised on transactions and account activity that, on the face of the pleadings, occurred between 1998 and 2004 – nor could discovery alter the legal consequences of Plaintiff's pleaded dates for purposes of the applicable statutes of limitations.

What is more, discovery does not precede the obligation to plead a plausible claim. Because Plaintiff's claims are time-barred on the allegations he has chosen to plead, discovery cannot "reveal" facts that reset accrual or cure Plaintiff's lack of diligence for purposes of tolling. And when a plaintiff "does not advise the district court how the complaint's defects would be cured," denial of leave to amend is not an abuse of the court's discretion.  *Altayyar v. Etsy, Inc.*, 731 F. App'x 35, 38 n.4 (2d Cir. 2018) (citation omitted).

Moreover, Plaintiff has not shown that amendment would be anything other than futile. Leave to amend may properly be denied where the defects in the complaint are substantive rather than merely the product of inartful pleading.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (denying leave where the problem with the claim was "substantive" and "better pleading

26

will not cure it"). Here, the Court's dismissal rests on fundamental legal barriers – including the expiration of the applicable statutes of limitations – that cannot be remedied through additional factual allegations. *See Grace v. Rosenstock*, 228 F.3d 40, 53 (2d Cir. 2000) (holding that leave to amend is futile when "the claims the plaintiff [seeks] to add would be barred by the applicable statute of limitations."). Under these circumstances, granting leave to amend would merely invite another round of futile pleading. Plaintiff's request for leave to amend is DENIED.

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED, and the complaint is dismissed with prejudice and without leave to amend.

The Clerk of Court is directed to terminate the motion pending at Docket Number 189, enter judgment in favor of the Morgan Stanley Defendants, and to close this case.

This constitutes the decision and order of the Court. It is a written decision.

Dated: March 6, 2026

U.S.D.J.

BY ECF TO ALL COUNSEL

27